## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

LETICIA RUDOLPH,

      Plaintiff,

v.
                                    CASE NO: 1:17-cv-125
                                    HON. JANET T. NEFF

DANIEL T. BABINEC, ROBERT A. ATKINSON,
in their individual and official capacities,
and the TOWNSHIP OF FRUITPORT,

      Defendants.

| CHRISTOPHER TRAINOR & ASSOCIATES | MCGRAW MORRIS, P.C. |
|---|---|
| CHRISTOPHER J. TRAINOR (P42449) | G. GUS MORRIS (P32960) |
| AMY J. DEROUIN (P70514) | CHRISTOPHER J. RAITI (P68600) |
| Attorneys for Plaintiff | Attorneys for Defendants |
| 9750 Highland Road | 2075 W. Big Beaver Road, Ste. 750 |
| White Lake, MI 48386 | Troy, MI 48084 |
| (248) 886-8650 / (248) 698-3321-fax | (248) 502-4000 / (248) 502-4001-fax |
| amy.derouin@cjtrainor.com | gmorris@mcgrawmorris.com |
| | craiti@mcgrawmorris.com |

**PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

      **NOW COMES** Plaintiff, **LETICIA RUDOLPH**, by and through her attorneys, CHRISTOPHER TRAINOR & ASSOCIATES, and for her *Response to Defendants' Motion for Summary Judgment* states the following:

      Plaintiff hereby denies each and every allegation contained in Defendants' Motion for the reasons stated in the accompanying brief and leaves Defendants to their strict proofs.

**WHEREFORE**, in light of the arguments, case law, and underlying evidence presented herein, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion in its entirety.  Moreover, Plaintiff respectfully requests that this Honorable Court grant Summary Judgment in her favor pursuant to Federal Rule of Civil Procedure 56 based upon the overwhelming evidence and case law presented below supporting that neither Defendant Atkinson nor Babinec had any probable cause to seize Plaintiff and their force used against her was unreasonable based upon the totality of the circumstances.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES

/s/Amy J. DeRouin
CHRISTOPHER J. TRAINOR (P42449)
AMY J. DEROUIN (P70514)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
amy.derouin@cjtrainor.com

Dated: April 17, 2018
*AJD/mms*

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

LETICIA RUDOLPH,

      Plaintiff,

v.                                                                        CASE NO: 1:17-cv-125
                                                                          HON. JANET T. NEFF

DANIEL T. BABINEC, ROBERT A. ATKINSON,
in their individual and official capacities,
and the TOWNSHIP OF FRUITPORT,

      Defendants.

| | |
|---|---|
| CHRISTOPHER TRAINOR & ASSOCIATES<br>CHRISTOPHER J. TRAINOR (P42449)<br>AMY J. DEROUIN (P70514)<br>Attorneys for Plaintiff<br>9750 Highland Road<br>White Lake, MI  48386<br>(248) 886-8650 / (248) 698-3321-fax<br>Amy.derouin@cjtrainor.com | MCGRAW MORRIS, P.C.<br>G. GUS MORRIS (P32960)<br>CHRISTOPHER J. RAITI (P68600)<br>Attorneys for Defendants<br>2075 W. Big Beaver Road, Ste. 750<br>Troy, MI 48084<br>(248) 502-4000 / (248) 502-4001-fax<br>gmorris@mcgrawmorris.com<br>craiti@mcgrawmorris.com |

## BREIF IN SUPPORT OF PLAINTIFF'S AMENDED RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## ORAL ARGUMENT REQUESTED

# <u>TABLE OF CONTENTS</u>

Table of Authority…………………………..……………………………………......v

Statement of Issues Presented……………………………………………………...…vii

I.    Overview……………………………………..……………………………..……1

II.   Counterstatement of Material Facts……………………………………..…...…1

III.  Corroborating Facts………………………………………………………...…5

IV.   Legal Argument……………………………………………….......................8

     A.  Standard of Review…………………………………………...……......…8

     B.  Defendant Atkinson Is Not Entitled to Summary Judgment
        When He Violated Plaintiff's *Fourth* Amendment Rights
        By Failing to Intervene...........................................................................9

     C.  Defendants Atkinson and Babinec are Not Entitled to Qualified Immunity
        When They Violated Plaintiff's Clearly Established *Fourth* Amendment
        Rights………………………………………………………….....................…11

     D.  Ms. Rudolph Has a Viable *Monell* Claim Against Defendant Township of
        Fruitport…………………………………………………………………24

     E.  Ms. Rudolph Has a Viable False Arrest State Law Claim Against Defendants...24

V.    Conclusion………………………………………………………………..…25

## TABLE OF AUTHORITY

*Baker v. City of Hamilton, Ohio*, 471 F. 3d 601, 607-608 (6th Cir. 2006)……………….………20

*Baynes v. Cleland,* 799 F.3d 600, 608 (6th Cir. 2015)……………………………………………21

*Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005)………………………….…11

*Bolan v. City of Keego Harbor,* No. Civ. 01-74467, 2002 U.S. Dist. LEXIS 21975 at *4 (E.D. Mich. October 24, 2002)……………………………………………………………………18

*Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982)………………………………….........9

*Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002)……………………………………………..18

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)……………………………………..……8

*Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006)……………………………………12

*City of Canton v. Harris*, 489 U.S. 378 (1989)……………………………………………22-23

*County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S. Ct. 1708 (1998)……………………12

*Crockett v. Cumberland College,* 316 F.3d 571, 581 (6th Cir. 2003)…………………………...12

*Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002)………………………………………23

*Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)……………………………………………...16

*Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005)…………………………………………..12-14

*Florida v. Bostick*, 111 S. Ct. 2382 (1991)……………………………………………………11

*Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. Mich. 2008)………………………………9

*Graham v. Connor*, 490 U.S. 386, 395; 109 S. Ct. 1865 (1989)……………………..…..11, 16-17

*Griffith v. Coburn,* 473 F.3d 650, 659 (6th Cir. 2007)……………………………………………...19

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)……………………………………………..10

*Harris v. City of Circleville,* 583 F.3d 356, 376 (6th Cir. 2009)…………………………………20

*Holmes v. City of Massillon,* 78 F.3d 1041, 1048 (6th Cir. 1996)………………………………21

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002)……………………………………………………10

*Ingram v. City of Columbus,* 185 F.3d 579, 597 (6th Cir. 1999)………………………………...21

*Johnson v. Jones*, 515 U.S. 304 (1995)…………………………………………………………11

*Jones v. Garcia*, 345 Fed. Appx. 987, 989 (6th Cir. 2009)………………………………………19

*Kammeyer v. City of Sharonville*, 2006 U.S. Dist. LEXIS 24058, 33-34 (SD Ohio, 2006)……………………………………………………....……23

*Lewis v. Farmer Jack, Inc*, 415 Mich. 212, 218 (1982)……………………………………………24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-588 (1986)……………..8

*McKenna v. Edgell*, 617 F.3d 432, 440 (6th Cir. 2010)…………………………………………12

*Meirthew v. Amore*, 417 Fed. Appx. 494, 499 (6th Cir. 2011)…………………………………..19

*Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir. 1997)………………………………12, 14-16

*Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690-691 (1978)……22

*Morrison v. Bd. Of Trs. Of Green Twp.*, 583 F.3d 394, 404 (6th Cir. 2009)……………..…20-21

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009)…………………………………………………11

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986)………………………………………22

*Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995)……………………………………………12

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)………………………………………………………10

*Scott v. Harris*, 127 S. Ct. 1769, 1776, (2007)…………………………………………………12

*Smoak v. Hall*, 460 F.3d 786, 783-784 (6th Cir. 2006)………………………………………..9, 19

*Terry v. Ohio*, 392 U.S. 1, 19, n.16, 88 S. Ct. 1868 (1968)……………………………………...12

*Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014)…………………………………………………10

*Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)………………………………………………9

*United States v. Campbell*, 486 F.3d 949, 956 (6th Cir. 2007)…………………………………..11

*Walsh v. Taylor*, 263 Mich. App 618; 689 N.W.2d 506, 513 (2004)……………………………24

*Wilson v. Morgan,* 477 F.3d 326, 334 (6th Cir. 2007)…………………………………………..12

*Ziegler v. Aukerman*, 512 F. 3d 777 (6th Cir. 2008)………………………….………..15-16

## <u>QUESTIONS PRESENTED</u>

1. Whether Defendant Atkinson is entitled to Summary Judgment When He Failed To Intervene to Stop and/or Prevent the Unreasonable Force Used Against Plaintiff by Defendant Babinec?

   **Plaintiff Answers: YES**
   Defendants Answer: No

2. Whether Defendants Atkinson and Babinec are Entitled to Qualified Immunity When They Violated Plaintiff's Clearly Established *Fourth* Amendment Rights?

   **Plaintiff Answers: YES**
   Defendants Answer: No

3. Whether Defendant Township of Fruitport is liable under *Monell* for its failure to train and supervise its police officers?

   **Plaintiff Answers: YES**
   Defendants Answer: No

4. Whether there is a Genuine Issue of Material Fact Regarding Plaintiff's Claim of False Arrest/False Imprisonment?

   **Plaintiff Answers: YES**
   Defendants Answer: No

I.   **OVERVIEW:**

This civil rights case involves the unlawful seizure of a compliant, coherent, and unarmed Plaintiff who was awakened in the middle of the night and despite exhibiting no signs of being suicidal, was slammed up against a wall, handcuffed, yanked from her home, and dragged to the police vehicle to be transported, against her will, to the hospital for a medical evaluation.  After being detained for approximately 30 minutes with unduly tight handcuffs, Ms. Rudolph was taken to the hospital only to be informed that she was an extremely low risk of self-harm and subsequently released.  As a result of Defendants' unlawful actions, Ms. Rudolph not only sustained injuries to her wrists, hands, and arms, but she also received a significant right ankle injury requiring her to undergo two surgeries.  Accordingly, and in light of the arguments, case law, and evidence set forth herein, Plaintiff respectfully requests that this Honorable Court deny Defendants' Summary Judgment Motion in its entirety.

II.   **COUNTERSTATEMENT OF MATERIAL FACTS:**

In the early morning hours of March 15, 2015, Plaintiff Leticia Rudolph ("Ms. Rudolph") had just hung-up the phone from talking with her son, Loghan (who lives in California), when her ex-husband, Kyle Rudolph, knocked on her door.  **(See Plaintiff's deposition testimony attached as Exhibit A, pp. 17-22, 26).**  Ms. Rudolph did not ask him to come to her house, but Loghan did because he worries about her every day.  **(Ex. A, pp. 17-19, 21).**  Mr. and Ms. Rudolph calmly spoke for approximately an hour to an hour-and-a-half about their relationship and their daughters.  **(Ex. A, pp. 22-23).**  During their conversation, Mr. Rudolph noticed that Ms. Rudolph had out her registered pistol (because she was cleaning it that day) and sleeps with it every night in order to feel safe; especially given the fact that she is a single mother.  **(Ex. A, pp. 24-25).**  Even though at no time during their conversation did Ms. Rudolph express that she was going to harm herself or

1

that she was suicidal and despite her objections, Mr. Rudolph took her gun and left her home.  **(Ex. A, pp. 25-31; See Kyle Rudolph's deposition testimony attached as Exhibit B, pp. 42-42).** Notably, Mr. Rudolph admitted that Ms. Rudolph never told him that she was suicidal.  **(Ex. B, pp. 42-43).** Ms. Rudolph allowed Mr. Rudolph to take her gun without incident, and she subsequently fell asleep.  **(Ex. A, p. 28).**

After some time had passed, Ms. Rudolph was awakened by a phone call from Mr. Rudolph telling her that the police were outside her house and to open the door.  **(Ex. A, p. 28).** Understandably confused, Ms. Rudolph asked why the police were at her house in which Mr. Rudolph responded that he had been stopped by the police on his way home and they were coming over to check on her.  **(Ex. A, p. 28).** Specifically, Mr. Rudolph had been stopped by Officer Hodges, a police officer for Fruitport Township Police Department, for speeding. Defendant Babinec was also present at the traffic stop.  **(See Defendant Babinec's deposition testimony attached as Exhibit D, p. 33).** During the traffic stop, Mr. Rudolph explained that he had Ms. Rudolph's gun in his car and gave it to Officer Hodges.  Notably, at no time during this stop does Mr. Rudolph recall telling any officer, including Defendant Babinec, that Ms. Rudolph was suicidal.  **(Ex. B, p. 47).** Mr. Rudolph was not issued any ticket and was allowed to leave.  **(Ex. B, pp. 45-46, 48).** When Mr. Rudolph pulled into his driveway, Officer Hodges pulled up behind him and told him that he needed to use his phone to contact Ms. Rudolph in which Mr. Rudolph thought Officer Hodge's behavior was odd and abnormal.  **(Ex. B, p. 49).**

Subsequently, and without any good reason or legitimate basis, Defendants Atkinson and Babinec headed over to Ms. Rudolph's residence and began to knock on her doors and windows. **(Ex. D, p. 45).**  After waking Ms. Rudolph from a sound sleep, she opened the door in which Defendants Atkinson and Babinec immediately entered (without her permission) into the laundry

room, and told her that they had pulled over her ex-husband and were there to check on her.  **(Ex. A, p. 33; See Defendant Atkinson's deposition testimony attached as Exhibit C, pp. 13-14; Ex. D, pp. 52-53).** Defendants subsequently asked Ms. Rudolph for her name and if Kyle Rudolph was her ex-husband; Ms. Rudolph was compliant and answered their questions.  **(Ex. A, p. 34).** Defendants continued to ask Ms. Rudolph a series of questions including whether she felt suicidal; to which Ms. Rudolph expressly stated to both of them that she did not. **(Ex. A, pp. 35-36, 39).** Ms. Rudolph also told them that the gun that Mr. Rudolph had during the stop belonged to her and he took it.  **(Ex. A, p. 36).**  Notably, neither Defendant had asked her why Mr. Rudolph ended up with her gun.  **(Ex. A, pp. 36-37).**  Also, it is interesting that Defendant Babinec never inquired if there were any other weapons in Ms. Rudolph's home (which there were not), and he even admitted that it was not important or a concern to him at the time. **(Ex. D, pp. 44, 50).** Furthermore, both Defendants testified that Ms. Rudolph told them that she was not suicidal, but felt fine and was okay.  **(Ex. C, p. 16; Ex. D, p. 52).**  Specifically, Defendant Atkinson testified to the following further evidencing the lack of probable cause to seize Ms. Rudolph:

> Q.    What statements on scene did she make to you that would indicate that she needed to be taken for observation?
>
> A.    I do remember Officer Babinec asking her about the gun, and she— making—made the statement that she was cleaning it.
>
> Q.    Okay.
>
> A.    And given the time of the day—night, excuse me, it seemed a little out of the ordinary.
>
> Q.    Did she indicate when she was cleaning it, whether she was cleaning it during the day that day or in the evening?
>
> A.    No.
>
> Q.    Other than that, any other statements?

