# EXHIBIT C

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.667   Page 2 of 14

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I
October 2, 2017

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              WESTERN DISTRICT OF MICHIGAN
 3
 4   LETICIA RUDOLPH,           )
 5              Plaintiff,      )
     vs.                        )   Case No. 1:17-CV-125
 6                              )   Hon. Janet T. Neff
     DANIEL T. BABINEC, ROBERT A.)
 7   ATKINSON, in their individual)
     and official capacities, and )
 8   the TOWNSHIP OF FRUITPORT,  )
 9              Defendants.     )
10   - - -
11
12          Deposition of OFFICER ROBERT A. ATKINSON, taken
13   on behalf of the Plaintiff, at 5825 Airline Road, Fruitport,
14   Michigan, commencing at 2:55 p.m., on Monday, October 2, 2017,
15   before CYNTHIA M. THOMAS, CSR/RPR/CM/CRR and Notary Public.
16
17
18   APPEARANCES:
19       For Plaintiffs:       CHRISTOPHER TRAINOR & ASSOCIATES
                               Attorneys at Law
20                             BY:  CHRISTOPHER J. TRAINOR
                               9750 Highland Road
21                             White Lake, Michigan  48386
22
         For Defendants:       MCGRAW MORRIS, P.C.
23                             Attorneys at Law
                               BY:  AMANDA MARIE ZDARSKY
24                             2075 W. Big Beaver Road
                               Suite 750
25                             Troy, Michigan  48084
```

**Page 2**

```
 1                    I N D E X
 2
 3   WITNESS              EXAMINATION           PAGE
 4   ROBERT A. ATKINSON   BY MR. TRAINOR           3
 5                        BY MS. ZDARSKY          30
 6
 ...
13               EXHIBITS FOR IDENTIFICATION
14                         (None)
```

**Page 3**

```
 1        Fruitport, Michigan, Monday, October 2, 2017
 2                         2:55 p.m.
 3                           - - -
 4              OFFICER ROBERT A. ATKINSON,
 5   produced as a witness by and on behalf of the Plaintiff,
 6   and having been first duly sworn by the Notary Public, was
 7   examined and testified as follows:
 8                           - - -
 9        MR. TRAINOR: Please state your name.
10        THE WITNESS: Robert Atkinson.
11        MR. TRAINOR: Let the record reflect this is the
12   deposition of Robert Atkinson taken pursuant to notice and
13   agreement of counsel of record to be used for any and all
14   purposes consistent with the Michigan Court Rules,
15   Michigan Rules of Evidence, Federal Court Rules, Federal
16   Rules of Evidence.
17                     EXAMINATION
18   BY MR. TRAINOR:
19   Q  Mr. Atkinson, have you ever had your deposition taken
20      before?
21   A  No.
22   Q  Testify in court?
23   A  Yes.
24   Q  Okay.  This is pretty much the same only you don't have a
25      judge here.  Okay?
```

**Page 4**

```
 1   A  All right.  A courtroom full of people.
 2   Q  Yeah, a courtroom full of people and the judge.
 3          Cindy is taking your testimony down.  So if you
 4      can answer with an out-loud, verbal response, it's
 5      appreciated.  Is that fair?
 6   A  That's fair, yeah.
 7   Q  Another thing is, is just like in the courthouse, you're
 8      going to be held to the answer you give.  Do you
 9      understand that?
10   A  Yes, sir.
11   Q  So if you don't understand what I've asked, you tell me
12      that.  Okay?
13   A  Okay.
14   Q  And you're currently employed where, sir?
15   A  Employment, you said?
16   Q  Yeah.  Where are you employed?
17   A  Fruitport County Sheriff Police Department.
18   Q  Are you full time?
19   A  Yes, sir.
20   Q  How long?
21   A  Five years now; two part time, three full time.
22   Q  You were full time back on March 15th of 2015?
23   A  Yes.  I would have been, yeah.
24   Q  Before being employed with Fruitport Police Department,
25      did you have any other police-related type employment
```

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.668   Page 3 of 14

Leticia Rudolph v.                              Robert Atkinson                          Robert Atkinson - Vol. I
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                          October 2, 2017

Page 5

1      experience?
2   A  Yes.
3   Q  Where?
4   A  I came from Roosevelt Park Police Department.
5   Q  I'm sorry?
6   A  Roosevelt Park.
7   Q  Where is that?
8   A  It's about five, six miles northwest of here.
9   Q  The town called Roosevelt Park?
10  A  Yes.
11  Q  Okay. Any other police department?
12  A  Yeah.
13  Q  Was that full time or part time?
14  A  That was part time.
15  Q  Any other?
16  A  Yes. Muskegon Township Police Department.
17  Q  Full time or part time?
18  A  Part time.
19  Q  And where else?
20  A  New Era Police Department.
21  Q  Part time or full time?
22  A  Part time.
23  Q  Any other?
24  A  One more. Shelby Police Department.
25  Q  Shelby. Part time or full time?

Page 6

1   A  Part time.
2   Q  Who did you work with over there at Shelby and New Era?
3      Was Morningstar over there?
4   A  No. This is in Oceana County.
5   Q  You never worked with Morningstar at New Era or Shelby?
6   A  No.
7   Q  How about Babinec; did you work with him over at New Era
8      and Shelby?
9   A  Yes.
10  Q  Okay. Did you work anywhere full time when you were at
11     Roosevelt Park?
12  A  No. They were all part-time jobs.
13  Q  And they all got you 40 to 50 to 60 hours a week?
14  A  Yeah, right around there. It was a combination of two or
15     three, and there was one period of time where I think
16     I had four part-time jobs for a month or two.
17  Q  Okay. Prior to becoming a police officer, how were you
18     employed?
19  A  I worked in a steel shop.
20  Q  Where?
21  A  Harbor Steel & Supply.
22  Q  Have you ever been terminated from employment?
23  A  No.
24  Q  Suspended?
25  A  No.

Page 7

1   Q  Even with police departments, you've not been suspended?
2   A  No.
3   Q  How about reprimanded?
4   A  Yes.
5   Q  For what?
6   A  I was taking a catnap in the office a few years back.
7   Q  Okay. Where?
8   A  Here.
9   Q  What did you tell the people who looked into this?
10  A  With the number of hours I was working, being extremely
11     exhausted, I was just having a hard time with it. So
12     I turned the radio up and just sat down in the chair for a
13     minute, just like I'm sitting now, and I just dozed off
14     for a couple minutes. And, actually, Morningstar is the
15     one who talked to me about that, so that was the --
16  Q  You told him you dozed off for a couple of minutes?
17  A  Yeah.
18  Q  But really you were taking a nap, right?
19  A  I guess you could call it a nap, sure.
20  Q  How long did you fall asleep for?
21  A  Just a real short time, a few minutes.
22  Q  So you were reprimanded for that. Anything else?
23  A  That was it.
24  Q  Did you go to college?
25  A  Yes, sir.

Page 8

1   Q  Where?
2   A  Where do I start. Muskegon Community College, Associate's
3      degree.
4   Q  Okay.
5   A  West Shore College in Scottville. That was for the
6      academy.
7   Q  Okay.
8   A  And Baker College for a Bachelor's degree.
9   Q  Oh, really? In what?
10  A  Science and police work, criminal justice.
11  Q  Okay.
12  A  I took a short program for MSU; they have an on-line
13     program for hazardous materials, I believe it was.
14  Q  All right.
15  A  I think that's it for school.
16  Q  Have you ever been accused by anybody that you've arrested
17     of using too much force?
18  A  I'm self-reflecting here -- ten years of work -- give me a
19     second.