A.    Just the odor of intoxicants that I got from her during her statement.

Q.    The odor of intoxicants, could be because she had one or two or three drinks; isn't that true?

***

A.    It could be any number of drinks, yes.

Q.    Okay. Well, what else is there other than statements from Hodges and Babinec? Is there anything that would indicate to you that she needed to be taken away for observation, in your personal knowledge?

A.    Not that I can recall no.  **(Ex. C, pp. 28-29).**

Without any warning or opportunity to turn around and place her arms behind her back, Defendant Babinec grabbed Ms. Rudolph by her arm and threw her forcefully, face-first against the wall in her laundry room and handcuffed her.  **(Ex. A, pp. 41-42; Ex. D, pp. 57-58).**  In response to the pain and while remaining face-first against the wall, Ms. Rudolph told both Defendants that they were hurting her and the cuffs were really tight.  **(Ex. A, pp. 43, 45-46, 112).**  Notably, at no time did either Defendant tell her that she was under arrest or ask her if she wanted to go to the hospital.  **(Ex. A, pp. 43, 60, 112-113).**  Instead, Defendants told Ms. Rudolph that she was going to the hospital even though she did not exhibit any suicidal signs and had told them that she was not suicidal.  **(Ex. A, pp. 43-44, 112; Ex. C, pp. 28-30).**  While ignoring her pleas to loosen the unduly tight handcuffs, Defendants also denied Ms. Rudolph's requests to get her shoes; thereby forcing her to walk outside barefoot.  **(Ex. A, pp. 46-47, 50).**  Defendant Babinec then grabbed Ms. Rudolph by her arms (which were still handcuffed behind her back) and yanked her outside causing her to fall down the cement steps onto her right ankle, while Defendant Atkinson followed close behind.  **(Ex. A, pp. 47, 50-51; Ex. C, p. 19; Ex. D, pp. 68-69).**  Ms. Rudolph repeatedly stated that he was hurting her but Defendant Babinec continued to drag her to the police vehicle, which was approximately 40 feet down a dirt driveway. **(Ex. A, pp. 47-48, 51).**  Ms.

4

Rudolph was forced to hop to the police car due to her right ankle pain.  **(Ex. A, pp. 47-48, 51).**
Ms. Rudolph continued to tell both Defendants that they were hurting her, but they did not do or
say anything.  **(Ex. A, pp. 51-52).**  It was not until after Ms. Rudolph was in the backseat of the
police car that Defendant Atkinson retrieved her shoes and threw them on the floor of the police
car.  **(Ex. A, p. 56).**

Upon arriving at the hospital, Defendants escorted her into the building where she
continued to walk in pain.  **(Ex. A, pp. 58-59).**  While at the hospital, she was questioned by a
doctor if she was suicidal and she again expressly stated that she was not.  **(Ex. A, p. 59).**
Specifically, Ms. Rudolph underwent a psychiatric evaluation by Dr. Tenelshof where it was noted
that "she is at extremely low risk of self-harm as she does not appear to want to harm herself, has
not tried to here and is sober and denies any sort of homicidal or suicidal thought or desire."  **(See
Mercy Health Muskegon records attached as Exhibit F).**  Ms. Rudolph was discharged
approximately 3 hours later—around 6:50 a.m.  **(Ex. A, p. 62).**  Mr. Rudolph picked her up from
the hospital and apologized to her and repeatedly said, "I did not tell them to go to your house."
**(Ex. A, p. 74).**  Due to her right ankle pain not resolving, Ms. Rudolph sought medical treatment
on March 19, 2015 from her primary care physician, Dr. Shelly Williams, where she reported the
subject incident and that her right ankle was injured. **(Ex. A, pp. 78-79).**  Specifically, her right
ankle was swollen, painful, and she was experiencing antalgic gait.  **(Ex. A, p. 80).**  Ms. Rudolph
was subsequently diagnosed with ligament tears in her right ankle where she had two surgeries—
one on September 15, 2015 and the second on April 27, 2017 as a result of the subject incident.
**(See records from MK GR Orthopaedic and Foot and Ankle Surgery attached as Exhibit J;
See records from Spectrum Health attached as Exhibit K).**  Ms. Rudolph also sustained severe
bruising and swelling around both of her wrists and arms due to the unduly tight handcuffs applied

during the subject incident. **(Ex. A, pp. 69-73; see Photographs of injuries attached as Exhibit**

**I).**

## III.     CORROBORATING FACTS:

### A.  PLAINTIFF'S DEPOSITION TESTIMONY (EXHIBIT A):

- When her ex-husband took her gun, he did not think that she was suicidal. **(pp. 29, 31).**
- She was cooperative with Defendants and answered all of their questions. **(p. 34).**
- She was asked by Defendants if she had any issues or felt suicidal and she told them she was not suicidal. **(pp. 36, 39).**
- She was never asked if she wanted to go to the hospital and at no time did she ever agree to go to the hospital. **(pp. 43, 60).**
- She was never given the opportunity to put her hands behind her back and she was never told that she was being arrested at any time. **(pp. 112-113).**
- After the handcuffs were on, she told Defendants that the handcuffs were too tight and that they were hurting her. **(pp. 45-46).**
- Before she was able to get onto the porch step, Defendant Babinec pulled her off the porch and she lost her balance and fell onto her right ankle.  **(pp. 49-50).**
- She never resisted or pulled away from Defendants when she was pushed against the wall. **(p. 62).**
- Her handcuffs were never adjusted when she complained about them being too tight. **(p. 62).**

### B.  KYLE RUDOLPH'S DEPOSITION TESTIMONY (EXHIBIT B):

- He is Ms. Rudolph's ex-husband. **(p. 6)**
- He really just wanted to go home and go to sleep so that is why he took Ms. Rudolph's gun. **(pp. 26-27).**
- Ms. Rudolph was not drinking at all while he was at her home. **(pp. 30, 53).**
- At no time around or on the day of the subject incident did Ms. Rudolph make any statements to him that she was suicidal.  **(pp. 34, 38).**
- While he was talking to Ms. Rudolph, she did not tell him that she wanted to kill herself or end her life.  **(p. 42).**
- He never recommended to anyone that Ms. Rudolph be taken to the hospital or that she seek mental treatment. **(pp. 42-43).**
- He never made any phone calls to 911 that evening because he was not concerned Ms. Rudolph was going to end her life. **(p. 44).**
- If Ms. Rudolph told him that she was suicidal, he would have taken her to the hospital and he would not have left her alone.  **(p. 43).**
- He does not recall telling Hodges that Ms. Rudolph was suicidal. **(pp. 17, 47).**
- He did not know why Defendants were bothering Ms. Rudolph because they already had her gun. Furthermore, Defendants did not have any good reason to go over to Ms. Rudolph's house.  **(pp. 49-52).**