20        No, this would be the first.
21  Q  Did you actually put your hands on Miss Rudolph in this
22     case?
23  A  Yes.
24  Q  My understanding is you grabbed her left wrist?
25  A  Yeah, to -- yes, place her arm behind her back.

Case 1:17-cv-00125-JTN-ESC  ECF No. 54-4 filed 04/19/18  PageID.669  Page 4 of 14

| Leticia Rudolph v.<br>Daniel Babinec, Robert Atkinson, Twp. of Fruitport | Robert Atkinson | Robert Atkinson - Vol. I<br>October 2, 2017 |
|---|---|---|

Page 9

1 Q And that's it?
2 A That was the gist of it, yeah. That was it.
3 Q Gist of it or is that all?
4 A That's all.
5 Q Okay. So you placed her hand behind her back?
6 A Yes, sir.
7 Q Okay. And who put the cuffs on her?
8 A Officer Babinec.
9 Q Okay. Did you see him push her against the wall?
10 A I didn't see any like push or shove, but I helped him by
11    holding her against the wall so she wouldn't pull away
12    from us again. I didn't see any shoving or pushing.
13 Q Okay. No one pushed her into the wall then, right?
14 A I didn't see any -- no, I didn't see any pushing.
15 Q Okay. Did you see Miss Rudolph pull away from Babinec?
16         MS. ZDARSKY: Objection to form. You mean after
17    the wall, before the wall?
18         MR. TRAINOR: At any time.
19         MS. ZDARSKY: Okay.
20         THE WITNESS: It's been so long. I remember the
21    pulling away. I can't remember -- recall if I observed
22    it.
23 BY MR. TRAINOR:
24 Q Okay.
25 A I do recall the pulling away.

Page 10

1 Q Well, what do you mean you don't know if you saw it or
2    observed it or not? Did you see her pull away or not?
3 A I can't -- I can't remember because I'm busy looking at
4    faces.
5 Q That's fair. That's fair. That's all I want to know.
6    You can't remember, right?
7 A Yes.
8 Q True?
9 A True. If it was a more recent incident ...
10 Q What about -- she ends up against the wall to put the
11    handcuffs on her, right?
12 A Yes.
13 Q And you had put your hands up like you were holding her
14    against the wall?
15 A No, I was holding the arm --
16 Q Yeah.
17 A -- while she was against the wall.
18 Q Okay. You were holding her elbow?
19 A The upper arm area and the wrist area.
20 Q Okay. To bring it behind her back, right?
21 A Yes, sir.
22 Q Okay. Was she pulling away from you?
23 A No.
24 Q Okay. So you brought it behind her back, and there was no
25    struggle from her left side, right?

Page 11

1 A No, sir.
2 Q Okay. Did you have any trouble getting the handcuffs on
3    that you saw?
4 A No.
5 Q Who told you to go to Miss Rudolph's home?
6 A That was -- Officer Babinec requested that I stop by there
7    to check on her.
8 Q All right. What did he tell you?
9 A I was informed that Officer Hodges had located a gun
10    from Miss Rudolph's -- was it boyfriend or husband or
11    ex-husband.
12 Q Okay.
13 A And she was potentially suicidal. So I was to go and
14    check and see if I could make contact with her at her
15    residence.
16 Q Okay. Did he tell you what to do if you couldn't make
17    contact with her?
18 A No.
19 Q Did they tell you she was suicidal and she needed to be
20    brought in?
21 A No.
22 Q So you were going over there to check on her. And you got
23    there first, right?
24 A Yes.
25 Q And who was there when you got there?

Page 12

1 A Oh, I got there and I -- I knocked on the front door,
2    checked in some windows, didn't see or hear anybody.
3 Q So then what did you do?
4 A I waited. Officer Babinec showed up shortly after, and he
5    proceeded to knock. Eventually, she came to the door.
6 Q Okay. So your knocking didn't get anywhere but his
7    knocking did, right?
8 A Yes.
9 Q So she answered the door after he knocked, right?
10 A Yes.
11 Q And were you standing -- was there a porch?
12 A I don't remember like an exterior porch.
13 Q Okay. Were there steps that went into the house?
14         MS. ZDARSKY: Objection; form. Which location?
15    Just at the location they were at?
16 BY MR. TRAINOR:
17 Q Yeah, the location you were at.
18         MS. ZDARSKY: The door you were at.
19         THE WITNESS: I don't remember if there were
20    steps or not.
21 BY MR. TRAINOR:
22 Q Okay. Was there a storm door?
23 A I believe so. I believe there was an outer door and then
24    the regular inner one.
25 Q Okay. So when Babinec knocks on the door, she opens up

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.670   Page 5 of 14

Leticia Rudolph v.  
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I  
October 2, 2017

Page 13

1  the door. And was she standing -- was the main door all
2  the way open?
3  A  I can't remember if she had it open or partial.
4  Q  Do you say anything to Miss Rudolph?
5  A  No, I believe Officer Babinec did the talking.
6  Q  What did he say?
7  A  I -- I don't remember.
8  Q  Okay. Does she invite you guys into her home?
9  A  The substance of the conversation -- I can't remember if
10     she said come on in or no, stay outside. It's been so
11     long.
12 Q  Okay. So if she's testified that she told you not to come
13     in her house, you don't have any reason to disagree with
14     that, right?
15          MS. ZDARSKY: Objection to the characterization.
16 BY MR. TRAINOR:
17 Q  Go ahead.
18 A  I just -- I don't recall the conversation.
19 Q  Okay.
20 A  It's -- yeah, it's so long ago.
21 Q  Okay. Do you know anything that Babinec says to her?
22 A  No.
23 Q  Do you know how you get into the house?
24 A  How we got into the house?
25 Q  Yeah. How did you get into the house?

Page 14

1  A  Just walked in the front door.
2  Q  Do you know what right you had to walk right in her front
3     door?
4  A  Well, at that point, it was checking on her well-being to
5     make sure she didn't plan on harming herself.
6  Q  And that allowed you the right to walk into her home?
7  A  I believe there's a policy or guideline that allows for a
8     well-being check. I can't recall offhand, but ...
9  Q  What if she tells you, get out of my house, I don't want
10    you here? Does that allow you to still go in the home?
11 A  I guess that would depend on the circumstance.
12 Q  How about in the circumstances in this case?
13 A  If officers are genuinely concerned for someone's
14    well-being, they may potentially cause harm to themselves,
15    I think that would qualify as an emergency or exigent
16    circumstance.
17 Q  Do you have any knowledge there's an indication that she's
18    going to harm herself before you go into the home?
19 A  Well, the information that we had at the time, I believe
20    there was a good possibility after a pistol was acquired
21    in the middle of the night.
22 Q  What information?
23 A  That was given from Officer Hodges to Babinec to me.
24 Q  Okay. So third-hand knowledge allows you the opportunity
25    to go into her home, right?

Page 15

1  A  Again, that would depend on -- I just wish I could
2     remember more of the conversation that night. I don't
3     want to make anything up.
4  Q  You don't have to make anything up. I appreciate you
5     doing your best to tell the truth here.
6          Does Miss Rudolph say anything to you
7     personally?
8  A  I believe she spoke to both of us while we were there.
9     And while speaking to us, I do remember the portion of
10    the conversation -- what led me to believe she was
11    intoxicated. I caught an odor of intoxicants from her.
12 Q  Was that inside or outside the house?
13 A  That was in the walkway -- yeah, just inside the walkway.
14    There was like a little breezeway there, I do remember
15    that.