- He does not recall telling Officer Hodges or any other officer during the traffic stop that Ms. Rudolph was intoxicated and did not want to live anymore like Officer Hodge's police report stated.  **(pp. 60-62).**

## C.  DEFENDANT ATKINSON'S DEPOSITION TESTIMONY (EXHIBIT C):

- He is currently employed by Fruitport Township Police Department. **(p. 4).**
- Ms. Rudolph did not struggle while being handcuffed.  **(pp. 10-11, 18).**
- He was told to go and make contact with Ms. Rudolph, but he was never told that she was suicidal and needed to be brought in. **(p. 11)**
- He does not know if she invited them in, but they walked in to the home.  **(pp. 13-14).**
- Ms. Rudolph expressed to them that she did not want to go to the hospital because she thought she was fine and okay.  **(p. 16).**
- He never told her to turn around, put her hands behind her back, or that she was under arrest, and Defendant Babinec never told her this either.  **(p. 17).**
- There would have been no reason to yank Ms. Rudolph off the porch or to forcefully push her into the wall. **(pp. 25-26).**
- Other than being told that she was cleaning her gun at night and she had a few drinks of alcohol, there was nothing that she said to them to make them believe that she was suicidal.  **(pp. 28-30).**

## D.  DEFENDANT BABINEC'S DEPOSITION TESTIMONY (EXHIBIT D):

- He is currently employed by the Fruitport Township Police Department.  **(p. 4).**
- He pushed Ms. Rudolph against the wall and pushed her hands behind her back. **(pp. 19-23, 57-58).  *Notably, Defendant Atkinson testified that there is no reason for these actions against Ms. Rudolph.*  (Ex. C, pp. 25-26).**
- The only information he heard prior to going to Ms. Rudolph's house was that her ex-husband was concerned for her safety and had taken a gun from her. **(p. 27).**
- He was never told that there were any other weapons at Ms. Rudolph's premises before arriving on the scene. **(p. 44).**
- He never inquired if there were other weapons at the home, and it was not important or a concern to him at the time. **(pp. 44, 50).**
- He had no personal knowledge of his own that would have justified him going into Ms. Rudolph's home without her consent. **(pp. 47-48).**
- Ms. Rudolph did not invite him into her home, but he stepped in through the doorway and Defendant Atkinson walked in with him.  **(pp. 52-53).**
- He asked her if she was suicidal and needed help, and she said no.  **(pp. 52, 54, 82).**
- He called Officer Hodges and told him that Ms. Rudolph denied being suicidal and both of them were of the agreement that she needed to be taken into custody. **(pp. 32, 56-57).**
- He never told Ms. Rudolph that she was going to be handcuffed or to put her hands behind her back. **(p. 61).**

7

- If someone complains of handcuffs being too tight, you have to check on them because to not do so would be a violation of their constitutional rights. **(p. 70).** *Notably, he never checked on Ms. Rudolph when she complained about the handcuffs were too tight and subsequently caused injuries!* **(Ex. A, p. 62)**

## E. Ms. Rudolph's Citizen Complaint (Exhibit E):

- "To be awoken to have two police officers, ask if I'm suicidal because of what my ex-husband stated. Again, to be awoke in my house and then because officer stated I slurred which enabled him to grab me, cuff me, drag me outside without shoes to cop car. My civil rights were violated. I never once stated I was suicidal."

## F. Mercy Health Hospital Records Dated March 15, 2015 (Exhibit F):

- She was evaluated at the emergency room by Dr. Tenelshof who noted that "she appears completely sober frankly." She specifically denied any homicidal or suicidal intent and was angry with the police for even brining her here.

- Dr. Tenelshof further opined that "**she is at extremely low risk of self-harm as she does not appear to want to harm herself, has not tried to here and is sober and denies any sort of homicidal or suicidal thought or desire**." He subsequently recommended that she be discharged.

## G. Photographs of Ms. Rudolph's Injuries (Exhibit I):

- Photographs depict swelling and bruising on Ms. Rudolph's arms and wrists from the handcuffs during the subject incident.

## IV. LEGAL ARGUMENT:

### A. Standard Of Review:

A motion for summary judgment brought pursuant to Federal Rule of Civil Procedure ("FRCP") 56 is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The party seeking summary judgment bears the initial burden of showing the court that there is an absence of a genuine issue of dispute over any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Also, under FRCP 56, the Court must draw all reasonable inferences from the record in the light most favorable to the nonmoving party and the Court may grant summary judgment only where the record, taken as a whole, could

not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-588 (1986). In this case, there are genuine issues of material facts that can only be answered by a jury. Accordingly, Defendants' instant motion must be denied in its entirety.

**B. DEFENDANT ATKINSON IS NOT ENTITLED TO SUMMARY JUDGMENT WHEN HE VIOLATED MS. RUDOLPH'S *FOURTH* AMENDMENT RIGHTS BY FAILING TO INTERVENE TO PREVENT DEFENDANT BABINEC'S UNREASONABLE FORCE AGAINST HER**

Contrary to Defendants' argument, Defendant Atkinson violated Ms. Rudolph's *Fourth* Amendment rights when he unlawfully seized her[1] and failed to intervene to prevent the unreasonable force used by Defendant Babinec against Ms. Rudolph. As it pertains to excessive force, a police officer is not required to have had actual contact with a plaintiff in order to be liable as §1983 liability also extends to an officer if he or she fails to intervene to prevent such force by another officer. *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006); *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982). Specifically, a police officer who fails to act to prevent excessive force shall be held liable if "(1) the officer observed or had reason to know that the excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. Mich. 2008) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). "In determining whether an officer had both the opportunity and the means to intervene, the Court must determine if the incident being challenged lasted long enough for the officers to 'both perceive what was going on and intercede to stop it.'" *Turner supra* at 429.