16 Q  Okay. Well, how did you get into the breezeway?
17          MS. ZDARSKY: Objection; asked and answered.
18 BY MR. TRAINOR:
19 Q  Go ahead. You just walked in?
20 A  Right. I believe I was behind Officer Babinec.
21 Q  Okay. Did Babinec ever go into the house and then leave
22    and then come back in again, if you know?
23 A  Not that I remember.
24 Q  Okay. How about you; did you ever go in and leave?
25 A  No, I stayed right there with him.

Page 16

1  Q  Okay. So you go in the house and the two of you are in
2     the house. And then you take her into custody and take
3     her to the car. That's the long and the short of it,
4     right?
5  A  Well, there's conversation, which I wish -- like I said,
6     I wish I could remember the substance of most of it,
7     but -- yes.
8  Q  Okay. So the two of you never go in, leave, and then come
9     back in again?
10 A  We were there with her for the duration.
11 Q  Okay. Do you ever remember her telling you to leave her
12    home?
13 A  I don't.
14 Q  She could have, but you don't remember, right?
15 A  Right.
16 Q  Do you remember anything she said like, I'm okay, leave me
17    alone, I'm not suicidal, anything like that?
18 A  I do remember her refusal to be taken to the hospital.
19 Q  Well, tell me how she refused.
20 A  She didn't want to go because she thought she was fine,
21    she was okay.
22 Q  Okay. Did anyone ask her to come with you?
23          MS. ZDARSKY: I'm sorry?
24 BY MR. TRAINOR:
25 Q  Like, come on with us, let's go, we're going?

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.671   Page 6 of 14

| Leticia Rudolph v. | Robert Atkinson | Robert Atkinson - Vol. I |
|---|---|---|
| Daniel Babinec, Robert Atkinson, Twp. of Fruitport | | October 2, 2017 |

Page 17

1  A   I don't remember that.
2  Q   Okay. Did you give her an ultimatum?
3  A   I believe I may have asked her -- told her she could --
4      she could go to the hospital or we could transport her.
5      I do remember that.
6  Q   You told her that?
7  A   Yes.
8  Q   Before you put your hands on her to put the handcuffs on
9      her, did you ever tell her that you're under arrest?
10 A   I don't remember that. I don't believe that would be
11     considered an arrest because there wasn't a -- it wasn't
12     criminal.
13 Q   Did you ever tell her, turn around, put your hands behind
14     your back, we're handcuffing you?
15 A   No, I don't remember that.
16 Q   Okay. Did Babinec ever tell her that?
17 A   Not that I can recall, no.
18 Q   You prepared a supplemental report to the incident report?
19 A   Yes.
20 Q   The purpose of the supplemental report is to memorialize a
21     certain incident that occurred?
22 A   Right, and document my involvement in that.
23 Q   Okay. Be as specific as possible and put in as much
24     detail as possible, correct?
25 A   Yes.

Page 18

1  Q   Tell me everything Miss Rudolph did to refuse to go to the
2      hospital.
3  A   Like?
4  Q   Everything. What did she do?
5  A   Verbally refusing.
6  Q   How about physically refusing, starting with that, if she
7      did.
8  A   Besides the pulling away --
9  Q   When did she pull away?
10 A   When we were inside the walkway there.
11 Q   Tell me how she pulled away.
12         MS. ZDARSKY: Objection; asked and answered.
13         Go ahead.
14         MR. TRAINOR: That's never been answered.
15         THE WITNESS: Well, I believe it was after
16     Officer Babinec attempted to place handcuffs on her.
17 BY MR. TRAINOR:
18 Q   Okay. How did he attempt to place handcuffs on her?
19 A   I believe he would have tried grabbing her right arm
20     because I had her left arm.
21 Q   Okay.
22 A   Then after that, there was no -- no resistance on her
23     part. She was pretty cooperative.
24 Q   Okay. Did she break free from you or Babinec?
25 A   No. No.

Page 19

1  Q   You said she pulled away though. So that, to me, means
2      she broke away.
3  A   Initially. You're talking during the initial attempt to
4      place handcuffs on?
5  Q   Yes.
6  A   She pulled away from Officer Babinec.
7  Q   Broke away from him?
8  A   No. No.
9  Q   And what did he do when she pulled away from him?
10 A   He grabbed ahold of her arm -- a better grab, a better
11     hold.
12 Q   And then what did he do?
13 A   Then we held her against the wall.
14 Q   Was she already against the wall?
15 A   No.
16 Q   How did she end up against the wall?
17 A   We moved her to the wall.
18 Q   Okay. You and he?
19 A   Yes.
20 Q   Okay. Did you escort Miss Rudolph to the car?
21 A   No, that was Officer Babinec.
22 Q   Did you watch him escort her to the car?
23 A   I remember walking alongside of him, yes.
24 Q   Okay. At what point in time did you go get her shoes?
25 A   It was after she was placed in the back seat of the --

Page 20

1  Q   What was Miss Rudolph saying as you were walking to the
2      car with her?
3  A   I do remember her saying that her -- she had a family
4      member that was an officer, and she would be calling him.
5  Q   That's on the way to the car?
6  A   Yes.
7  Q   Okay. Anything else she was saying?
8  A   Not that I remember, no.
9  Q   Was she talking the whole way to the car?
10 A   I don't remember.
11 Q   Did she ever complain about being hurt; you're hurting me?
12 A   No. She walked without any problems.
13 Q   Did she ever complain about the handcuffs being too tight?
14 A   No.
15 Q   Why did you put in your report that you checked the
16     handcuffs and made sure they were double locked?
17 A   Standard procedure is to make sure that they're not gonna
18     cause harm to someone's wrist and they're on there -- and
19     they're not meant for comfort, but they're on there in a
20     decent fashion so they're not getting any tighter or any
21     looser.
22 Q   How come Babinec didn't put that in his report?
23         MS. ZDARSKY: Objection; speculation.
24 BY MR. TRAINOR:
25 Q   Go ahead.

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.672   Page 7 of 14

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I
October 2, 2017

Page 21

1  A   It's possibly because I was the one that checked them
2      after he put them on.
3  Q   When did you prepare your report after this incident?
4  A   When?
5  Q   Yeah.
6  A   I can't remember if it was the night of the incident or
7      the day after. It was --
8  Q   Why would it take you five days to prepare this report,
9      a supplement, after the incident?
10         MS. ZDARSKY: Objection; form, speculation.
11 BY MR. TRAINOR:
12 Q   Can you answer that question or not?
13 A   A ton of reasons. Number of call volume or other reports
14     that needed to be done.
15 Q   Did Morningstar tell you to prepare the supplemental
16     report?
17 A   No, that's --
18 Q   You did it on your own?
19 A   Yeah. Yes.
20 Q   Okay. Because you want to be truthful and accurate and --
21     right?
22 A   Yes, sir.
23 Q   Did Morningstar ever investigate this and ask you
24     questions about it?
25 A   Yes.

Page 22

1  Q   He interviewed you personally?
2  A   I can't remember if he talked to my -- just me or myself
3      and Babinec together.
4  Q   But you think he spoke with you, right?
5  A   Yes, he did.
6  Q   Okay. If he claims he didn't speak with you, what do you
7      make of that?
8  A   Bad memory. I don't know.
9  Q   You're saying he did?
10 A   I do remember speaking to him about the incident, yes.
11 Q   In a detective-type setting?
12         MS. ZDARSKY: Objection to form; "detective-type
13     setting."
14         If you understand, you can answer the question.
15         THE WITNESS: As in at work, not my home?
16 BY MR. TRAINOR:
17 Q   Yeah, at work.
18 A   Yes.
19 Q   He took you in a room and questioned you?
20 A   Yeah, I spoke to him at our office.
21 Q   Took notes?
22 A   I believe he would have, yeah. I'm not -- I didn't watch
23     him write, but ...