In this case, there is no question that Defendant Atkinson, who was present at all times when the unreasonable force was used against Ms. Rudolph by Defendant Babinec, had both the

---

[1] Ms. Rudolph's *Fourth* Amendment claims against Defendant Atkinson as to unlawful seizure is addressed in Section C of the instant Brief.

opportunity and means to prevent this force. Here the facts show that after both Defendant Atkinson and Babinec unlawfully entered into Ms. Rudolph's home, Defendant Atkinson assisted Defendant Babinec in handcuffing Ms. Rudolph, by grabbing her left wrist and pushing her against the wall. **(Ex. C, pp. 8-10).** Notably, Defendant Atkinson testified that Ms. Rudolph was not struggling while being handcuffed. **(Exhibit C, pp. 10-11, 18).** After she was handcuffed by Defendant Babinec, Ms. Rudolph made numerous complaints that the handcuffs were too tight and neither Defendant loosened them let alone inspected them at any time. **(Ex. A, pp. 43, 45-46, 60, 112-113).** Moreover, Defendant Atkinson was present the entire time that Ms. Rudolph was handcuffed, heard her complain the handcuffs were too tight, and said nothing and did nothing the entire time. **(Ex. A, p. 46).** Defendant Atkinson also witnessed Defendant Babinec grab Ms. Rudolph's arm and yank her off her porch causing her to fall down her cement steps injuring her right ankle and as Ms. Rudolph continuously cried "you are hurting me," Defendant Atkinson did nothing. **(Ex. A, pp. 46-50).** Clearly, this unreasonable force by Defendant Babinec against Ms. Rudolph did not occur in a few short seconds but continued from the time that Ms. Rudolph was slammed up against her laundry room wall until the overly tight handcuffs were ultimately removed at the hospital in which Defendant Atkinson was present to witness such actions and did nothing. *Bruner* at 684 F2d. at 426 ("[a] deputy's failure to intervene in a beating administered by Sheriff is sufficient to subject him for liability"). Lastly, Ms. Rudolph's Complaint sufficiently alleges these unlawful actions against Defendant Atkinson despite Defendants' argument to the contrary. **[D/E #1, PageID 3-5].** Accordingly, Defendant Atkinson is liable under the *Fourth* Amendment, and summary judgment must be denied.

## C. DEFENDANTS BABINEC AND ATKINSON ARE NOT ENTITLED TO QUALIFIED IMMUNITY WHEN THEY VIOLATED MS. RUDOLPH'S CLEARLY ESTABLISHED *FOURTH AMENDMENT* RIGHTS

Defendants' actions unquestionably violated Ms. Rudolph's clearly established *Fourth* Amendment rights, and any reasonable officer in the same position would have refrained from such unlawful actions. Accordingly, Defendants are not entitled to qualified immunity. Qualified immunity is a privilege granting immunity to government officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasis added). To determine whether a defendant is entitled to qualified immunity at the summary judgment stage, courts are required to engage in a two-pronged inquiry. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). The first inquiry asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* "[T]he salient question . . . is whether the state of law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.* at 741.

Regarding the two qualified immunity prongs mentioned above, courts have discretion to decide the order in which to evaluate those two prongs. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). However, under either prong, **courts may not resolve genuine disputes of fact in favor**

**of the party seeking summary judgment**." *Cotton, supra* at 1866 (emphasis added). The *Cotton* court went on to state the following:

> Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. In making that determination, a court must view the evidence "in the light most favorable to the opposing party." Our qualified immunity cases illustrate the importance of drawing inferences in favor of the nonmovant. . . . (internal citations omitted).

In considering whether a constitutional violation occurred, if the defendant challenges the plaintiff's version of the facts, an issue of fact is created, and qualified immunity must be denied. *Johnson v. Jones*, 515 U.S. 304 (1995).

As set forth below, Defendants Atkinson and Babinec violated Ms. Rudolph's clearly established *Fourth* Amendment rights, and they had fair notice at the time that their actions constituted an unlawful seizure and unreasonable force in violation of the *Fourth* Amendment.

### i. Defendants Violated Plaintiff's Clearly Established *Fourth* Amendment Rights When They Unlawfully Seized Her

The Fourth Amendment to the United States Constitution guarantees that "the right of the people to be secured in their person… against unreasonable searches and seizures, shall not be violated…" U.S.CONST.AMEND.IV. The reasonableness of a seizure "depends not only on when it is made, but also on how it was carried out." *Graham v. Connor*, 490 U.S. 386, 395; 109 S. Ct. 1865 (1989). A seizure occurs when a reasonable person would not feel free to leave an encounter with the police. *Florida v. Bostick*, 111 S. Ct. 2382 (1991); *United States v. Campbell*, 486 F.3d 949, 956 (6th Cir. 2007); *Bennett v. City of Eastpointe*, 410 F.3d 810, 834 (6th Cir. 2005). In a typical seizure, this occurs when a government actor has, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen." *Graham*, 490 U.S. at 395 n.10 (citing *Terry v. Ohio*, 392 U.S. 1, 19, n.16, 88 S. Ct. 1868 (1968)). There must be "a governmental

termination of freedom of movement through means intentionally applied." *Scott v. Harris*, 127 S. Ct. 1769, 1776, (2007); *County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S. Ct. 1708 (1998); *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006).  Moreover, it is well established in the Sixth Circuit that "[a]bsent suspected criminal activity, a law-enforcement official may not physically restrain an individual merely to assess his mental health.  Rather…in the context of mental health seizure an officer must have probable cause to believe that the person seized poses a danger to himself or others."  *Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005). Notably, the existence of probable cause is a question for the jury to decide at trial unless there is only one reasonable determination possible—which in this case there is not. *Wilson v. Morgan,* 477 F.3d 326, 334 (6th Cir. 2007); *Crockett v. Cumberland College,* 316 F.3d 571, 581 (6th Cir. 2003); *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995).

This case is factually similar to the *Fisher* case where the police received a call from a passerby who reported that a man in the distance appeared to have tied himself to railroad tracks in an attempt to take his own life. *Id.* at 839-40. When the defendant officers approached the plaintiff, they observed him sitting in a folding chair with a rifle where he had positioned himself in order to shoot groundhogs. *Id.* at 840.  The plaintiff complied with the defendant officers' orders. *Id.* While obeying their orders, the plaintiff went into cardiac arrest and was permanently disabled as a result of the subject incident in which he subsequently sued the defendant officers, among other claims, for a violation of his right under the *Fourth* and *Fourteenth* Amendments to be free from unreasonable seizure without probable cause.  *Id.* at 841.  In reversing the trial court's grant of summary judgment, the Sixth Court held that the defendant officers were not entitled to qualified immunity as they did not have the required probable cause to justify a mental health seizure.  *Id.* at 845-46.  In reaching its decision in favor of the plaintiff, the Court relied upon the following

facts in pertinent part:  the plaintiff complied with the orders given, the plaintiff approached the police in an entirely ordinary manner, the plaintiff did not do anything that the defendant officers considered to be suspicious or threatening; the plaintiff was never verbally threatening, abusive, or irrational; the plaintiff did not make any statements about hurting himself or anyone else; and he never attempted to avoid the officers or flee the area.  *Id.* at 843-44.