24 Q   But he had a pen and paper or pencil and paper?
25 A   I don't know if he did or not. I don't remember.

Page 23

1  Q   Did he record the interview?
2  A   I don't know.
3  Q   Did you have a union representative with you?
4  A   No.
5  Q   Did he give you Garrity?
6  A   No.
7  Q   Were you concerned with him giving you Garrity?
8         MS. ZDARSKY: "With him giving you Garrity"?
9         MR. TRAINOR: Yeah.
10        MS. ZDARSKY: He just said he didn't get
11     Garrity.
12        MR. TRAINOR: He didn't.
13 BY MR. TRAINOR:
14 Q   But were you concerned about that?
15 A   No.
16 Q   Do you know what a Use of Force form is?
17 A   Yes.
18 Q   What is it?
19 A   A form we have at the department that's filled out anytime
20     an officer uses force.
21 Q   If someone is injured during the course of an arrest, are
22     you supposed to fill one out?
23 A   I'm just looking at this from two different ways in my
24     mind, whether it's officer or -- I'm trying to recall the
25     form. You know, if -- an example, if I use my taser or

Page 24

1      use an OC spray, that's all on there. I'm just trying to
2      remember if there's -- I do remember there was a section
3      for officer injuries on the Use of Force form.
4  Q   How about arrestee injury?
5  A   Yes. Yes, there is. There's a spot for that and if they
6      needed to be taken in for medical attention.
7  Q   Okay. Can you explain how Miss Rudolph ended up with
8      bruising on her arm?
9         MS. ZDARSKY: Objection; speculation.
10        You can go ahead.
11        THE WITNESS: I don't know how that would have
12     happened, no.
13 BY MR. TRAINOR::
14 Q   Can you explain how Miss Rudolph ended up injuring her
15     ankle?
16        MS. ZDARSKY: Same objection.
17        THE WITNESS: I wouldn't know how she would have
18     done that, no.
19 BY MR. TRAINOR:
20 Q   Can you explain how she ended up with swelling and redness
21     and marks on her wrists?
22        MS. ZDARSKY: Same objection.
23        Go ahead.
24        THE WITNESS: No.
25 \

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.673   Page 8 of 14

| Leticia Rudolph v. | Robert Atkinson | Robert Atkinson - Vol. I |
| Daniel Babinec, Robert Atkinson, Twp. of Fruitport | | October 2, 2017 |

## Page 25

1  BY MR. TRAINOR:
2  Q  I want you to assume that Miss Rudolph has testified she
3     was yanked off steps or a porch, and she landed on her
4     ankle and twisted it.
5         Was there any reason to have yanked her off the
6     steps or porch?
7         MS. ZDARSKY: Objection; form and improper
8     assumptions, characterization.
9  BY MR. TRAINOR:
10 Q  Go ahead.
11        MS. ZDARSKY: If you understand the question.
12 BY MR. TRAINOR:
13 Q  Would there have been any reason to have yanked her off a
14    porch or steps?
15 A  No.
16 Q  Okay. I want you to assume that Miss Rudolph has
17    testified that she complained that not you, but Babinec,
18    was hurting her the whole time -- you're hurting me,
19    you're hurting me -- when he shoved her or pushed her into
20    the wall.
21        Would there have been any reason to have shoved
22    her or pushed her into the wall --
23        MS. ZDARSKY: Same objections.
24 BY MR. TRAINOR:
25 Q  -- such that she said she was being hurt?

## Page 26

1  A  No reason for any shoving. If there's somebody
2     complaining of pain in some way, we'd most certainly look
3     into it.
4  Q  Okay.
5  A  Like not just ignore it, if that did happen.
6  Q  There's no reason to have forcefully pushed her into the
7     wall in this case, was there?
8         MS. ZDARSKY: Same objections.
9  BY MR. TRAINOR:
10 Q  Go ahead.
11 A  No.
12 Q  That's no?
13 A  No. Right, yes -- no. Excuse me, no. The answer is no.
14 Q  If Miss Rudolph had complained of the handcuffs being too
15    tight, someone should have checked on the handcuffs.
16    Would you agree with me?
17        MS. ZDARSKY: Same objections;
18    mischaracterization, form, improper assumption and -- the
19    mischaracterization that someone didn't check the
20    handcuffs for tightness.
21        THE WITNESS: If somebody -- ask it again. I'm
22    sorry.
23 BY MR. TRAINOR:
24 Q  If Miss Rudolph had been complaining about the handcuffs
25    being too tight, someone should have checked the

## Page 27

1     handcuffs, correct?
2  A  Yes, that would be appropriate to check the handcuffs.
3  Q  Can you explain why no one requested an ambulance to come
4     to the scene?
5  A  No.
6  Q  If someone is suicidal, is it appropriate to call an
7     ambulance and ask someone to take a look at her who's got
8     more medical training than you do?
9  A  If that person was willing to go, usually -- generally,
10    given options, if they were willing to ride in an
11    ambulance to the hospital, that would be an option.
12 Q  Okay. Do you know why an ambulance wasn't called in this
13    case?
14        MS. ZDARSKY: Objection; asked and answered.
15    Go ahead.
16        THE WITNESS: Possibly because of Miss Rudolph's
17    refusal to go.
18 BY MR. TRAINOR:
19 Q  Did you offer the option for her to go in an ambulance
20    instead of in a police car?
21 A  I can't remember if she was offered that by myself or the
22    other officer on scene or not.
23 Q  If it's not in anybody's report, then most likely she
24    wasn't offered the opportunity to go to the hospital in an
25    ambulance; isn't that true?

## Page 28

1  A  That would be true, if I didn't put it in there.
2  Q  Did you ever ask why her husband wasn't brought to the
3     scene to talk with her?
4  A  No, not that I can remember. No.
5  Q  Did you ask -- or did you suggest that maybe we should go
6     talk to her husband before we take her away, whether she
7     told him she was suicidal or not?
8  A  No.
9  Q  No?
10 A  No.
11 Q  So you relied upon what Hodges told Babinec and Babinec
12    told you, and you engaged in the taking into custody of
13    Miss Rudolph based upon that, right?
14 A  Based on the information from Officer Babinec and Hodges
15    and her condition and statements on scene.
16 Q  What statements on scene did she make to you that would
17    indicate that she needed to be taken for observation?
18 A  I do remember Officer Babinec asking her about the gun,
19    and she -- making -- made the statement that she was
20    cleaning it.
21 Q  Okay.
22 A  And given the time of the day -- night, excuse me, it
23    seemed a little out of the ordinary.
24 Q  Did she indicate when she was cleaning it, whether she was
25    cleaning it during the day that day or in the evening?

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.674   Page 9 of 14

| Leticia Rudolph v. | Robert Atkinson | Robert Atkinson - Vol. I |
| --- | --- | --- |
| Daniel Babinec, Robert Atkinson, Twp. of Fruitport | | October 2, 2017 |

Page 29

1  A  No.
2  Q  Other than that, any other statements?
3  A  Just the odor of intoxicants that I got from her during
4     her statement.
5  Q  The odor of intoxicants could be because she had one or
6     two or three drinks; isn't that true?
7           MS. ZDARSKY: Objection; speculation.
8  BY MR. TRAINOR:
9  Q  That doesn't really mean anything, does it?
10          MS. ZDARSKY: Objection.
11          You can go ahead and answer if you understand
12     the question.
13          THE WITNESS: It could be any number of drinks,
14     yes.