Similarly within the instant case, there are no facts from which a reasonable officer could have found a probability or substantial chance that Ms. Rudolph posed a danger to herself or others at the time that she was seized.  Specifically, the facts show the following:  (a) Ms. Rudolph had no weapon at the time that she was seized as her gun was taken by Officer Hodges and Defendants were aware of this at the time; (b) Mr. Rudolph does not recall telling any officer that Ms. Rudolph was suicidal, that she was intoxicated, or that she did not want to live anymore; (c) Mr. Rudolph never recommended that an officer go to Ms. Rudolph's home but instead testified that he did not know why Defendants bothered Ms. Rudolph as they already had her gun and did not have any good reason to go to her house; (d) after being awakened from a sound sleep in the middle of the night by Defendants, Ms. Rudolph opened her door and said "hello;" (e) Ms. Rudolph was cooperative and answered all of Defendants' questions; (f) Ms. Rudolph told both Defendants that she was not suicidal; and (g) Ms. Rudolph did not struggle with either Defendant nor did she attempt to flee.  Moreover, Defendants state in their Brief that Ms. Rudolph was "very intoxicated;" however, this is not true which is reflected by Defendant Atkinson's testimony as he testified that even though he smelled an odor of intoxicants, this odor could simply mean that she only had one, two, or three drinks which, of course, does not support the fact that she was so intoxicated as Defendants allege.  **(Ex. C, pp. 28-29).** Notably, Defendants did not perform any PBT or field sobriety tests—further evidencing that they did not believe that Ms. Rudolph was intoxicated let

alone "very intoxicated."  Furthermore, neither Defendant was concerned for Ms. Rudolph's safety

as they knew at the time her gun had been seized which is supported by Defendant Babinec's

testimony:

> Q.    Did anyone ever tell you that there was any other weapons in Miss
>       Rudolph's premises before you went to the scene?
>
> A.    No.
>
> Q.    Did you ask that question of her ex-husband or Hodges?
>
> A.    I did not.
>
> Q.    Was that important to you?
>
> A.    At the time, no.
>
> Q.    Why is that?
>
> A.    We had already taken a weapon away from her through the husband.
>       **(Ex. D, p. 44).**

Unlike the facts in the instant case and *Fisher,* Defendants rely on *Monday v. Oullette*, 118

F.3d 1099, 1101 (6th Cir. 1997) in support of their erroneous position that their actions were

lawful; however, the facts in *Monday* are factually distinguishable. In *Monday,* the plaintiff called

the mental-health hotline and reported that he had ingested prescription medication, was drinking

alcohol, and could have cared less.  *Id.* at 1102-1103.  This information was then reported to the

police. *Id.* at 1103.  When the defendant officers arrived at the plaintiff's residence, they found

that at least twenty of his pills were missing from a recently issued prescription bottle, and

observed that he was intoxicated.  *Id.* at 1103-1104. Although the plaintiff denied having

overdosed, the Court held that the officers' observations, in the context of the psychologist's report,

created probable cause to believe that the plaintiff's life was in danger. *Id.* at 1102-03.

Distinguishably in the instant case, there was never a report made by anyone that Ms. Rudolph

was suicidal and that her life was in danger.  As referenced above and in addition to Ms. Rudolph expressly stating that she was not suicidal, there were no observations made by either Defendant to believe that Ms. Rudolph was suicidal.  Instead of even doing a half-way investigation, Defendants immediately walked into Ms. Rudolph's home uninvited when she opened the door, slammed her up against the wall despite the fact that she was compliant and not struggling and arrested her.

Defendants also rely upon *Ziegler v. Aukerman*, 512 F. 3d 777 (6th Cir. 2008), which is also factually distinguishable from the instant case. In *Ziegler*, the court held that the police officer had probable cause to detain Ziegler and take her to the hospital. *Id*. at 784.  In reaching its decision in favor of the defendant, the court relied on the fact that the defendant officer had received a 911 call directly from the hospital informing him that there was a clinical certificate confirming that that the plaintiff was suicidal. *Id.* at 784-785.  Unlike the *Ziegler* case, there was never a medical determination stating that Ms. Rudolph was suicidal before or even after she was taken to the hospital. In fact, the mental evaluation performed at the hospital by Dr. Tenelshof reported just the opposite as it stated that  "she is at extremely low risk of self-harm as she does not appear to want to harm herself, has not tried to here and is sober and denies any sort of homicidal or suicidal thought or desire." **(Ex. F).** Accordingly, looking at the facts of this case in the light most favorable to Ms. Rudolph, one can only conclude that Defendants lacked probable cause to believe she was a danger to herself or others and such seizure violated her *Fourth* Amendment right to be free from unreasonable seizures by government officials in which said Right was clearly established at the time.  *Fisher* at 846 ("[a]s we have already noted, in 1997 this court specifically held that 'the Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to himself or others.'" *Monday,* 118

F.3d at 1102).  Defendants are not entitled to qualified immunity as to Count II as they violated Ms. Rudolph's *Fourth* Amendment rights to be free from unreasonable seizure without probable cause.

> **ii.   Defendants' Violated Plaintiff's Clearly Established *Fourth* Amendment Rights When They Used Excessive Force Against Her**

Ms. Rudolph alleges in her Complaint, along with these facts being fully explored during discovery, that the following actions by Defendants violated her *Fourth* Amendment right to be free from excessive or unreasonable force during her arrest:  (a) the handcuffs, which were applied unduly tight were not loosed causing injury despite her complaints; (b) she was thrown against her laundry room wall after Defendants unlawfully entered into her home despite her compliance, not being a threat to anyone, and not engaged in any crime nor attempting to flee; and (c) the unreasonable force continued (after she was handcuffed) by being yanked off her cement porch causing a severe injury to her right ankle and dragged to the Defendants' patrol vehicle, again, without any legal justification whatsoever.

> **(a) Defendants Failing to Loosen the Unduly Tight Handcuffs Despite Ms. Rudolph's Pleas Causing Injury Warrant the Denial of Summary Judgment**

Defendants Atkinson and Babinec are both liable for their *Fourth* Amendment violations against Ms. Rudolph when Defendant Babinec, assisted by Defendant Atkinson, applied unduly tight handcuffs upon Ms. Rudolph, failed to loosen them despite her complaints, and caused bruising and swelling on her wrists and arms.  "The Fourth Amendment prohibits unduly tight or excessively forceful handcuffing during the course of a seizure."  *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) relying upon *Kostrzewa v. City of Troy,* 247 F.3d 633, 639 (6th Cir. 2001).  Moreover, in order for Ms. Rudolph's handcuffing claim to survive summary judgment, she must offer sufficient evidence to create a genuine issue of material fact that: (1) she

complained the handcuffs were too tight; (2) Defendants ignored her complaints; and (3) she experienced "some physical injury" resulting from the handcuffing." *Morrison* at 401 relying upon *Lyons v. City of Xenia,* 417 F. 3d 565 (6th Cir. 2009).