15  BY MR. TRAINOR:
16  Q  Okay. Well, what else is there other than statements from
17     Hodges and Babinec? Is there anything that would indicate
18     to you that she needed to be taken away for observation,
19     in your personal knowledge?
20          MS. ZDARSKY: Objection; asked and answered.
21          Go ahead.
22  BY MR. TRAINOR:
23  Q  Go ahead.
24  A  Not that I can recall, no.
25          MR. TRAINOR: That's all.

Page 30

1           MS. ZDARSKY: I'm going to have a few questions
2      for you.
3                    EXAMINATION
4  BY MS. ZDARSKY:
5  Q  You talked about the odor of intoxicants. Did that
6     intoxication cause you any concern for Miss Rudolph's
7     well-being that evening?
8  A  Yes.
9  Q  Why is that?
10 A  And with the information that I arrived on scene with from
11    Mr. Rudolph's husband or ex-husband, and the other two
12    officers in combination with that, that's where
13    I developed a concern for her well-being.
14 Q  Go ahead.
15 A  That was it.
16 Q  While you were on scene -- and I know you mentioned that
17    Officer Babinec was really having most of the conversation
18    with Miss Rudolph -- did you or did Officer Babinec ask
19    Miss Rudolph to go to Hackley Hospital voluntarily?
20 A  I do remember her being asked if she would -- if she would
21    go.
22 Q  Did you hear her say that she refused to go, in one way or
23    another?
24 A  Yes.
25 Q  There were some questions you were asked about to assume

Page 31

1     things that Miss Rudolph had complained about, the
2     handcuffs being too tight. And I know that earlier you
3     testified that you didn't hear any complaints or that she
4     didn't make any complaints to you. But, nonetheless, in
5     your interaction with her, setting aside those
6     assumptions, did you actually check her handcuffs for
7     tightness?
8  A  Yes.
9  Q  In your conversations with Detective Morningstar, were you
10    open and honest in those conversations?
11 A  Yes.
12 Q  The fact that you didn't have any Garrity warning, did
13    that affect your willingness to be honest?
14 A  No.
15 Q  Did you eventually get shoes for Miss Rudolph?
16 A  Yes.
17 Q  Do you remember what kind of shoes those were?
18 A  I don't.
19          MS. ZDARSKY: All right. Those are all the
20     questions that I have for you.
21          MR. TRAINOR: That's all. Thanks.
22          (Deposition concluded at 3:34 p.m.)
23  \
24  \
25

Page 32

                    CERTIFICATE
STATE OF MICHIGAN    )
                     ) ss
COUNTY OF OTTAWA     )

        I, CYNTHIA M. THOMAS, Certified Shorthand
Reporter and Notary Public, do hereby certify that the
foregoing deposition was taken before me at the time and
place hereinbefore set forth, and that said witness was
duly sworn by me to tell the truth, the whole truth, and
nothing but the truth, and thereupon was examined and
testified in the foregoing deposition as appears:

        I FURTHER CERTIFY that the deposition was taken
in shorthand and thereafter transcribed by means of
computer-aided transcription by me and under my direction
and supervision, and that it is a true and accurate
transcript of my original shorthand notes.

        I FURTHER CERTIFY that I am not a relative or
employee or attorney or counsel of any of the parties, or
financially interested directly or indirectly in this
action.

        IN WITNESS WHEREOF, I have hereunto set my hand
this 10th day of October, 2017, at Grand Rapids, Michigan.

                    CYNTHIA M. THOMAS
                    Certified Shorthand Reporter No. 3836
                    Notary Public, Ottawa County, Michigan
                    My Commission Expires: 11-09-21

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.675   Page 10 of 14

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I
October 2, 2017

**1**

**15th (1)**
4:22

**2**

**2 (1)**
3:1
**2:55 (1)**
3:2
**2015 (1)**
4:22
**2017 (1)**
3:1

**3**

**3:34 (1)**
31:22

**4**

**40 (1)**
6:13

**5**

**50 (1)**
6:13

**6**

**60 (1)**
6:13

**A**

**academy (1)**
8:6
**accurate (1)**
21:20
**accused (1)**
8:16
**acquired (1)**
14:20
**actually (3)**
7:14;8:21;31:6
**affect (1)**
31:13
**again (5)**
9:12;15:1,22;16:9;
26:21
**against (8)**
9:9,11;10:10,14,17;
19:13,14,16
**ago (1)**
13:20
**agree (1)**
26:16
**agreement (1)**
3:13

**ahead (13)**
13:17;15:19;18:13;
20:25;24:10,23;25:10;
26:10;27:15;29:11,21,
23;30:14
**ahold (1)**
19:10
**allow (1)**
14:10
**allowed (1)**
14:6
**allows (2)**
14:7,24
**alone (1)**
16:17
**alongside (1)**
19:23
**ambulance (6)**
27:3,7,11,12,19,25
**ankle (2)**
24:15;25:4
**answered (6)**
12:9;15:17;18:12,14;
27:14;29:20
**appreciate (1)**
15:4
**appreciated (1)**
4:5
**appropriate (2)**
27:2,6
**area (2)**
10:19,19
**arm (7)**
8:25;10:15,19;18:19,
20;19:10;24:8
**around (2)**
6:14;17:13
**arrest (3)**
17:9,11;23:21
**arrested (1)**
8:16
**arrestee (1)**
24:4
**arrived (1)**
30:10
**aside (1)**
31:5
**asleep (1)**
7:20
**Associate's (1)**
8:2
**assume (3)**
25:2,16;30:25
**assumption (1)**
26:18
**assumptions (2)**
25:8;31:6
**ATKINSON (4)**
3:4,10,12,19
**attempt (2)**
18:18;19:3
**attempted (1)**
18:16

**attention (1)**
24:6
**away (16)**
9:11,15,21,25;10:2,22;
18:8,9,11;19:1,2,6,7,9;
28:6;29:18

**B**

**Babinec (26)**
6:7;9:8,15;11:6;12:4,
25;13:5,21;14:23;15:20,
21;17:16;18:16,24;19:6,
21;20:22;22:3;25:17;
28:11,11,14,18;29:17;
30:17,18
**Bachelor's (1)**
8:8
**back (10)**
4:22;7:6;8:25;9:5;
10:20,24;15:22;16:9;
17:14;19:25
**Bad (1)**
22:8
**Baker (1)**
8:8
**based (2)**
28:13,14
**becoming (1)**
6:17
**behalf (1)**
3:5
**behind (6)**
8:25;9:5;10:20,24;
15:20;17:13
**Besides (1)**
18:8
**best (1)**
15:5
**better (2)**
19:10,10
**both (1)**
15:8
**boyfriend (1)**
11:10
**break (1)**
18:24
**breezeway (2)**
15:14,16
**bring (1)**
10:20
**broke (2)**
19:2,7
**brought (3)**
10:24;11:20;28:2
**bruising (1)**
24:8
**busy (1)**
10:3

**C**

**call (3)**

7:19;21:13;27:6
**called (2)**
5:9;27:12
**calling (1)**
20:4
**came (2)**
5:4;12:5
**can (12)**
4:4;17:17;21:12;
22:14;24:7,10,14,20;
27:3;28:4;29:11,24
**car (7)**
16:3;19:20,22;20:2,5,
9;27:20
**case (4)**
8:22;14:12;26:7;27:13
**catnap (1)**
7:6
**caught (1)**
15:11
**cause (3)**
14:14;20:18;30:6
**certain (1)**
17:21
**certainly (1)**
26:2
**chair (1)**
7:12
**characterization (2)**
13:15;25:8
**check (7)**
11:7,14,22;14:8;
26:19;27:2;31:6
**checked (5)**
12:2;20:15;21:1;
26:15,25
**checking (1)**
14:4
**Cindy (1)**
4:3
**circumstance (2)**
14:11,16
**circumstances (1)**
14:12
**claims (1)**
22:6
**cleaning (3)**
28:20,24,25
**college (4)**
7:24;8:2,5,8
**combination (2)**
6:14;30:12
**comfort (1)**
20:19
**Community (1)**
8:2
**complain (2)**
20:11,13
**complained (3)**
25:17;26:14;31:1
**complaining (2)**
26:2,24
**complaints (2)**

31:3,4
**concern (2)**
30:6,13
**concerned (3)**
14:13;23:7,14
**concluded (1)**
31:22
**condition (1)**
28:15
**considered (1)**
17:11
**consistent (1)**
3:14
**contact (2)**
11:14,17
**conversation (6)**
13:9,18;15:2,10;16:5;
30:17
**conversations (2)**
31:9,10
**cooperative (1)**
18:23
**counsel (1)**
3:13
**County (2)**
4:17;6:4
**couple (2)**
7:14,16
**course (1)**
23:21
**Court (3)**
3:14,15,22
**courthouse (1)**
4:7
**courtroom (2)**
4:1,2
**criminal (2)**
8:10;17:12
**cuffs (1)**
9:7
**currently (1)**
4:14
**custody (2)**
16:2;28:12

**D**

**day (4)**
21:7;28:22,25,25
**days (1)**
21:8
**decent (1)**
20:20
**degree (2)**
8:3,8
**Department (8)**
4:17,24;5:4,11,16,20;
24:23;19
**departments (1)**
7:1
**depend (2)**
14:11;15:1
**deposition (3)**

Case 1:17-cv-00125-JTN-ESC  ECF No. 54-4 filed 04/19/18  PageID.676  Page 11 of 14

Leticia Rudolph v.  