In *Morrison*, the Sixth Circuit Court of Appeals affirmed the district court's denial of qualified immunity to the defendant officer on the basis that there is a genuine issue of material fact as to the plaintiff's handcuffing claim and, in doing so, the Court disagreed with the defendant officer's argument that "allegations of bruising and wrist marks alone are, as a matter of law, insufficient to establish a 'physical injury.'" *Id.* at 402. The plaintiff in *Morrison* alleged that the defendant officer failed to loosen the handcuffs after she complained of the tightness and that due to the handcuffs being so tight, her "skin was all pinched over and it was turning black and blue" and there was also evidence that there were "marks" on the plaintiff's wrists as a result of the handcuffing. *Id.* at 402. Notably, there was no evidence in *Morrison* that the plaintiff sought additional medical treatment in which the Court held that it was not necessary to survive summary judgment as it noted that "[t]his is not the first time we indicated that bruising could support an excessive use of force claim based on handcuffing." *Id.* at 403 relying upon *Burchett v. Kiefer,* 310 F.3d 937 (6th Cir. 2002); *Bolan v. City of Keego Harbor,* No. Civ. 01-74467, 2002 U.S. Dist. LEXIS 21975 at *4 (E.D. Mich. October 24, 2002) ("finding allegations that handcuffs applied 'so tight as to bruise [plaintiff's] wrists' permitted claim for excessive force to survive summary judgment. Accordingly, and similar to the facts in *Morrison*, Ms. Rudolph repeatedly complained that the handcuffs were really tight and they were hurting her in which such statements were made in front of both Defendant Atkinson and Defendant Babinec and neither of them examined or loosened the cuffs until she was at the hospital. **(Ex. A, pp. 43, 45-47, 50, 112).** As a result of the unduly tight handcuffs not being loosened, Ms. Rudolph sustained black and blue bruising on her

hands and wrists which are not only supported by her testimony but also by way of pictures. **(Ex. A, pp. 69-73; Ex. I).** Accordingly, Defendants' argument that there is no evidence that Defendants ignored her complaints of the handcuffs is untrue as Ms. Rudolph's deposition testimony substantiates same. Defendants' argument that they removed the handcuffs within about 10 minutes when she was at the hospital also fails as the travel time alone to the hospital from Ms. Rudolph's residence was 10 minutes. However, the testimony by both Defendants as well as Ms. Rudolph support that she was handcuffed immediately after she opened the door and remained in handcuffs until she reached the hospital which is approximately 30 minutes as Defendants arrived at her house at 3:24 a.m. and she was seen at the Emergency Room at 3:54 a.m. **(Ex. F; See Activity Log attached as Exhibit H).** Notably, Defendants' own activity log does not reflect that they did not clear the scene until 4:18 a.m. **(Ex. H).**

In their Brief, Defendants rely upon *Miller v. Sanilac County,* 606 F.3d 240 (6th Cir. 2010) for their mistaken position that Ms. Rudolph had to receive actual medical treatment from a first responder or a medical professional in order to meet the third element or the "injury element," which not only directly conflicts with the *Morrison* holding but also is not consistent with the holding in *Miller.* In *Miller*, the Court held that the defendant officers did not use excessive force in handcuffing the plaintiff during his arrest because he did not complain about the handcuffs being too tight until he arrived at the jail at which point they were removed. *Id.* at 252. Unlike the *Miller* case, Ms. Rudolph began to complain about being hurt and that the handcuffs were too tight as soon as they were placed upon her and made continued complaints. **(Ex. A, pp. 43, 45-48, 51, 62, 112).** Moreover, the *Miller* case does not stand for the allegation that a plaintiff must show some form of medical treatment or complaint in order to prove the existence of a "physical injury" resulting from handcuffing. *Id.* at 252. Instead, the *Miller* Court held that the plaintiff was unable

to satisfy the injury prong because "although Miller stated in his deposition that he lost color in his hands for more than a day after the arrest and has a continuing inability to use his hands, these assertions are not supported by his medical records or the intake form he completed during his arrest." *Id*. at 252.  However, and as referenced above, Ms. Rudolph's deposition testimony that she sustained bruising and swelling from the handcuffs is corroborated by her pictures. Accordingly, Defendants are not entitled to qualified immunity as Ms. Rudolph's *Fourth* Amendment rights were violated as to the unduly tight handcuffs and this right was clearly established at the time of the subject incident.  *Morrison* at 401.

### iii.   Defendant Babinec Used Excessive Force When He Slammed Ms. Rudolph Up Against the Wall

Pursuant to 42 U.S.C. § 1983, a cause of action exists for excessive use of force during an arrest. The *Fourth* Amendment's prohibition of unreasonable seizures strictly limits the amount of force a police officer may use. *Id.* at 494.  Specifically, a police officer may only use that degree of force necessary to complete the arrest.  *Monday* at 1102 (6th Cir. 1997).  Under the *Fourth* Amendment, "we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396-397. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene… and the question is "whether the totality of the circumstances justifie[s] a particular sort of… seizure." *Id.*  There are three factors which should be considered under the excessive force analysis: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

In this case, and as referenced above, Defendants had absolutely no justifiable basis to arrest Ms. Rudolph in which such action violated the *Fourth* Amendment.  Moreover, based upon the totality of the circumstances Defendants were not justified in using any force against Ms. Rudolph at any time during her unlawful arrest.  Specifically, Ms. Rudolph had not committed any crime and, in fact, Defendants concede this by alleging they only responded to her house for an alleged wellness check.  Secondly, Ms. Rudolph did not pose any immediate threat to the safety of Defendants and testified that she was cooperative with both Defendants and answered all of their questions, she was not intoxicated, and answered the door after she was awakened from a sound sleep.  **(Ex. A, pp. 36, 39).**  Thirdly, Ms. Rudolph never resisted either Defendant at any time.  **(Ex. A, p. 62).**  Even Defendant Atkinson testified that Ms. Rudolph did not struggle while being handcuffed.  **(Ex. C, pp. 10-11, 18).**  Notably, Ms. Rudolph was never given any kind of warning that she was going to be arrested or handcuffed or asked if she wanted to go to the hospital. **(Ex. A, pp. 43-45).** Instead, she was thrown against the wall. **(Ex. A, pp. 41-42, 47).**  In fact, Defendants admitted that they never told her at any time:  (1) to turn around; (2) put her hands behind her back; (3) that she was going to be handcuffed; or (4) that she was under arrest.  **(Ex. C, p. 17; Ex. D, p. 61).**

In their Brief, Defendant Babinec claims that Ms. Rudolph resisted by pulling away while he was attempting to handcuff her. **(Ex. D, p. 19).**  However and even though Ms. Rudolph directly disputes this, she also was never given any opportunity to put her hands behind her back prior to being slammed against the wall. (**Exhibit A, pp. 62, 112-113).**   Furthermore, Defendant Atkinson's testimony contradicts Defendant Babinec's allegations that Ms. Rudolph was resisting as he testified that she was not struggling in any way when being handcuffed. **(Ex. C, pp. 10-11, 18).** Accordingly, any force used against Ms. Rudolph, including being thrown up against a wall,

is unjustified and excessive in violation of the *Fourth* Amendment. Lastly, and even as Defendants' admit, the *Goodrich v. Everett,* 193 Fed. Appx. 551 (6th Cir. 2006) case relied upon by Defendants is factually distinguishable from the instant case as the plaintiff in that case was suspected of committing a violent crime and fled from the defendant officers—none of these facts are present in the instant matter. Accordingly, based upon the totality of the circumstances, Ms. Rudolph's right to be free from excessive force by not being slammed against a wall by Defendant Babinec was clearly established at the time and he is not entitled to qualified immunity.