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I  
October 2, 2017

3:12,19;31:22
**detail (1)**
   17:24
**Detective (1)**
   31:9
**detective-type (2)**
   22:11,12
**developed (1)**
   30:13
**different (1)**
   23:23
**disagree (1)**
   13:13
**document (1)**
   17:22
**done (2)**
   21:14;24:18
**door (11)**
   12:1,5,9,18,22,23,25;
   13:1,1;14:1,3
**double (1)**
   20:16
**down (2)**
   4:3;7:12
**dozed (2)**
   7:13,16
**drinks (2)**
   29:6,13
**duly (1)**
   3:6
**duration (1)**
   16:10
**during (4)**
   19:3;23:21;28:25;29:3

**E**

**earlier (1)**
   31:2
**elbow (1)**
   10:18
**else (4)**
   5:19;7:22;20:7;29:16
**emergency (1)**
   14:15
**employed (4)**
   4:14,16,24;6:18
**Employment (3)**
   4:15,25;6:22
**end (1)**
   19:16
**ended (3)**
   24:7,14,20
**ends (1)**
   10:10
**engaged (1)**
   28:12
**Era (4)**
   5:20;6:2,5,7
**escort (2)**
   19:20,22
**Even (1)**
   7:1

**evening (2)**
   28:25;30:7
**Eventually (2)**
   12:5;31:15
**Evidence (2)**
   3:15,16
**EXAMINATION (2)**
   3:17;30:3
**examined (1)**
   3:7
**example (1)**
   23:25
**Excuse (2)**
   26:13;28:22
**exhausted (1)**
   7:11
**ex-husband (2)**
   11:11;30:11
**exigent (1)**
   14:15
**experience (1)**
   5:1
**explain (4)**
   24:7,14,20;27:3
**exterior (1)**
   12:12
**extremely (1)**
   7:10

**F**

**faces (1)**
   10:4
**fact (1)**
   31:12
**fair (4)**
   4:5,6;10:5,5
**fall (1)**
   7:20
**family (1)**
   20:3
**fashion (1)**
   20:20
**Federal (2)**
   3:15,15
**few (3)**
   7:6,21;30:1
**fill (1)**
   23:22
**filled (1)**
   23:19
**fine (1)**
   16:20
**first (3)**
   3:6;8:20;11:23
**Five (3)**
   4:21;5:8;21:8
**follows (1)**
   3:7
**force (4)**
   8:17;23:16,20;24:3
**forcefully (1)**
   26:6

**form (10)**
   9:16;12:14;21:10;
   22:12;23:16,19,25;24:3;
   25:7;26:18
**four (1)**
   6:16
**free (1)**
   18:24
**front (3)**
   12:1;14:1,2
**Fruitport (3)**
   3:1;4:17,24
**full (10)**
   4:1,2,18,21,22;5:13,
   17,21,25;6:10

**G**

**Garrity (5)**
   23:5,7,8,11;31:12
**generally (1)**
   27:9
**genuinely (1)**
   14:13
**gist (2)**
   9:2,3
**given (3)**
   14:23;27:10;28:22
**giving (2)**
   23:7,8
**gonna (1)**
   20:17
**good (1)**
   14:20
**grab (1)**
   19:10
**grabbed (2)**
   8:24;19:10
**grabbing (1)**
   18:19
**guess (2)**
   7:19;14:11
**guideline (1)**
   14:7
**gun (2)**
   11:9;28:18
**guys (1)**
   13:8

**H**

**Hackley (1)**
   30:19
**hand (1)**
   9:5
**handcuffing (1)**
   17:14
**handcuffs (16)**
   10:11;11:2;17:8;
   18:16,18;19:4;20:13,16;
   26:14,15,20,24;27:1,2;
   31:2,6
**hands (4)**

8:21;10:13;17:8,13
**happen (1)**
   26:5
**happened (1)**
   24:12
**Harbor (1)**
   6:21
**hard (1)**
   7:11
**harm (3)**
   14:14,18;20:18
**harming (1)**
   14:5
**hazardous (1)**
   8:13
**hear (3)**
   12:2;30:22;31:3
**held (2)**
   4:8;19:13
**helped (1)**
   9:10
**herself (2)**
   14:5,18
**Hodges (5)**
   11:9;14:23;28:11,14;
   29:17
**hold (1)**
   19:11
**holding (4)**
   9:11;10:13,15,18
**home (8)**
   11:5;13:8;14:6,10,18,
   25;16:12;22:15
**honest (2)**
   31:10,13
**hospital (6)**
   16:18;17:4;18:2;
   27:11,24;30:19
**hours (2)**
   6:13;7:10
**house (10)**
   12:13;13:13,23,24,25;
   14:9;15:12,21;16:1,2
**hurt (2)**
   20:11;25:25
**hurting (4)**
   20:11;25:18,18,19
**husband (4)**
   11:10;28:2,6;30:11

**I**

**ignore (1)**
   26:5
**improper (2)**
   25:7;26:18
**incident (7)**
   10:9;17:18,21;21:3,6,
   9;22:10
**indicate (3)**
   28:17,24;29:17
**indication (1)**
   14:17

**information (4)**
   14:19,22;28:14;30:10
**informed (1)**
   11:9
**initial (1)**
   19:3
**Initially (1)**
   19:3
**injured (1)**
   23:21
**injuries (1)**
   24:3
**injuring (1)**
   24:14
**injury (1)**
   24:4
**inner (1)**
   12:24
**inside (3)**
   15:12,13;18:10
**instead (1)**
   27:20
**interaction (1)**
   31:5
**interview (1)**
   23:1
**interviewed (1)**
   22:1
**into (18)**
   7:9;9:13;12:13;13:8,
   23,24,25;14:6,18,25;
   15:16,21;16:2;25:19,22;
   26:3,6;28:12
**intoxicants (4)**
   15:11;29:3,5;30:5
**intoxicated (1)**
   15:11
**intoxication (1)**
   30:6
**investigate (1)**
   21:23
**invite (1)**
   13:8
**involvement (1)**
   17:22

**J**

**jobs (2)**
   6:12,16
**judge (2)**
   3:25;4:2
**justice (1)**
   8:10

**K**

**kind (1)**
   31:17
**knock (1)**
   12:5
**knocked (2)**
   12:1,9

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.677   Page 12 of 14

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I
October 2, 2017

knocking (2)
    12:6,7
knocks (1)
    12:25
knowledge (3)
    14:17,24;29:19

**L**

landed (1)
    25:3
leave (5)
    15:21,24;16:8,11,16
led (1)
    15:10
left (3)
    8:24;10:25;18:20
likely (1)
    27:23
little (2)
    15:14;28:23
located (1)
    11:9
location (3)
    12:14,15,17
locked (1)
    20:16