> **iv.    Defendant Babinec Used Excessive Force When He Yanked Ms. Rudolph Off Her Cement Porch, While She was Handcuffed, and Continued to Drag Her to His Patrol Vehicle.**

In addition to Defendant Babinec having no justifiable reason for slamming Ms. Rudolph against the wall, he also had absolutely no justifiable reason to yank her off her front porch and continue to drag her to his patrol vehicle especially given the fact that she was handcuffed, compliant, and not resisting in any manner. Specifically, Ms. Rudolph testified that, while she was handcuffed, she was manhandled out of her house by Defendant Babinec when he pulled her outside "very abruptly and very quickly, and he went down the steps, the cement steps, and I fell down the steps onto my ankle, and I kept telling him he was hurting me." **(Ex. A, p. 47).** Ms. Rudolph further testified that she "didn't even get on the step. He pulled me off my porch. That's where I tried to gather my balance and fell, and I went onto my ankle. **(Ex. A, pp. 49-50).** After being yanked down the steps, which caused a significant injury to her right ankle, Defendant Babinec continued to drag her down the driveway and forced her to hop along in order to keep up with him. **(Exhibit A, pp. 47-51).**

Moreover, and as referenced above, Ms. Rudolph was handcuffed at this time and the Sixth Circuit has recognized any use of force administered after an individual is handcuffed is excessive

as a matter of law. "Specifically, the Sixth Circuit has held that the "need for force is "nonexistent" when a suspect is handcuffed and "not trying to escape or hurt anyone." *Jones v. Garcia*, 345 Fed. Appx. 987, 989 (6th Cir. 2009).  In *Meirthew v. Amore*, 417 Fed. Appx. 494, 499 (6th Cir. 2011), the Court stated:

> Our prior opinions clearly establish that it is unreasonable to use a significant amount of force on a restrained subject, even if some level of passive resistance is presented. *See Griffith v. Coburn,* 473 F.3d 650, 659 (6th Cir. 2007) (holding that it is clearly established that when a suspect refuses to follow officers orders, but otherwise poses no safety threat, use of significant force is unreasonable) (emphasis added); *Smoak v. Hall*, 460 F.3d 786, 783-784 (6th Cir. 2006) (noting that despite plaintiff's action in suddenly jumping to his feet, a reasonable officer would have known that knocking the plaintiff to the ground was excessive in light of the fact that plaintiff was handcuffed.) Indeed, in *Harris v. City of Circleville,* 583 F.3d 356, 376 (6th Cir. 2009), we held that "there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect who already has been subdued and does not present a danger to himself or others." 583 F.3d at 376; *see also Morrison v. Bd. Of Trs. Of Green Twp*., 583 F.3d 394, 404 (6th Cir. 2009) (quoting *Baker v. City of Hamilton, Ohio,* 471 F. 3d 601, 607-608 (6th Cir. 2006)) **("This Court has consistently held… that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'").** (Emphasis added).

Accordingly, Defendant Babinec's actions against Ms. Rudolph were clearly more than just having her walk too fast as Defendants would like this Honorable Court to believe.  As referenced above, the totality of the circumstances do not support any force used against Ms. Rudolph let alone being yanked off her cement porch and drug to the police vehicle in which Defendant Babinec's actions violated Ms. Rudolph's *Fourth* Amendment right to be free from unreasonable force that was clearly established at the time and he is not entitled to qualified immunity.

**D.  Ms. Rudolph Has A Viable *Monell* Claim Against Defendant Township of Fruitport**

In *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 690-691 (1978), the United States Supreme Court held that local governments "may be sued for constitutional

deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." While a municipality cannot be held liable solely because it employs a tortfeasor, liability can be imposed when an employee adheres to an official policy which causes another's constitutional rights to be violated. As set forth in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986), the United States Supreme Court stated that Congress did not intend for municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." "More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481.

A municipality can be held liable for inadequately training its officers when it "evidences a 'deliberate indifference' to the rights of its inhabitants…such a shortcoming [can] be properly thought of as city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378 (1989). Contrary to Defendants' argument, Defendant Fruitport Township failed to train its officers as to the proper use of force and unlawful seizures of citizens. Specifically, Defendant Babinec testified that he has not had any training outside of the police academy. **(Ex. D, pp. 9-10).** Moreover, Defendant Atkinson's personnel file also reveals that he has not had any training by Defendant Fruitport Township.

Moreover, a municipality can also be held liable for failing to supervise its officers. *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002). In order to attach liability through a failure to supervise theory, it must be shown than such failure was a deliberate or conscious choice by the municipality. *Kammeyer v. City of Sharonville*, 2006 U.S. Dist. LEXIS 24058, 33-34 (SD Ohio, 2006) **(Exhibit L)** (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989)). Moreover,

liability for failing to supervise its officers can also be viewed as a failure to review and discipline its officers. In *Kammeyer*, the plaintiff set forth a municipal liability claim on the basis of the failure to supervise. Support for the plaintiff's position was that the personnel file of one of the lead detectives, who was involved in a cover-up, did not include a single performance evaluation in over thirty-two (32) years of his employment. *Id.* at 34. The Court determined that the issue of municipal liability was a question to be answered by the jury and not the Court. *Id.* at 34-35.

Similar to the facts in *Kammeyer*, Defendant Fruitport Township does not regularly conduct performance evaluations on its police officers nor does it review or monitor the officers' conduct. Neither Defendant Atkinson nor Babinec have received any performance evaluations from Defendant Fruitport Township which has been revealed by a thorough review of their personnel files received through discovery. Accordingly, Defendant Fruitport Township must be held liable for its failure to train and supervise its police office and its motion for summary judgment must be denied.

### E.  Ms. Rudolph Has a Viable False Arrest State Law Claim Against Defendants

A false arrest claim under Michigan law requires a showing that Defendants "participated in an illegal and unjustified arrest, and that [the defendants] lacked probable cause to do so." *Walsh v. Taylor*, 263 Mich. App 618; 689 N.W.2d 506, 513 (2004). Moreover, a false arrest is an illegal or unjustified arrest, and the guilt or innocence of the person arrested is irrelevant. *Lewis v. Farmer Jack, Inc.*, 415 Mich. 212, 218 (1982). Ms. Rudolph relies upon her argument and case law in Section C, i of her instant Response supporting that Defendants did not have probable cause to seize her and not only did they violate her *Fourth* Amendment right but also state law right to be free from an unlawful arrest in the absence of probable cause. The facts, as referenced above, certainly warrant that Defendants acted in bad faith as their actions were undertaken with malice and they are not entitled to the protection of governmental immunity.

## V.  <u>CONCLUSION</u>

In light of the evidence, case law, and arguments presented herein, Ms. Rudolph respectfully requests that this Honorable Court deny Defendants' instant Motion in its entirety. Moreover, Plaintiff respectfully requests that this Honorable Court grant Summary Judgment in her favor pursuant to Federal Rule of Civil Procedure 56 based upon the overwhelming evidence and case law presented above supporting that neither Defendant Atkinson nor Babinec had any probable cause to seize Plaintiff and their force used against her was unreasonable based upon the totality of the circumstances.

Respectfully Submitted,
CHRISTOPHER TRAINOR & ASSOCIATES

/s/Amy J. DeRouin
CHRISTOPHER J. TRAINOR (P42449)
AMY J. DEROUIN (P70514)
Attorneys for Plaintiff
9750 Highland Road
White Lake, MI 48386
(248) 886-8650
amy.derouin@cjtrainor.com

Dated: April 17, 2018
*AJD/mms*

26