long (6)
    4:20;7:20;9:20;13:11,
    20;16:3
look (2)
    26:2;27:7
looked (1)
    7:9
looking (2)
    10:3;23:23
looser (1)
    20:21

**M**

main (1)
    13:1
making (1)
    28:19
March (1)
    4:22
marks (1)
    24:21
materials (1)
    8:13
may (2)
    14:14;17:3
maybe (1)
    28:5
mean (3)
    9:16;10:1;29:9
means (1)
    19:1
meant (1)
    20:19
medical (2)
    24:6;27:8

member (1)
    20:4
memorialize (1)
    17:20
memory (1)
    22:8
mentioned (1)
    30:16
Michigan (3)
    3:1,14,15
middle (1)
    14:21
miles (1)
    5:8
mind (1)
    23:24
minute (1)
    7:13
minutes (3)
    7:14,16,21
mischaracterization (2)
    26:18,19
Miss (22)
    8:21;9:15;11:5,10;
    13:4;15:6;18:1;19:20;
    20:1;24:7,14;25:2,16;
    26:14,24;27:16;28:13;
    30:6,18,19;31:1,15
Monday (1)
    3:1
month (1)
    6:16
more (4)
    5:24;10:9;15:2;27:8
Morningstar (6)
    6:3,5;7:14;21:15,23;
    31:9
most (4)
    16:6;26:2;27:23;30:17
moved (1)
    19:17
MSU (1)
    8:12
much (3)
    3:24;8:17;17:23
Muskegon (2)
    5:16;8:2
myself (2)
    22:2;27:21

**N**

name (1)
    3:9
nap (2)
    7:18,19
needed (5)
    11:19;21:14;24:6;
    28:17;29:18
New (4)
    5:20;6:2,5,7
night (4)
    14:21;15:2;21:6;28:22

nonetheless (1)
    31:4
northwest (1)
    5:8
Notary (1)
    3:6
notes (1)
    22:21
notice (1)
    3:12
number (3)
    7:10;21:13;29:13

**O**

Objection (16)
    9:16;12:14;13:15;
    15:17;18:12;20:23;
    21:10;22:12;24:9,16,22;
    25:7;27:14;29:7,10,20
objections (3)
    25:23;26:8,17
observation (2)
    28:17;29:18
observed (2)
    9:21;10:2
OC (1)
    24:1
occurred (1)
    17:21
Oceana (1)
    6:4
October (1)
    3:1
odor (4)
    15:11;29:3,5;30:5
off (5)
    7:13,16;25:3,5,13
offer (1)
    27:19
offered (2)
    27:21,24
offhand (1)
    14:8
office (2)
    7:6;22:20
OFFICER (21)
    3:4;6:17;9:8;11:6,9;
    12:4;13:5;14:23;15:20;
    18:16;19:6,21;20:4;
    23:20,24;24:3;27:22;
    28:14,18;30:17,18
officers (2)
    14:13;30:12
One (10)
    5:24;6:15;7:15;9:13;
    12:24;21:1;23:22;27:3;
    29:5;30:22
on-line (1)
    8:12
only (1)
    3:24
open (3)

13:2,3;31:10
opens (1)
    12:25
opportunity (2)
    14:24;27:24
option (2)
    27:11,19
options (1)
    27:10
ordinary (1)
    28:23
out (4)
    14:9;23:19,22;28:23
outer (1)
    12:23
out-loud (1)
    4:4
outside (2)
    13:10;15:12
over (4)
    6:2,3,7;11:22
own (1)
    21:18

**P**

pain (1)
    26:2
paper (2)
    22:24,24
Park (4)
    5:4,6,9;6:11
part (10)
    4:21;5:13,14,17,18,21,
    22,25;6:1;18:23
partial (1)
    13:3
part-time (2)
    6:12,16
pen (1)
    22:24
pencil (1)
    22:24
people (3)
    4:1,2;7:9
period (1)
    6:15
person (1)
    27:9
personal (1)
    29:19
personally (2)
    15:7;22:1
physically (1)
    18:6
pistol (1)
    14:20
place (4)
    8:25;18:16,18;19:4
placed (2)
    9:5;19:25
Plaintiff (1)
    3:5

plan (1)
    14:5
Please (1)
    3:9
pm (2)
    3:2;31:22
point (2)
    14:4;19:24
Police (11)
    4:17,24;5:4,11,16,20,
    24;6:17;7:1;8:10;27:20
police-related (1)
    4:25
policy (1)
    14:7
porch (5)
    12:11,12;25:3,6,14
portion (1)
    15:9
possibility (1)
    14:20
possible (2)
    17:23,24
possibly (2)
    21:1;27:16
potentially (2)
    11:13;14:14
prepare (3)
    21:3,8,15
prepared (1)
    17:18
pretty (2)
    3:24;18:23
Prior (1)
    6:17
problems (1)
    20:12
procedure (1)
    20:17
proceeded (1)
    12:5
produced (1)
    3:5
program (2)
    8:12,13
Public (1)
    3:6
pull (4)
    9:11,15;10:2;18:9
pulled (4)
    18:11;19:1,6,9
pulling (4)
    9:21,25;10:22;18:8
purpose (1)
    17:20
purposes (1)
    3:14
pursuant (1)
    3:12
push (2)
    9:9,10
pushed (4)
    9:13,25;19:22;26:6

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.678   Page 13 of 14

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I
October 2, 2017

pushing (2)
   9:12,14
put (12)
   8:21;9:7;10:10,13;
   17:8,8,13,23;20:15,22;
   21:2;28:1

**Q**

qualify (1)
   14:15

**R**

radio (1)
   7:12
real (1)
   7:21
really (4)
   7:18;8:9;29:9;30:17
reason (6)
   13:13;25:5,13,21;
   26:1,6
reasons (1)
   21:13
recall (7)
   9:21,25;13:18;14:8;
   17:17;23:24;29:24
recent (1)
   10:9
record (3)
   3:11,13;23:1
redness (1)
   24:20
reflect (1)
   3:11
refusal (2)
   16:18;27:17
refuse (1)
   18:1
refused (2)
   16:19;30:22
refusing (2)
   18:5,6
regular (1)
   12:24
relied (1)
   28:11
remember (37)
   9:20,21;10:3,6;12:12,
   19;13:3,7,9;15:2,9,14,
   23;16:6,11,14,16,18;
   17:1,5,10,15;19:23;20:3,
   8,10;21:6;22:2,10,25;
   24:2,2;27:21;28:4,18;
   30:20;31:17
report (9)
   17:18,18,20;20:15,22;
   21:3,8,16;27:23
reports (1)
   21:13
representative (1)
   23:3

reprimanded (2)
   7:3,22
requested (2)
   11:6;27:3
residence (1)
   11:15
resistance (1)
   18:22
response (1)
   4:4
ride (1)
   27:10
right (30)
   4:1;6:14;7:18;8:14;
   9:13;10:6,11,20,25;11:8,
   23;12:7,9;13:14;14:2,2,
   6,25;15:20,25;16:4,14,
   15;17:22;18:19;21:21;
   22:4;26:13;28:13;31:19
ROBERT (3)
   3:4,10,12
room (1)
   22:19
Roosevelt (4)
   5:4,6,9;6:11
Rudolph (18)
   8:21;9:15;13:4;15:6;
   18:1;19:20;20:1;24:7,
   14;25:2,16;26:14,24;
   28:13;30:18,19;31:1,15
Rudolph's (5)
   11:5,10;27:16;30:6,11
Rules (4)
   3:14,15,15,16

**S**

same (6)
   3:24;24:16,22;25:23;
   26:8,17
sat (1)
   7:12
saw (2)
   10:1;11:3
saying (4)
   20:1,3,7;22:9
scene (7)
   27:4,22;28:3,15,16;
   30:10,16
school (1)
   8:15
Science (1)
   8:10
Scottville (1)
   8:5
seat (1)
   19:25
second (1)
   8:19
section (1)
   24:2
seemed (1)
   28:23

self-reflecting (1)
   8:18
setting (3)
   22:11,13;31:5
Shelby (5)
   5:24,25;6:2,5,8
Sheriff (1)
   4:17
shoes (3)
   19:24;31:15,17
shop (1)
   6:19
Shore (1)
   8:5
short (3)
   7:21;8:12;16:3
shortly (1)
   12:4
shove (1)
   9:10
shoved (2)
   25:19,21
shoving (2)
   9:12;26:1
showed (1)
   12:4
side (1)
   10:25
sitting (1)
   7:13
six (1)
   5:8
somebody (2)
   26:1,21
someone (6)
   23:21;26:15,19,25;
   27:6,7
someone's (2)
   14:13;20:18
sorry (3)
   5:5;16:23;26:22
speak (1)
   22:6
speaking (2)
   15:9;22:10
specific (1)
   17:23
speculation (4)
   20:23;21:10;24:9;29:7
spoke (3)
   15:8;22:4,20
spot (1)
   24:5
spray (1)
   24:1
Standard (1)
   20:17
standing (2)
   12:11;13:1
start (1)
   8:2
starting (1)
   18:6

state (1)
   3:9
statement (2)
   28:19;29:4
statements (4)
   28:15,16;29:2,16
stay (1)
   13:10
stayed (1)
   15:25
steel (2)
   6:19,21
steps (5)
   12:13,20;25:3,6,14
still (1)
   14:10
stop (1)
   11:6
storm (1)
   12:22
struggle (1)
   10:25
substance (2)
   13:9;16:6
suggest (1)
   28:5
suicidal (5)
   11:13,19;16:17;27:6;
   28:7
supplement (1)
   21:9
supplemental (3)
   17:18,20;21:15
Supply (1)
   6:21
supposed (1)
   23:22
sure (4)
   7:19;14:5;20:16,17
Suspended (2)
   6:24;7:1
swelling (1)
   24:20
sworn (1)
   3:6

**T**

talk (2)
   28:3,6
talked (3)
   7:15;22:2;30:5
talking (3)
   13:5;19:3;20:9
taser (1)
   23:25
telling (1)
   16:11
tells (1)
   14:9
ten (1)
   8:18
terminated (1)

   6:22
testified (5)
   3:7;13:12;25:2,17;
   31:3
Testify (1)
   3:22
testimony (1)
   4:3
Thanks (1)
   31:21
third-hand (1)
   14:24
though (1)
   19:1
thought (1)
   16:20
three (3)
   4:21;6:15;29:6
tight (4)
   20:13;26:15,25;31:2
tighter (1)
   20:20
tightness (2)
   26:20;31:7
together (1)
   22:3
told (8)
   7:16;11:5;13:12;17:3,
   6;28:7,11,12
ton (1)
   21:13
took (3)
   8:12;22:19,21
town (1)
   5:9
Township (1)
   5:16
training (1)
   27:8
TRAINOR (32)
   3:9,11,18;9:18,23;
   12:16,21;13:16;15:18;
   16:24;18:14,17;20:24;
   21:11;22:16;23:9,12,13;
   24:13,19;25:1,9,12,24;
   26:9,23;27:18;29:8,15,
   22,25;31:21
transport (1)
   17:4
tried (1)
   18:19
trouble (1)
   11:2
True (5)
   10:8,9;27:25;28:1;
   29:6
truth (1)
   15:5
truthful (1)
   21:20
trying (2)
   23:24;24:1
turn (1)

Case 1:17-cv-00125-JTN-ESC   ECF No. 54-4 filed 04/19/18   PageID.679   Page 14 of 14

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Robert Atkinson

Robert Atkinson - Vol. I
October 2, 2017

17:13
**turned (1)**
  7:12
**twisted (1)**
  25:4
**two (8)**
  4:21;6:14,16;16:1,8;
  23:23;29:6;30:11
**type (1)**
  4:25

### U

**ultimatum (1)**
  17:2
**under (1)**
  17:9
**union (1)**
  23:3
**up (11)**
  7:12;10:10,13;12:4,
  25;15:3,4;19:16;24:7,14,
  20
**upon (2)**
  28:11,13
**upper (1)**
  10:19
**Use (4)**
  23:16,25;24:1,3
**used (1)**
  3:13
**uses (1)**
  23:20
**using (1)**
  8:17
**usually (1)**
  27:9

### V

**verbal (1)**
  4:4
**Verbally (1)**
  18:5
**volume (1)**
  21:13
**voluntarily (1)**
  30:19

### W

**waited (1)**
  12:4
**walk (2)**
  14:2,6
**walked (3)**
  14:1;15:19;20:12
**walking (2)**
  19:23;20:1
**walkway (3)**
  15:13,13;18:10
**wall (15)**
  9:9,11,13,17,17;10:10,
  14,17;19:13,14,16,17;
  25:20,22;26:7
**warning (1)**
  31:12
**watch (2)**
  19:22;22:22
**way (5)**
  13:2;20:5,9;26:2;
  30:22
**ways (1)**
  23:23
**week (1)**
  6:13
**well-being (5)**
  14:4,8,14;30:7,13
**West (1)**
  8:5
**whole (2)**
  20:9;25:18
**who's (1)**
  27:7
**willing (2)**
  27:9,10
**willingness (1)**
  31:13
**windows (1)**
  12:2
**wish (3)**
  15:1;16:5,6
**without (1)**
  20:12
**witness (12)**
  3:5,10;9:20;12:19;
  18:15;22:15;24:11,17,
  24;26:21;27:16;29:13
**work (7)**
  6:2,7,10;8:10,18;
  22:15,17
**worked (2)**
  6:5,19
**working (1)**
  7:10
**wrist (3)**
  8:24;10:19;20:18
**wrists (1)**
  24:21
**write (1)**
  22:23

### Y

**yanked (3)**
  25:3,5,13
**years (3)**
  4:21;7:6;8:18

### Z

**ZDARSKY (28)**
  9:16,19;12:14,18;
  13:15;15:17;16:23;
  18:12;20:23;21:10;
  22:12;23:8,10;24:9,16,
  22;25:7,11,23;26:8,17;
  27:14;29:7,10,20;30:1,4;
  31:19