# EXHIBIT D

Case 1:17-cv-00125-JTN-ESC  ECF No. 55-5 filed 04/19/18  PageID.917  Page 2 of 33

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec - Vol. !
October 2, 2017

Page 1

```
1              UNITED STATES DISTRICT COURT
2             WESTERN DISTRICT OF MICHIGAN
3
4    LETICIA RUDOLPH,              )
5              Plaintiff,          )
6    vs.                          )    Case No. 1:17-CV-125
     DANIEL T. BABINEC, ROBERT A. )    Hon. Janet T. Neff
7    ATKINSON, in their individual )
     and official capacities, and )
8    the TOWNSHIP OF FRUITPORT,    )
9              Defendants.         )
10
11
12        Deposition of SERGEANT DANIEL T. BABINEC, taken
13   on behalf of the Plaintiff, at 5825 Airline Road, Fruitport,
14   Michigan, commencing at 1:00 p.m., on Monday, October 2, 2017,
15   before CYNTHIA M. THOMAS, CSR/RPR/CM/CRR and Notary Public.
16
17
18   APPEARANCES:
19      For Plaintiffs:     CHRISTOPHER TRAINOR & ASSOCIATES
20                          Attorneys at Law
                            BY:  CHRISTOPHER J. TRAINOR
21                          9750 Highland Road
                            White Lake, Michigan  48386
22
        For Defendants:    MCGRAW MORRIS, P.C.
23                          Attorneys at Law
                            BY:  AMANDA MARIE ZDARSKY
24                          2075 W. Big Beaver Road
                            Suite 750
25                          Troy, Michigan  48084
```

Page 2

```
1                    I N D E X
2
3    WITNESS            EXAMINATION           PAGE
4    DANIEL T. BABINEC  BY MR. TRAINOR        3, 84
5                       BY MS. ZDARSKY        80
6
7
8
9
10
11
12
13            EXHIBITS FOR IDENTIFICATION
14   NUMBER                                   PAGE
15      A - Hand-drawn diagram                58
16
17
18
19
20
21
22
23
24
25
```

Page 3

Fruitport, Michigan, Monday, October 2, 2017
1:00 p.m.

- - -

DANIEL T. BABINEC,

produced as a witness by and on behalf of the Plaintiff, and having been first duly sworn by the Notary Public, was examined and testified as follows:

- - -

MR. TRAINOR: Could you please state your name.

THE WITNESS: Daniel, D-a-n-i-e-l; middle is Thomas, T-h-o-m-a-s; last is Babinec, B-a-b-i-n-e-c. And I am the second.

MR. TRAINOR: Let the record reflect that this is the deposition of Daniel Babinec taken pursuant to notice to be used for any and all purposes consistent with the Michigan Court Rules, Michigan Rules of Evidence, Federal Court Rules, Federal Rules of Evidence.

EXAMINATION

BY MR. TRAINOR:

20 Q  Mr. Babinec, have you ever had your deposition taken before?

22 A  Yes.

23 Q  How many times?

24 A  Once.

25 Q  Cindy is going to take everything you say down.  So if you

Page 4

1  shrug your shoulders, shake your head, use "uh-huh" or
2  "huh-uh," she can't get it down.  Okay?

3 A  I understand.

4 Q  And I'm going to ask you to speak out loud.  Okay?

5 A  I will.

6 Q  You're going to be held to the answer you give.  Do you
7  understand that?

8 A  I do.

9 Q  So if you don't understand what I ask you, tell me that or
10  don't answer my question.  Okay?

11 A  Understood.

12 Q  The other deposition you gave, what did that involve?

13 A  Civil court; two drivers of a traffic crash.

14 Q  Okay.  You prepared a UD-10 and you were called to testify
15  on that?

16 A  I did.

17 Q  Okay.  You're currently employed with the Fruitport Public
18  Safety Department?

19 A  Township Police Department.

20 Q  It's called Fruitport Township Police Department?

21 A  Correct.

22 Q  Okay.  Did it change?

23 A  No.

24 Q  I was looking outside, and I saw something about "Public
25  Safety" on the outside of the building.

Leticia Rudolph v.                                  Daniel Babinec                          Daniel Babinec - Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                         October 2, 2017

Page 5

1 A  The reason I say Police Department is I don't do anything
2     with the fire service.
3 Q  Okay.
4 A  The shoulder patches indicate police department.
5 Q  Okay. And Ken Doctor is in charge of the fire department
6     and the police department then?
7 A  Ken Doctor is currently retired.
8 Q  Okay. And when did he retire?
9 A  I would say approximately a year and a half ago.
10 Q  And who took over as director?
11 A  Director currently is Brian Michelli.
12 Q  And who is the second in command?
13 A  We currently have Deputy Chief Jeff Whelan, W-h-e-l-a-n,
14     who was recently promoted to deputy chief.
15 Q  Okay. Who is below him?
16 A  There are three sergeants.
17 Q  So you don't have a lieutenant anymore?
18 A  No lieutenant.
19 Q  Who are the sergeants?
20 A  You have Detective Sergeant Rypsytra, Sergeant Andrew
21     Hunt, and then myself.
22 Q  And when were you promoted to sergeant?
23 A  Approximately a month and a half ago.
24 Q  And before being employed with the Fruitport Police
25     Department, how were you employed?

Page 6

1 A  I worked for the City of Whitehall Police Department, and
2     currently still do. Prior to that, I worked for Baker
3     College Campus Safety. I've worked for the Mecosta County
4     Sheriff's Office.
5 Q  Okay.
6 A  I've worked for the Shelby Police Department and New Era
7     Police Department.
8 Q  I'm sorry, what now?
9 A  Shelby.
10 Q  Shelby and then what?
11 A  Yep. Shelby and New Era, both in Oceana County.
12 Q  Shelby and what was the next one?
13 A  New Era.
14 Q  New Era. That's what I thought you said. I thought you
15     were talking about like laundry detergent or something.
16 A  Nope.
17 Q  So New Era is a little town?
18 A  Very small, both of them. Both Shelby and New Era are
19     very small.
20 Q  Any others?
21 A  No other law enforcement. Then I had a longer stint in
22     manufacturing at Knoll, K-n-o-l-l, here in Muskegon.
23 Q  Any law enforcement-related type employment experience,
24     military police, loss prevention, security guard, anything
25     along those lines?

Page 7

1 A  Campus Safety is the only one that would fall in line
2     there. Other than that, no.
3 Q  Okay. Did you attend college?
4 A  I did.
5 Q  Where?
6 A  Muskegon Community College and also West Shore Community
7     College.
8 Q  Where is that?
9 A  West Shore is in Scottville. Muskegon is in Muskegon.
10 Q  Did you obtain a degree?
11 A  I have a two-year Associate's degree.
12 Q  Okay. Criminal justice?
13 A  General studies.
14 Q  Where did you go to the academy?
15 A  West Shore.
16 Q  Have you ever been terminated from employment?
17 A  No.
18 Q  Suspended from employment?
19 A  Nope.
20 Q  Any reprimands as a police officer?
21 A  Not to my knowledge, no.
22 Q  Any oral counselings or any negative inquiries into your
23     personnel file at any police department?
24 A  I wouldn't have any knowledge of anybody requesting access
25     to my personnel file. So I guess the answer would be no.

Page 8

1 Q  Okay. New Era was part time, Shelby was part time?
2 A  Correct. I worked both of those jobs at the same time as
3     I was finishing up at Knoll.
4 Q  And Mecosta was part time?
5 A  Full time.
6 Q  Did you go from Mecosta to Baker?
7 A  I went from Mecosta to Baker and Whitehall.
8 Q  Why did you leave Mecosta?
9 A  63 to 64-mile drive from my door to the office of the
10     sheriff. And there was a living requirement that required
11     me to live within 20 miles of the county line. And I was
12     employed with them between 2008 and 2009 when the housing
13     market crashed. And I had bought my house at the peak, so
14     it made selling a home very difficult.
15 Q  So they said either sell your house or you can't have a
16     job?
17 A  They did not. This was a choice that I made for the
18     betterment of myself and my family.
19 Q  Okay. And you say you currently work at Whitehall and
20     Fruitport?
21 A  I do.
22 Q  Full time at Fruitport?
23 A  Correct.
24 Q  And how many hours at Whitehall?
25 A  Varies month to month, between 12 to 24.

Leticia Rudolph v.                          **Daniel Babinec**                   Daniel Babinec – Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                              October 2, 2017

Page 9

1   Q   What do you do there?
2   A   Police officer.
3   Q   Road patrol?
4   A   Road patrol.
5   Q   Do you have any -- did you wrestle in high school?
6   A   One year.
7   Q   What year?
8   A   It was my freshman year, which would have been '91.
9   Q   Do you have any boxing or hand-to-hand combat-type martial
10      arts experience after your wrestling career?
11          MS. ZDARSKY: Objection to the characterization
12      of "wrestling career."
13          Go ahead.
14          THE WITNESS: The only training in --
15  BY MR. TRAINOR:
16  Q   I don't want to know about your training.
17  A   Okay.
18  Q   Just if you --
19  A   Then no.  Outside of the police academy, no other
20      training.
21  Q   Did you have training at the Police Academy?
22  A   Correct.
23  Q   How to handle yourself out on the road, right --
24  A   Yes.
25  Q   -- basically?

Page 10

1           MS. ZDARSKY: How to handle yourself, I'm sorry,
2       out ...
3           MR. TRAINOR: How to handle yourself out on the
4       road.
5           MS. ZDARSKY: Out on the road.
6   BY MR. TRAINOR:
7   Q   Basically, right?
8   A   Yes.  Yes.
9   Q   Did you speak with Ken Doctor about the incident with
10      Leticia Rudolph?
11  A   I did.
12  Q   And when did you speak with him?
13  A   This was after she filed a formal written complaint.
14  Q   Okay.  Did you speak with anyone else other than Ken
15      Doctor --
16          MS. ZDARSKY: Objection just in --
17  BY MR. TRAINOR:
18  Q   -- about the incident?
19          MS. ZDARSKY: Objection just in the case that it
20      calls for attorney/client privilege.
21          MR. TRAINOR: Oh, you know what --
22          MS. ZDARSKY: You can answer other than any
23      communications that you've had with me or that we've all
24      had together with me present.
25  \

Page 11

1   BY MR. TRAINOR::
2   Q   Did you speak with anyone else other than your attorney
3       and Ken Doctor about this incident?
4   A   Director Michelli is aware of this.
5   Q   Director Michelli?
6   A   M-i-c-h-e-l-l-i, I believe is how that's spelled.
7           MS. ZDARSKY: Correct.
8           THE WITNESS: Obviously, Detective Lieutenant
9       Morningstar.
10  BY MR. TRAINOR:
11  Q   You spoke with him?
12  A   Yes.
13  Q   Okay.  And he asked you what happened and you gave him
14      details, correct?
15  A   I did.
16  Q   Okay.  Specific details as much as you could, right?
17  A   (Nodded head in the affirmative.)
18  Q   "Yes?"
19  A   Yes.
20  Q   And he interviewed you then?
21  A   He did.
22  Q   Okay.  When did he interview you?
23  A   After the formal complaint was filed.
24  Q   Did Ken Doctor interview you?
25  A   He did not.

Page 12

1   Q   Okay.  Did Director Michelli interview you?
2   A   He did not.
3   Q   What did you speak with -- let's start with Ken Doctor;
4       what did you speak with him about?
5   A   It was a very brief conversation of -- he brought up the
6       complaint was filed against myself, and he was of the
7       opinion that we had done everything right.
8   Q   Okay.  So basically he said there's a complaint filed, and
9       you did everything right.
10  A   Correct.
11  Q   Did you ask him how he knew that you did everything right?
12  A   I believe this conversation was after that of Detective
13      Morningstar.
14  Q   Okay.  Do you know one way or another whether Morningstar
15      spoke with you before you spoke with Doctor?
16          MS. ZDARSKY: Wait.  Objection to form.
17          MR. TRAINOR: Okay.
18          MS. ZDARSKY: If you understand --
19  BY MR. TRAINOR:
20  Q   Do you understand my question?  Bad question.
21  A   If you could maybe reword it.
22  Q   I'm trying to talk to you like I'm sitting at my kitchen
23      table at home.
24          Do you have any idea whether Morningstar
25      actually interviewed you and spoke with you about the

Leticia Rudolph v.                                   Daniel Babinec                         Daniel Babinec - Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                          October 2, 2017

1  incident before you talked to Ken Doctor about the
2  incident?
3  A  I don't know. I wasn't present for their conversation.
4  Q  Okay. So you're just assuming that Ken Doctor knew that
5     Morningstar had completed an investigation, and that's how
6     he was able to tell you that you did everything right,
7     based -- based upon assumption; is that what you're
8     telling me?
9  A  Not on assumption.
10 Q  Okay. Well, how is it that you know that --
11 A  Formal complaints go to the chief.
12 Q  Okay.
13 A  Or director of public safety, if you will.
14 Q  But once he told you, it looks like you did everything
15    right, you can't tell me right now whether he had any
16    other information other than your police report or the
17    complaint that Miss Rudolph wrote up; is that correct?
18 A  Correct.
19 Q  Okay. Director Michelli, what did you talk with him about
20    the incident?
21       MS. ZDARSKY: Objection just to the extent that
22    it calls for any conversations with -- between us, with
23    your attorneys present, either myself or Mr. Morris.
24 BY MR. TRAINOR:
25 Q  Was there any attorney present when you talked to

1  Michelli?
2  A  I don't believe so.
3  Q  Okay. What did you talk to Michelli about?
4  A  Director Michelli was informed that we were served papers
5     for a civil suit.
6  Q  Okay.
7  A  And then provided copies of it.
8  Q  Okay. And did he question you about what happened?
9  A  No.
10 Q  Did you keep notes of the interview that Morningstar had
11    with you?
12 A  I -- I didn't take notes of that interview.
13 Q  Okay. Are you part of a union?
14 A  We are.
15 Q  Did you have a union representative with you when --
16 A  I did not, no.
17 Q  -- when Morningstar interviewed you?
18 A  I did not, sir.
19 Q  Why not?
20 A  I felt I didn't need one.
21 Q  Did he give you Garrity warnings? Do you know what
22    those --
23 A  I do know what Garrity is. And, no, he did not.
24 Q  Okay. Explain to me why -- what Garrity is, I should say,
25    in your mind.

1  A  That is -- Garrity rights are where I'm to provide answers
2     to questions about an incident that just happened, but it
3     offers me protection against any action taken against me
4     based off of those -- that interview.
5  Q  Okay. In other words, it allows you to be open and free
6     about what you're saying without worrying about
7     incriminating yourself?
8  A  Yes.
9  Q  Okay. Is there a policy with respect to when someone is
10    injured, when you take them to the hospital for medical
11    treatment?
12 A  I would have to go back through my SOGs to verify, but
13    I don't believe there is.
14 Q  Okay. Is there a policy with respect to -- forget that.
15    Strike that.
16       Do you have Use of Force forms or reports that
17    you have to fill out?
18 A  Use of Force forms are consistent with my police narrative
19    of the incident.
20 Q  Okay.
21 A  And then there's also a Use of Force form.
22 Q  Okay. So if a person has been injured during the course
23    of an arrest, you're supposed to fill out a Use of Force
24    form?
25 A  It should be documented in my narrative. Our Use of Force

1  form -- it actually should probably be filled out, too,
2  because that discusses injuries but it also discusses the
3  tools or techniques used.
4  Q  Okay. When are you supposed to use a Use of Force form?
5  A  When there's been a use of force that involves taser,
6     baton, pepper spray, a physical assault on an officer and
7     defense.
8  Q  How about if someone is resisting you and obstructing you?
9  A  If it escalated to the point of using some of the tools
10    available to us, yes.
11 Q  Okay. What if there's no tools involved and you're just
12    having to grab the person and drag them?
13 A  That would be placed only in our police narrative.
14 Q  Okay. When are you supposed to report something to your
15    superiors that you believe may have gone beyond just a
16    normal handcuffing?
17 A  I would say immediately.
18 Q  If someone is resisting you and you have to push them or
19    shove them, is that something you'd want to report to your
20    superiors?
21 A  That would be at the -- when the time is best.
22    Immediately may not be the best term for -- at that point.
23 Q  Okay. Within the day or two after, right?
24 A  Probably.
25 Q  Okay. And you want to tell your superiors why you had to

Leticia Rudolph v.                              **Daniel Babinec**                         Daniel Babinec -   Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                                October 2, 2017

1   use more than just handcuffing force; is that true?
2 A   Yes.
3 Q   You'd certainly want to describe it in your narrative
4   report, right?
5 A   Yes.
6 Q   The purpose of your -- what's called an incident
7   investigation report, the purpose is to memorialize an
8   incident that occurred, correct?
9 A   Correct.
10 Q   Provide as much and specific detail as you can about the
11   incident, correct?
12 A   Correct.
13 Q   So if called upon to testify later, you can refresh your
14   recollection, correct?
15 A   Correct.
16 Q   And a supplemental report, if you supplement an incident
17   and investigation report, should follow the same criteria,
18   correct?
19 A   Correct.
20 Q   Did you tell Morningstar that Leticia Rudolph had resisted
21   you?
22 A   Could I ask for a little bit more specific information?
23 Q   Did you tell that she engaged with you or resisted you
24   or pushed you or anything like that?
25 A   In my interview with --

1 Q   Yes. I'm sorry. In your interview. Now I gotcha.
2 A   That's what I was looking for.
3 Q   Fair.
4 A   In my interview over the formal filed complaint, he asked
5   about -- about her actions and the force used, yes.
6 Q   Okay. And was he taking notes when he was interviewing
7   you?
8 A   I believe so.
9 Q   Okay. Was he recording you?
10 A   That is unknown to me.
11 Q   Okay. If he possesses a recording device that he says he
12   uses when he's investigating matters, do you know if he
13   was doing that?
14        MS. ZDARSKY: Objection to the characterization,
15   form.
16 BY MR. TRAINOR:
17 Q   Go ahead.
18 A   I -- I wouldn't know.
19 Q   Okay. And what did you tell Morningstar about
20   Miss Rudolph's actions?
21 A   I explained to Detective Lieutenant Morningstar that upon
22   repeated questioning and making the determination that
23   Leticia would be transported to Hackley, she was
24   noncompliant with my original request to just comply,
25   without any force used, at which point I grabbed her by

1   the arm.  She pulled away.
2 Q   Did you tell him how she pulled away?
3 A   She pulled her arm away from me.
4 Q   Okay.  Like pulled it away like you're doing right now,
5   like you grabbed her -- did you grab her by the wrist, the
6   forearm, the bicep?
7 A   It was upper arm near her elbow area.
8 Q   Okay.  Was it above or below the elbow?
9 A   Above the elbow.
10 Q   Bicep then?
11 A   Correct.
12 Q   Okay.  And she pulled that away?
13 A   She pulled.
14 Q   Was she able to break your grip?
15 A   No.
16 Q   And why did you grab her arm?
17 A   She was being taken into protective custody.
18 Q   Okay.  So you told him that she pulled away from you.  And
19   did you tell him she broke your grip or no?
20 A   I don't believe that was asked.
21 Q   Okay.  And what else did you tell Morningstar?
22 A   I explained that when she pulled away, I pushed her to a
23   wall --
24 Q   Okay.
25 A   -- and pushed her hands behind her back.  And with the

1   assistance of Officer Atkinson, handcuffs were placed on
2   her.
3 Q   You pushed her hands behind her back?
4 A   Yes.
5 Q   From her shoulder area pushed -- you pushed with your
6   hands in or how did you do that?
7 A   Having ahold of her right arm, I pushed her to the wall,
8   and that's when I grabbed her arm down by the wrist with
9   my other hand and brought it up to the middle and then
10   handcuffs were applied.
11 Q   Okay.  So you had both her hands behind her back?
12 A   I had one of her hands behind her back.
13 Q   Who had her other hand?
14 A   Officer Atkinson.
15 Q   Okay.  So how did you push her into the wall?
16 A   I walked her up to it with -- pushing on her arm.
17 Q   Did you push her in the back, push her in the shoulder,
18   push her in the head; where?
19 A   It was more of -- I guess it would be her shoulder.
20   I still had ahold of her arm.  And this is at the point
21   where I grabbed her wrist, as well, and just pushed with
22   her arm and wrist.
23 Q   How far were you from the wall when you pushed her?
24 A   A couple feet.
25 Q   Okay.  Why did you use the wall?

Leticia Rudolph v.                    **Daniel Babinec**                    Daniel Babinec – Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                          October 2, 2017

Page 21

1 A  The wall is a common object to use to help contain
2    someone's behavior.
3 Q  Is there a reason why you couldn't just pull her hand
4    behind her back and your partner grab the other hand and
5    cuff her right there?
6 A  She was pulling away from me, at which point that is an
7    act of resistance.  So I wanted to make sure that she was
8    safely controlled.
9 Q  Do you know if she hit her head on the wall?
10 A  She did not.
11 Q  Okay.  What part of her body hit the wall?
12 A  It was her chest area.
13 Q  Okay.  Did she catch herself off the wall?
14 A  Catch herself how?
15 Q  With her hands.  Was she able to put her hands up?
16 A  No, I had her right arm.
17 Q  Okay.  What about her other hand?
18 A  I believe Officer Atkinson, about the time she was getting
19    to the wall, was grabbing ahold of her.
20 Q  Okay.
21 A  I was focused on her arm and getting her wrist behind her
22    back.
23 Q  When she was pulling away, can you describe her motion,
24    how she was pulling away.
25 A  When I grabbed her right arm, she lowered her hips and

Page 22

1    leaned back.
2 Q  Oh, so you were in front of her and you were pulling her
3    towards you?
4 A  I was in front of her to her right.
5 Q  Okay.  So she squatted and pulled away from you?
6        MS. ZDARSKY: Objection to the characterization.
7    You can go ahead.
8 BY MR. TRAINOR:
9 Q  Go ahead.
10 A  Yes.
11 Q  Okay.  And when you pulled her towards you, she came
12    towards you?
13 A  Yes.
14 Q  And then there was a wall that would have been behind you
15    or at least off to your left shoulder?
16 A  It would have been behind me.
17 Q  Okay.  And did you step aside and continue her momentum to
18    the wall?
19 A  I turned and just pushed her to the wall.
20 Q  Okay.  And how did you keep her from hitting you?
21 A  From --
22 Q  You're pulling her towards you and the wall is behind you
23    and she ended up at the wall.  So how did she not hit you?
24 A  I parried.  I turned with her.
25 Q  Okay.  And you said you parried?

Page 23

1 A  (Nodded head in the affirmative.)
2 Q  "Yes"?
3 A  Yes.
4 Q  What does that mean?
5 A  I turned my body to allow her to come through.
6 Q  Okay.  Did you use her arm as a lever such that you could
7    take her into the wall?
8        MS. ZDARSKY: Objection to form.
9        If you understand, you can answer.  But you can
10    always ask him to clarify if you don't.
11        THE WITNESS: I would say the answer would be
12    yes, that is what I used to push her against the wall.
13 BY MR. TRAINOR:
14 Q  Kind of like swung her around then?
15 A  Pushed her.
16 Q  Okay.  Well, you had ahold of her -- is it her right arm?
17    You had the right?
18 A  I did.
19 Q  And you would have been to her right-hand side?
20 A  I was.
21 Q  Okay.  And the door would have been to her left?
22 A  Clarification.
23 Q  Go ahead.
24 A  You say "the door."
25 Q  Yes.

Page 24

1 A  What door?
2 Q  I'm going to ask you to draw something in a minute, so
3    forget about that.
4        So you told all these things to Morningstar,
5    correct?
6 A  Not in as much detail --
7 Q  Okay.
8 A  -- but summarized, yes.
9 Q  Okay.  Did you tell him that she hit her chest off the
10    wall?
11 A  She didn't hit her chest off the wall, so no.
12 Q  Okay.  Well, you said her chest came in contact with the
13    wall.
14 A  Right.
15 Q  Did you tell him that?
16 A  Yes.
17 Q  Okay.  Were you aware that she had bruising to her upper
18    arm area?
19        MS. ZDARSKY: Objection to the characterization.
20 BY MR. TRAINOR:
21 Q  Go ahead.
22 A  No.
23 Q  Okay.  Did you tell him that I had to grab her pretty hard
24    and may have had to grip her pretty hard because she was
25    pulling away from me?

Leticia Rudolph v.                                        Daniel Babinec                          Daniel Babinec - Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                                     October 2, 2017

Page 25

1        MS. ZDARSKY: Objection to the characterization.
2   BY MR. TRAINOR:
3   Q   Go ahead.
4   A   No.
5   Q   And what else did you tell Morningstar?
6   A   I told Detective Lieutenant Morningstar that after her
7       refusal to comply voluntarily, she was then placed into
8       handcuffs.  Then she was asked to put shoes on and she was
9       asked multiple times to do this, to which she refused.
10  Q   After she had handcuffs on?
11  A   Correct.
12  Q   Okay.
13  A   She -- after several refusals, we walked her to my patrol
14      vehicle and placed her inside, at which point she had
15      complained about not being allowed to have shoes put on.
16      Which Officer Atkinson then retrieved a pair of slip-ons
17      for her.
18  Q   Did you have to walk Miss Rudolph out of the house?
19  A   Yes.
20  Q   Out onto the porch?
21  A   A cement driveway area.
22  Q   There wasn't a porch?
23  A   I don't recall a porch being there.
24  Q   Okay.  Was there more than one step to get up into the
25      house?

Page 26

1   A   I don't recall.
2   Q   Okay.  Did you tell Morningstar anything else that
3       occurred?
4   A   I explained to him the signs of intoxication on the
5       subject, her extreme slurred speech.
6   Q   Okay.
7   A   She smelled of intoxicants.  And that hospital staff had
8       presented a preliminary breath test to her, which I was
9       witness to, and saw the results.
10  Q   Okay.  Anything else you told him?
11  A   I believe that's it.
12  Q   Okay.  So he only asked you about your actions when you
13      were at the scene with Miss Rudolph?
14          MS. ZDARSKY: Objection to form and
15      characterization.
16          You were saying "he," Detective Morningstar?
17          MR. TRAINOR: Yeah, I'm talking about
18      Morningstar.  Sorry.  I'm still on Morningstar.
19  BY MR. TRAINOR:
20  Q   Like I was talking about, I think I'm sitting at my
21      kitchen table with you.
22          So I asked you if there's anything else; you
23      said no.  So did he talk to you about anything else other
24      than Miss Rudolph's actions?
25  A   He asked me about the circumstances of the entire

Page 27

1       complaint.
2   Q   Okay.  And what did you tell him?
3   A   I explained to him that I responded to a traffic stop in
4       which Officer Hodges had initiated where a gun was taken
5       off from a driver.
6   Q   Okay.
7   A   I explained to him the information that Officer Hodges had
8       presented to me while I was on scene, and then also some
9       of the information and the exchange between those two, the
10      driver of that vehicle and Officer Hodges.
11  Q   Did you hear what the driver said?
12  A   Only briefly.
13  Q   What's "briefly"?
14  A   That conversation was nearly done when I got there.
15  Q   Okay.  Well, what did you hear?
16  A   That he had been concerned for her safety.
17  Q   Okay.  And that's all?
18  A   And had taken a pistol away from her.
19  Q   Concerned for her safety.  That's the only thing you
20      heard?
21  A   I believe so.
22  Q   Okay.  And you told Morningstar that during your
23      interview, right?
24  A   Yes.
25  Q   Okay.  Anything else you told him besides the driver

Page 28

1       was pulled over and the man who you heard say that he
2       was concerned for her safety and then the events at
3       Miss Rudolph's home?
4   A   I talked to Detective Lieutenant Morningstar about the
5       information I had received from Officer Hodges, as well,
6       reviewing text messages from the driver of that vehicle.
7   Q   Okay.  Anything else?
8   A   And he -- Officer Hodges also briefed me on his contact
9       with the driver; his name is Kyle.
10  Q   Okay.
11  A   And that was also relayed to Detective Morningstar at the
12      time of the interview.
13  Q   Anything else?
14  A   I believe that may have been it.
15  Q   Okay.  Are you aware that Atkinson was interviewed by
16      Morningstar?
17          MS. ZDARSKY: Objection.
18          THE WITNESS: Yes.
19          MS. ZDARSKY: Go ahead.
20          THE WITNESS: Yes.  Yes, I am.
21  BY MR. TRAINOR:
22  Q   Okay.  Did Atkinson tell you that he was interviewed by
23      Morningstar?
24  A   He did not.
25  Q   Okay.  How do you know he was interviewed by Morningstar

Leticia Rudolph v.                                Daniel Babinec                    Daniel Babinec – Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                        October 2, 2017

Page 29

1   then?
2 A I was provided a copy of his findings from the official
3   formal complaint to which notes speaking to Officer
4   Atkinson.
5 Q So the Fruitport citizen complaint investigation indicates
6   that Morningstar spoke with Atkinson.
7 A Yes.
8 Q Okay. And if it doesn't say that in there, how do you
9   know that he spoke with Atkinson? If it's not in -- if
10  that is not contained in that report that I just showed
11  you, how do you know he spoke with Atkinson?
12 A I wouldn't expect him not to. Detective Morningstar is
13  very thorough --
14 Q Okay.
15 A -- having interviewed me.
16 Q Okay. And you'd agree with me that he should have
17  interviewed you and Atkinson personally, correct?
18      MS. ZDARSKY: Objection; form, speculation.
19      You can answer the question though.
20      THE WITNESS: Yes.
21 BY MR. TRAINOR:
22 Q To fill in the blanks of what occurred, correct?
23 A Yes.
24 Q To determine whether Miss Rudolph is making stuff up or
25   whether you guys violated her civil rights, correct?

Page 30

1 A Yes.
2 Q Not to be personal, but my client said you had brown hair
3   back in 2015. Did you have more hair back then?
4 A At that point I would guess it would probably be very
5   short --
6 Q Okay.
7 A -- as I am balding.
8 Q Short brown hair?
9 A It is very brown.
10 Q Okay. And Atkinson had blond hair?
11 A Incorrect.
12 Q What did he have?
13 A He has black hair.
14 Q Black hair.
15      Do you know if any officers on the scene had
16   blond hair?
17 A No, no one did.
18 Q Okay. At some point in time on the scene with
19   Miss Rudolph did you call Hodges?
20 A I did.
21 Q On your cell phone, on your radio, what?
22 A Cell phone.
23 Q And what did you talk with him about?
24 A I explained to him that -- can I back up and answer this
25   question a little bit more thorough?

Page 31

1      MS. ZDARSKY: Whatever you need to do to answer
2   his question.
3      THE WITNESS: Okay. He was contacted by radio
4   that there was no answer at the door.
5 BY MR. TRAINOR:
6 Q Okay.
7 A To which he arranged a phone call with the driver of the
8   vehicle, that being the ex-husband of Leticia, to get her
9   to answer the door.
10 Q Okay.
11 A Upon my speaking with Leticia --
12 Q That's what I'm asking.
13 A Okay.
14 Q After you spoke with Leticia -- I should preface that.
15   After speaking with Leticia, my understanding is is that
16   you called Hodges.
17 A I did. I explained --
18 Q After speaking with Leticia, right?
19 A Yes.
20 Q Okay.
21 A Now that we're on the same page.
22 Q Right.
23 A I called him and explained to him that Leticia was denying
24   everything.
25 Q Okay.

Page 32

1 A She had stated she had the pistol out for cleaning
2   purposes, and that she was not overly forthcoming in how
3   she presented herself to me.
4 Q What do you mean by "overly forthcoming"?
5 A During my conversation with her at first, she indicated
6   that her husband was over at her house, he talked to her
7   about issues concerning their children. And when
8   confronted with information that one of our officers had
9   read text messages that were led to be suicidal statements
10   or cries for help, she then changed her story to, well,
11   Mr. Rudolph was over to talk about problems between the
12   two of them.
13 Q Okay.
14 A During that conversation with Officer Hodges, he indicated
15   to me that the text messages that he had seen and
16   conversation indicated concern for her mental well-being.
17 Q Was he your supervisor or superior, Hodges?
18 A He has the same rank, so no.
19 Q Okay. Did he direct you to take Miss Rudolph into
20   custody?
21 A He and I were in agreement that she should be taken into
22   custody.
23 Q Okay. So I'm going to ask you: Did he direct you to take
24   her into custody?
25      MS. ZDARSKY: Objection; asked and answered.

Leticia Rudolph v.                                       **Daniel Babinec**                           Daniel Babinec -  Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                                    October 2, 2017

Page 33

1      Go ahead.
2          THE WITNESS: He had stated his opinion that she
3  has to go.
4  BY MR. TRAINOR:
5  Q  Okay.  Would you have had to follow his direction even if
6     you didn't agree?
7          MS. ZDARSKY: Objection to the characterization
8  of "direction."  He's already given an answer.
9          You can go ahead and answer the question if you
10 understand it.
11         THE WITNESS: No, I would not have.
12 BY MR. TRAINOR:
13 Q  Okay.  So my understanding is is that you were on the
14    scene with the ex-husband.  Did you see him perform his
15    field sobriety tests?
16         MS. ZDARSKY: Objection to form.  Are you
17 talking about the scene of the traffic stop now, going
18 back?
19         MR. TRAINOR: Scene of the traffic stop with the
20 ex-husband.
21         THE WITNESS: I believe I showed up near the
22 ending of the field sobriety testing.
23 BY MR. TRAINOR:
24 Q  And Hodges had already spoken with him about his wife,
25    correct?

Page 34

1  A  Yes.
2  Q  Okay.  Because you just caught the tail end of this guy
3     talking about his ex-wife being a danger to herself,
4     right?
5  A  Yep.
6  Q  So Hodges had already had an in-depth conversation with
7     this ex-husband about his ex-wife?
8  A  That conversation continued after I arrived.
9  Q  Okay.  It continued on, right?
10 A  Yes, for a short moment.
11 Q  Okay.  But it was also -- it also had occurred before you
12    arrived, correct?
13 A  It had, yes.
14 Q  And did it continue during the field sobriety tests?
15 A  During t, no.
16 Q  Okay.  Did you see the field sobriety tests being
17    conducted?
18 A  I saw some of them being conducted.
19 Q  Do you know how long those field sobriety tests took?
20 A  I wasn't there for the entirety, and I wasn't performing
21    them.
22 Q  Okay.
23 A  So I was not managing the time of that part of the
24    investigation.
25 Q  Okay.  Did you see them finished?  The field sobriety

Page 35

1      tests, that is.
2  A  I believe so, yes.
3  Q  And is that when Hodges spoke with you about what was
4     going on?
5  A  Yes.
6  Q  Okay.  Did you take any actions with respect to patting
7     down the ex-husband?
8  A  That had already been completed when I arrived.
9  Q  Okay.  Did you follow the ex-husband home?
10 A  No.
11 Q  And you cleared the scene where the ex-husband was
12    stopped?
13 A  Yes.
14 Q  And what did you do next?
15 A  Went directly to Leticia Rudolph's residence on Black
16    Creek Road.
17 Q  Okay.  How much time passed between the time you received
18    the call to go back up Officer Hodges and the time you
19    got to Leticia Rudolph's?
20 A  Could you repeat the question?
21 Q  How much time passed between the time you got the call to
22    go back up Officer Hodges and the time you went to Leticia
23    Rudolph's home?
24 A  There was no formal request for me to respond to his
25    traffic stop.  And I would only be speculating the amount

Page 36

1      of time I spent on scene at the traffic stop.
2  Q  And you wouldn't have notated that in an activity log or
3     called in?
4  A  That is maintained by our dispatch center with our
5     en-route buttons, arrive-on-scene buttons, time stamp.
6     It's called a CAD ticket.
7  Q  Okay.  So if we were able to get the dispatch records --
8  A  We have them.
9  Q  -- it would indicate what time you got to the scene with
10    the husband and what time you left the scene?
11 A  I believe so.
12 Q  Okay.  And if you can take a look at those right now.
13         MS. ZDARSKY: Do you have a copy?
14         MR. TRAINOR: Yeah, I have a copy.
15         MS. ZDARSKY: Okay.  Well, were you planning on
16 marking it?
17         MR. TRAINOR: Pardon?
18         MS. ZDARSKY: Were you planning on marking it?
19         MR. TRAINOR: I was going to have him look at
20 yours.
21         MS. ZDARSKY: Well, it's your deposition.
22         MR. TRAINOR: You've got them laid out.
23         MS. ZDARSKY: Well, I was also planning on using
24 mine.
25 \

Leticia Rudolph v.                          Daniel Babinec                          Daniel Babinec - Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                              October 2, 2017

Page 37

1  BY MR. TRAINOR:
2  Q  If you can for me, circle what time you arrived on scene
3     with the ex-husband.
4  A  Which part do you want?  Do you want the time arrived
5     circled?
6  Q  Yes, please.
7  A  Okay.  Which would be 3:01 a.m. on March 15th, 2015.
8  Q  Okay.  And what time did you leave the ex-husband traffic
9     stop?
10 A  At 3:22 a.m.
11 Q  You left the ex-husband traffic stop at 3:22 a.m.?
12 A  3:22 a.m.
13 Q  Okay.  Will you mark that in red.  Circle that in red.
14 A  (Witness complies.)
15 Q  Okay.  And I want to make sure I understand your
16    testimony.  When you got on scene, did you know that there
17    was an accusation or idea that Miss Rudolph was suicidal?
18 A  On scene to which location?
19 Q  The ex-husband stop.
20 A  When I arrived --
21 Q  When you arrived.
22 A  -- no.
23 Q  Okay.  It wasn't until you cleared that you found that
24    out, correct?
25 A  It was during the course of that time on scene.

Page 38

1  Q  So it would have been during that 21 minutes sometime you
2     would have learned this?
3  A  Yes.
4  Q  Do you know when during that 21 minutes you would have
5     learned that?
6  A  No.
7  Q  Thanks.
8  A  You're welcome, sir.
9  Q  And can you tell me what time you would have arrived at
10    Miss Rudolph's home based upon these records?
11 A  My arrival time was two minutes later, 3:24 a.m.
12 Q  Okay.  Could you write a three -- or, actually, you know
13    what, again, blue.  Circle that in blue.
14 A  (Witness complies.)
15 Q  Okay.  So it took you two minutes to get from the ex
16    traffic stop to Miss Rudolph's home.
17 A  Two minutes, yes.
18 Q  Okay.  Do you know what time you arrived at Miss
19    Rudolph's?  I'm sorry.  3:24, right?
20 A  We covered that, yes.  3:24 a.m.
21 Q  What time did you clear Miss Rudolph's?
22 A  Clear to transport or clear the call?
23 Q  Clear to transport.
24 A  At 3:40 a.m.
25 Q  Okay.  Can you circle that, please.

Page 39

1  A  (Witness complies.)
2  Q  And I assume clear to transport was later than that,
3     right?
4        MS. ZDARSKY:  Objection to form.  He just said
5     that it was clear to transport.
6  BY MR. TRAINOR:
7  Q  Okay.  That you cleared the scene totally.
8  A  Cleared the call, as in I was done at Hackley Hospital?
9  Q  No, at Miss Rudolph's.
10       You wouldn't have cleared the call until after
11    you were done at Hackley Hospital; is that what you're
12    telling me?
13 A  That is correct, yes.
14 Q  Okay.  Good.  Now I understand.
15       Do you have any idea how long anyone walked
16    around the home trying to get Miss Rudolph to come to the
17    door?
18 A  Without reviewing CAD notes, no.
19       MR. TRAINOR:  Do you have Atkinson's -- these?
20    Because I don't.  I just have Hodges'.
21       MS. ZDARSKY:  No, just the dispatch event
22    report.
23 BY MR. TRAINOR:
24 Q  I just have an event report.  Would those tell us -- could
25    you take a look.  It's Officer Atkinson's -- strike that.

Page 40

1        Did Officer Atkinson get to Miss Rudolph's home
2     before you did?
3  A  He did.
4  Q  Do you know how much time passed between the time he got
5     there and you got there?
6  A  I don't without reviewing --
7  Q  Okay.
8  A  -- the event information.
9  Q  Was he out of the vehicle before you arrived at
10    Miss Rudolph's?
11       MS. ZDARSKY:  Objection to form.
12       But you can answer to what you saw.
13 BY MR. TRAINOR:
14 Q  Out of his vehicle before you arrived.
15 A  I don't know what his actions were as I was not on scene
16    at that point.
17 Q  Okay.  Well, you arrived at the scene.  Did you see him
18    sitting in his vehicle still?
19 A  He was back on the radio with me, so he would have been in
20    his car, yes.
21 Q  Okay.  Do you know one way or another whether he actually
22    got out of the vehicle to go knock on Miss Rudolph's door
23    before you got there?
24 A  He indicated to me over the radio that he had not gotten
25    an answer at the door.

Page 41

1 Q   Okay. Can you tell me what time you arrived at
2     Miss Rudolph's.
3 A   When I got to Miss Rudolph's?
4 Q   No, when Atkinson got to Miss Rudolph's.
5 A   Okay.
6 Q   You've already told me what time you got there.
7 A   Yep. Officer Atkinson arrived at 3:19:39 a.m.
8         Do you want it circled in blue?
9 Q   Yes, please.
10 A   (Witness complies.)
11 Q   And is there an indication of when he spoke with you?
12 A   There won't be any indication for that, no.
13 Q   Okay. What's the next action that's notated on this event
14     report?
15 A   After his arrival on scene, the next is myself being
16     dispatched.
17 Q   Dispatched where?
18 A   To the Black Creek address.
19 Q   Okay.
20 A   To Officer Atkinson's location.
21 Q   And what time was that?
22 A   3:22 a.m., 29 seconds.
23 Q   Okay. Next event?
24 A   Is myself as en route with the same time.
25 Q   3:22?

Page 42

1 A   Correct.
2 Q   And the next event is?
3 A   Is my arrival on scene at 3:24 a.m. and two seconds.
4 Q   Which is consistent with the central dispatch report,
5     right?
6 A   It is.
7 Q   What's the difference between the central dispatch report
8     that has your name on it and the event report?
9 A   The difference is this is an -- the item off to your left
10     is an officer activity log that shows a very basic layout
11     of my activities -- or an officer's activities throughout
12     the night.
13         This is a specific log for the incident at this
14     address, 2891 Black Creek Road.
15 Q   Okay. And that would give me more detail, right?
16 A   Yes.
17 Q   Okay. So there should be one of these event reports for
18     Atkinson -- I mean, for all three of you, right?
19 A   Officer Atkinson and I are combined onto one because they
20     go by the address, not by the officer.
21 Q   Okay. And there should be officer activity reports for
22     all three of you, is what I'm asking.
23 A   Correct.
24 Q   At 3:07 there's a notation above the 3:19 that you say the
25     time that Atkinson arrived at Miss Rudolph's address.

Page 43

1     What does that refer to?
2 A   If I could clarify and say this time right here for 3:07.
3 Q   Yes.
4 A   This is -- the one directly above it is Officer Atkinson
5     being en route to that location.
6 Q   Okay. Where does it say he was en route to that location
7     on here?
8 A   This is the event log for that address.
9 Q   Okay. He's dispatched at 3:07 and he's en route at the
10     same -- roughly the same time, right?
11 A   Correct.
12 Q   Okay. Do you know who told him to go there?
13 A   I did.
14 Q   Okay. So you called from the scene of the ex-husband?
15 A   I did.
16 Q   Okay. Do you remember what you told him?
17 A   I directed him -- as far as word for word, no.
18 Q   Okay.
19 A   I directed him to that address on Black Creek, informed
20     him of a female that had made suicide comments through
21     text messages to family members.
22 Q   Okay.
23 A   And a firearm was taken off from her by her ex-husband.
24 Q   Okay.
25 A   And requested he respond for a well-being check.

Page 44

1 Q   Okay.
2 A   I also noted I would be en route as soon as I was able to
3     clear that traffic stop.
4 Q   What's a well-being check?
5 A   To check on someone's mental health, physical health, to
6     see how they're doing and if they're okay.
7 Q   Okay. It doesn't automatically mean you're just going to
8     take the person away, does it?
9 A   It does not.
10 Q   You still have to have probable cause to believe the
11     person is in danger of harming themselves or others in
12     order to take them away, don't you?
13 A   Totality of the circumstances, yes.
14 Q   Okay. Did anyone ever tell you that there was any other
15     weapons in Miss Rudolph's premises before you went to the
16     scene?
17 A   No.
18 Q   Did you ask that question of her ex-husband or Hodges?
19 A   I did not.
20 Q   Was that important to you?
21 A   At the time, no.
22 Q   Why is that?
23 A   We had already taken a weapon away from her through the
24     husband.
25 Q   Okay.

Leticia Rudolph v.                     Daniel Babinec                    Daniel Babinec -  Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                  October 2, 2017

Page 45

1  A  That was now in law enforcement possession.
2  Q  So Atkinson gets there before you, correct?
3  A  He does.
4  Q  And he calls you and tells you she's not answering the
5     door?
6  A  Correct.
7  Q  And you arrive on the scene?
8  A  I did.
9  Q  Did you tell Atkinson to take any other action before you
10    arrived on the scene?
11 A  No.
12 Q  So he was in his car waiting for you when you got there?
13 A  Yes.
14 Q  Okay.  And then the two of you went back up and knocked on
15    doors and windows again?
16 A  We did.
17 Q  No answer again?
18 A  Correct, no answer.
19 Q  Okay.  Let's assume at this time right now Miss Rudolph
20    never comes to the door.  Do you have that so far?
21 A  Yes.
22 Q  She never, never comes to the door.  Okay?
23        MS. ZDARSKY: Objection just to improper
24    assumption and hypothetical.
25        But you can go ahead and answer the question.

Page 46

1  BY MR. TRAINOR:
2  Q  Do we have that straight?
3  A  Yes.
4  Q  Okay.  Would you and Atkinson have been justified in
5     breaking her door down to check on her?
6  A  I believe so.
7  Q  Okay.  I want you to assume that Miss Rudolph had come to
8     the door and cracked the door or there was a storm door in
9     between you -- either way, you're able to talk with her
10    and hear what she's saying -- and you question her, and
11    you tell her, get lost -- or she tells you, get lost,
12    I don't need your help, I don't want you around.
13        Based upon what you had, the knowledge you had
14    when you went there, would you have been justified in
15    forcing your way into her home?
16        MS. ZDARSKY: Same objections.
17        Go ahead.
18 BY MR. TRAINOR:
19 Q  Go ahead.
20 A  Yes.
21 Q  Okay.  And tell me all the facts you had at your disposal
22    that would have allowed you to force your way into her
23    home?
24 A  Text messages indicating intent to harm one's self were
25    received by her ex-husband and her son, who had requested

Page 47

1     that her ex-husband respond to the house because she has a
2     gun out.  She had sent a text to her ex-husband saying
3     good-bye, and then refused to reply to any subsequent
4     follow-ups from him.  And he had responded, talked to her
5     for some time, and had taken a gun away from her while he
6     was at her house.
7  Q  Okay.  And that information you just told me was
8     secondhand from Hodges, was it not?
9  A  Yes.
10 Q  Okay.  So you relied upon what Hodges told you in order to
11    allow you to go into her house and take her, right?
12 A  Yes.
13 Q  And you had no personal knowledge of your own -- or
14    personal facts of your own that would have justified
15    allowing you into her home without her consent; isn't that
16    true?
17        MS. ZDARSKY: Objection to the characterization,
18    assumes facts not in evidence regarding allowing him into
19    the home without consent.
20 BY MR. TRAINOR:
21 Q  Go ahead.
22        MS. ZDARSKY: If you can answer the question,
23    you can answer.
24        THE WITNESS: Repeat the question.
25  \

Page 48

1  BY MR. TRAINOR:
2  Q  So you had no personal knowledge or facts that justified
3     you in going into her home and taking her into custody.
4  A  All my information was from Officer Hodges.
5  Q  Okay.
6  A  If that doesn't classify as "personal," then the answer is
7     no.
8  Q  No, you didn't have your own personal knowledge, correct?
9  A  No.
10 Q  Okay.  Because this is going to be written down and taken
11    down, no, you did not have --
12 A  No, I did not --
13 Q  Okay.  Good.
14 A  -- have personal knowledge.
15 Q  Okay.  After knocking on doors and windows and not
16    answering the door, you decided to call Hodges back,
17    right?
18 A  Yes.
19 Q  Okay.  And at that time he told you that she is suicidal,
20    there's text messages, all indications tell us that she's
21    suicidal so you need to go get her, right?
22 A  Repeat that question.
23 Q  Okay.  Bad question.
24        Hodges basically tells you that all indications
25    show that Miss Rudolph is suicidal so you have to go in

Leticia Rudolph v.                                      Daniel Babinec                          Daniel Babinec -   Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                                 October 2, 2017

Page 49

1   and get her.  Is that what he tells you?
2 A  Can I ask for clarification?
3 Q  Yes, you can.
4 A  When you started your question, you said when we had
5     received no answer at the door.  That is when I asked --
6     or called -- or contacted Officer Hodges, which I did.
7     That was not a topic of conversation at that point in
8     time.
9 Q  Okay.  What was the topic of conversation with Hodges?
10 A  I explained to him that I received no answer at the door.
11 Q  And what did he say?
12 A  He agreed to go to the ex-husband's house and ask for a
13     phone call to be placed, which was completed.
14 Q  Why did you need a phone call from the ex-husband?
15 A  To see if we couldn't coax her to the door --
16 Q  Okay.
17 A  -- to verify her well-being.
18 Q  Is there a reason you didn't have the ex-husband come to
19     the scene?
20 A  Safety purposes.
21 Q  What safety purposes?
22 A  His safety.  He had just been there, taken a gun away from
23     her.
24 Q  Okay.
25 A  We didn't want him being involved in anything that may

Page 50

1     escalate in any situation.
2 Q  Well, what was going to escalate?
3 A  We didn't know; that's why.
4 Q  Okay.  Were you concerned that she had other weapons?
5 A  Wasn't really a thought.
6 Q  Okay.  Did you speak with the ex-husband Kyle by
7     telephone?
8 A  I did not.
9 Q  You're just aware that Hodges told you he called his
10     ex-wife and got her to get up out of bed.
11 A  Yes.
12 Q  Do you know if Hodges spoke with Miss Rudolph?
13 A  I don't.
14 Q  Did he tell you he spoke with Miss Rudolph?
15 A  His reply to me was she should be coming to the door.
16 Q  Okay.
17 A  The nature of their conversation is unknown.
18 Q  Okay.  You don't even know if Hodges and Miss Rudolph
19     spoke to each other, right?
20 A  I don't.
21 Q  Okay.  And what's Atkinson doing this whole time?
22 A  Waiting with me.
23 Q  Standing next to you while you're on the phone with
24     Hodges?
25 A  He may have been -- he was in the general area.  Whether

Page 51

1     he was in his car or outside his car, I don't recall.
2 Q  Do you remember the layout of the home?
3 A  I didn't go into the entire home.
4 Q  Do you remember the layout of the outside of the home?
5 A  I know what the exterior looks like and I know that we
6     stepped into a vestibule.
7 Q  Okay.
8 A  Mudroom, if you will.
9 Q  Okay.  Do you know the outside of the home, whether
10     there's a driveway, whether there's stairs, whether
11     there's a porch?
12 A  I don't recall a porch.  I don't recall steps.  There is a
13     driveway that I pulled into.
14 Q  Okay.  Is there more than one door?
15 A  I don't know.
16 Q  Was there a storm door on the door that Miss Rudolph came
17     to?
18 A  I don't recall.
19 Q  How close were you to the home when Miss Rudolph came to
20     the door?
21 A  I was at a door that's on the south side of the home.
22 Q  Standing at the doorway within hand's reach?
23 A  Arm's reach.
24 Q  Arm's reach?
25 A  A few feet away.

Page 52

1 Q  Okay.  And did she open that door?
2 A  She did.
3 Q  What's the first thing she did when she opened the door?
4 A  Said hello.
5 Q  Okay.  And then what did she say?
6 A  That's when I asked -- I took over the conversation.
7     Asked her how she was doing tonight and started my
8     investigation into her well-being.
9 Q  What's the first thing you said to her?
10 A  I don't recall specific language.
11 Q  Okay.  Do you remember any specifics about the
12     conversation you had with her?
13 A  I asked if she was suicidal.
14 Q  And she said no, correct?
15 A  She said no, correct.
16 Q  Okay.  Did she ever tell you, I don't need your help,
17     I don't want you here, please leave?
18 A  She did not.
19 Q  Okay.  Did you ever ask her if she needed help?
20 A  Yes.
21 Q  And what did she say to that?
22 A  She said no.
23 Q  Did she invite you into her home?
24 A  No.
25 Q  How did you get into the home?

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

**Daniel Babinec**

Daniel Babinec - Vol. !
October 2, 2017

1  A  I stepped through the doorway.
2  Q  How far was the door open?
3  A  All the way.
4  Q  So the door was all the way open and it was stopped
5     against a wall?
6  A  I don't know if it was stopped against a wall.  It was
7     open enough for me to walk through without making contact
8     with the door.
9  Q  Did Atkinson come in with you?
10  A  He did.
11  Q  Okay.  And she was talking to you at this point in time
12     standing in the doorway?
13  A  We were inside this vestibule, coat room.
14  Q  Okay.  When you were first speaking with her and asked her
15     if she was suicidal, weren't you outside?
16  A  No.
17  Q  Okay.  Immediately you walked right in?
18  A  Yes.
19  Q  So she says hello and she's at the doorway and you walked
20     right in?
21  A  Yes, as I was saying hello.
22  Q  How did you not bump into her?
23  A  She stepped back.
24  Q  She moved away from you?
25  A  She did.

1  Q  Stepped one step back?
2  A  I don't know how many steps she stepped back.
3  Q  Were you ever within breathing -- breath distance of her
4     such that you could feel her breathing on you?
5  A  Feel her breathing, no.  To smell her breath, yes.
6  Q  Okay.  Were you ever within six inches of her?
7  A  When she was being taken into custody, yes.
8  Q  Besides that.  I'm talking about when you first walked in.
9  A  No.
10  Q  So she would have had to take more than one step back;
11     would you agree with me?
12  A  Yeah.
13  Q  Did you push her out of the way?
14  A  No.
15  Q  You just walked towards her?
16  A  I stepped in the home and -- which would be towards her,
17     and she backed up and we had our conversation.
18  Q  Did she ever ask you, what are you doing in my house?
19  A  No.
20  Q  Did she ever ask you to leave?
21  A  No.
22  Q  And you don't remember the specifics of your conversation
23     with her, do you?
24  A  I asked if she was suicidal, and she denied this.
25  Q  Right.  We know that.

1  A  I asked her more specifically about the -- having her
2     husband come over and to talk with her for some time, and
3     then he leaves with a pistol in his possession.
4  Q  Okay.  And anything else you talked to her about?
5  A  That course -- that course of conversation went from -- as
6     I previously stated, she was only talking to her husband
7     about issues between their kids --
8  Q  Right.
9  A  -- to when confronted a little bit further about the
10     pistol, that's when the story changed to problems between
11     her and him.
12  Q  Okay.  And --
13         MS. ZDARSKY: Wait.  Sorry.
14         Were you finished?
15         THE WITNESS: Yes.
16  BY MR. TRAINOR:
17  Q  And Atkinson was inside with you at this time?
18  A  Yes.
19  Q  And then you would have left and called Hodges after she
20     denied needing help, right?
21  A  Yes.
22  Q  Okay.  And you walked outside.  Did you go to your car?
23  A  I did.
24  Q  Okay.  And Atkinson came with you?
25  A  No.

1  Q  Where did he go?
2  A  I don't know.
3  Q  Okay.
4  A  I believe he stayed in the house.
5  Q  Are you sure he stayed in the house?
6  A  I'm not sure.
7  Q  Okay.  After you got done talking to Hodges, did you have
8     to knock on the door again?
9  A  No.
10  Q  Okay.  How did you get in the house?
11  A  Walked through an open door.
12  Q  And you believe you had the right to walk into her home?
13  A  Yes.
14  Q  Where was Atkinson when you walked back the second time?
15  A  I don't recall if he was in the house or he was following
16     me in, as I previously stated.
17  Q  Do you remember what the inside of this vestibule, laundry
18     room, mudroom area looked like?
19  A  Vaguely.
20  Q  Do you know where the wall was that she ended up against?
21  A  Yes.
22  Q  Would it have been to your right or left after you would
23     have walked in the door?
24  A  When I stepped in, it was to my left.
25  Q  Okay.  Just so I understand, I'm going to have you draw

Leticia Rudolph v.                                     **Daniel Babinec**                      **Daniel Babinec – Vol. !**
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                              **October 2, 2017**

Page 57

1  the best picture you can of the doorway and then the
2  inside vestibule area.
3         MS. ZDARSKY: Objection to form.
4         To the extent, you know, you can recall.  I know
5  you've indicated you can't, but go ahead.
6         MR. TRAINOR: I'll be right back.
7         MS. ZDARSKY: So we'll go off the record then.
8     (Recess taken from 2:08 p.m. to 2:10 p.m.)
9         MR. TRAINOR: Go back on the record.
10 BY MR. TRAINOR:
11 Q  Inside the door is there another door that led out of the
12    vestibule area?
13 A  There is.
14 Q  Where would that have been?
15 A  I am unsure if it is on the east wall or on the north
16    wall, but over in this end of the --
17 Q  Okay.  It would have been towards the north, and it may
18    have been in the northeast of the north wall, right --
19 A  Yes.
20 Q  -- the other door?
21 A  Yes.
22 Q  Okay.  And which wall did you end up at handcuffing
23    Miss Rudolph?
24 A  She would have been placed approximately in this region
25    right here.

Page 58

1  Q  Okay.  Where the X is, correct?
2  A  Yes.
3  Q  About how far in were you into the door when you grabbed
4     ahold of Miss Rudolph?
5  A  At approximately that same area right -- a little way -- a
6     little bit off from the wall.
7  Q  Okay.  And let's say you'd lost grip of your -- of
8     Miss Rudolph's arm.  Would you have fallen backwards out
9     the door?
10        MS. ZDARSKY: Objection, assumptions and the
11    characterization.
12        You can go ahead and answer if you understand
13    the question.
14        THE WITNESS: No.
15 BY MR. TRAINOR:
16 Q  You were within how far of the door when you placed her
17    against the wall?
18 A  Approximately a couple feet, two to three feet.
19 Q  Okay.  And where was Atkinson standing when you came in
20    the door?
21 A  He was behind me and standing near the doorway.
22 Q  Okay.  Will you sign and date that, please.
23 A  (Witness complies.)
24        (Deposition Exhibit A was marked for
25        identification and is attached hereto.)

Page 59

1  BY MR. TRAINOR:
2  Q  Did you speak with Atkinson about this incident at any
3     time after it occurred?
4         MS. ZDARSKY: Same objection as to privilege;
5     any conversations with an attorney present, either myself
6     or Mr. Morris or any other attorney.
7  BY MR. TRAINOR:
8  Q  I can ask you if you spoke with them at any time, and then
9     I'll ask you the next question.  And even if you spoke in
10    the presence of your attorney, I'm still entitled to know
11    if you spoke with him, but I can't ask about the
12    conversation.  So I'll ask the question again.
13 A  Understood.
14 Q  I'll ask the question again.
15 A  I did.
16 Q  Okay.  How many times?
17 A  I couldn't give you an exact number of times.  One to two.
18    Well, it would be two for sure.
19 Q  Okay.  And one of those times would have been in the
20    presence of attorneys?
21 A  Yes.
22 Q  Okay.  Did you prepare your supplement at the same time he
23    prepared his supplement?
24 A  I don't believe so.  I believe I overheard Detective
25    Morningstar asking him to do a supplement on this incident

Page 60

1  after mine was already submitted.
2  Q  Do you know why Morningstar would have asked him to do a
3     supplement?
4  A  I don't.
5  Q  Can you think of any reason why he would have asked him to
6     do a supplement?
7  A  I can't.  I cannot.
8  Q  Why did you do a supplement?
9  A  Because I had the conversation directly with Miss Rudolph.
10 Q  So the purpose of your supplement really would have been
11    to memorialize what happened between you and Miss Rudolph
12    since everything else was -- all the other information was
13    given to you by Hodges; is that fair to say?
14 A  Yes.
15 Q  Can you tell me exactly how Leticia Rudolph refused to go
16    to -- or go with you.
17 A  As I explained to her that I would like her to go to
18    Hackley and speak with a social worker about her mental
19    well-being, she said that she didn't want to go and did
20    not have to go.
21        At which time I explained to her that there are
22    two ways to handle this.  One would be that she
23    voluntarily goes down, talks with a social worker.  The
24    other being that she is taken into custody, protective
25    custody.

Leticia Rudolph v.                          **Daniel Babinec**                    Daniel Babinec -  Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                October 2, 2017

---
Page 61
---

1  Q  Handcuffed, right?
2  A  And transported to Hackley.
3  Q  Did you tell her she was going to be handcuffed?
4  A  No.
5  Q  Did you ever tell her to put her hands behind her back,
6     she's going with you?
7  A  No.
8  Q  Why not?
9  A  During that part of the conversation it wasn't necessary
10    to go to that length.
11 Q  Just grab her and take her and put her into handcuffs
12    then, right?
13 A  Your conversation about asking -- or explaining to her the
14    ways that this could be handled, was not asked at that
15    point and she was not told that she was going to be placed
16    in handcuffs.  It was explained that she would be taken
17    into custody by us and taken down to Hackley involuntarily
18    in protective custody.
19 Q  So at that point you just grabbed her, right?
20 A  No.  She continued to refuse after I made several attempts
21    to persuade her.
22 Q  What did she say to you in refusing?
23 A  I don't have to go.  I'm not going.
24 Q  Anything else she says; I don't have to go, I'm not going?
25 A  At that point, no.

---
Page 62
---

1  Q  So you come in the door and you have a conversation with
2     her and you tell her why you're there, right?
3  A  I did.
4  Q  And she backs up from you, correct?
5        MS. ZDARSKY: Objection to the characterization.
6        You can answer.  You can describe it.
7  BY MR. TRAINOR:
8  Q  As you're coming in the door she's backing up from you,
9     right?
10 A  That is correct.
11 Q  And at this point in time you've only had a quick -- she
12    says hello, you say we're here to check on you, right?
13 A  Correct.
14 Q  You take over the conversation at that point in time,
15    right?
16 A  Yes.
17 Q  And what do you say to her at that point in time as she's
18    backing up from you?
19        MS. ZDARSKY: Objection to the characterization.
20        Go ahead.
21        THE WITNESS: I explained to her why I was
22    there.  I asked if she was suicidal.
23 BY MR. TRAINOR:
24 Q  We've gone over that.  And she said no --
25 A  Correct.

---
Page 63
---

1  Q  -- I'm not.
2  A  Correct.
3        I asked her about why her husband was over and
4     why he had taken a pistol away from her, which she
5     provided answers that had changed as our conversation went
6     on.
7  Q  I understand all that.
8  A  Okay.  That's the conversation I had.
9  Q  And I'm going to jump -- I'm going to cut you off.
10        So, basically, that's all you discussed at the
11    first point when you were there, about what she said to
12    her husband and that stuff.  Then you went out, made a
13    phone call to Hodges, correct?
14 A  Yes.
15 Q  And then you came back in, correct?
16 A  Yes.
17 Q  And did you back her up at that point in time?
18 A  No, she --
19        MS. ZDARSKY: Go ahead.
20        THE WITNESS: No.
21 BY MR. TRAINOR:
22 Q  Where is she standing when you come back in the second
23    time?
24 A  She's still in the vestibule, mudroom, entryway, whatever
25    this room is.

---
Page 64
---

1  Q  Okay.  Is she at the doorway?
2  A  No.
3  Q  Is she leaning on anything?
4  A  I don't -- I don't recall that.
5  Q  Okay.  How far into the mudroom is she from the doorway
6     when you come back the second time?
7  A  A few feet.
8  Q  Okay.
9  A  Four feet.
10 Q  Okay.  How long does your conversation with Hodges take?
11 A  A minute or two.
12 Q  Okay.  And when you come back in, what do you say to her?
13 A  This is when I started asking for her to voluntarily go to
14    Hackley.
15 Q  Okay.  Tell me what you exactly said to her.
16        MS. ZDARSKY: Objection; asked and answered.
17        THE WITNESS: I explained to her that there are
18    a couple ways to handle this.  We would like you to
19    voluntarily go down and talk to a social worker.  I said,
20    the other option is we take you into protective custody
21    and we transport you down there ourselves, at which --
22    this is when the refusals were beginning.
23 BY MR. TRAINOR:
24 Q  Okay.  No, I'm not going, right?
25 A  Correct.

Leticia Rudolph v.                                  **Daniel Babinec**                        Daniel Babinec - Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                              October 2, 2017

Page 65

1  Q  Anything else you said to her?
2  A  It was repeated requests for her to go down there to talk
3     with a social worker voluntarily.
4  Q  And those are the types of details you'd put into your
5     police report, right?
6  A  It is documented in my supplement.
7  Q  What she said and what you said, right?
8  A  Not specifically, no.
9  Q  Why not?  I thought you said the police report was to
10    memorialize an incident.
11 A  It is.  That doesn't necessarily mean that it is
12    word-for-word quotations.
13 Q  You'd want some quotations in there, wouldn't you?
14 A  They aren't necessarily needed on every report.
15 Q  Okay.  Well, on -- strike that.
16        You didn't find a need to put it in this report,
17    quotations, what was said?
18 A  The one that is in there that is quotations is that she
19    had the gun out for cleaning purposes, which was in
20    quotations.
21 Q  Okay.  Other than that.
22 A  No.
23 Q  So her refusal turns into you grabbing her?
24 A  Yes.
25 Q  Did you ever tell her, turn around, put your hands behind

Page 66

1     your back, you're being cuffed?
2  A  I explained to her that we were taking her involuntarily
3     into custody.
4  Q  Did you ever tell her to turn around, put your hands
5     behind your back, you're under arrest?
6  A  I never told her that she was under arrest.
7  Q  Okay.  She was arrested, though, wasn't she?
8  A  She was taken into protective custody.
9  Q  Right.  Same thing.  She's arrested, right?
10        MS. ZDARSKY: Objection to the characterization.
11        You can go ahead and answer if you understand
12    the question.
13        THE WITNESS: I would have to say I don't
14    understand the question then because I don't see them as
15    the same thing.
16 BY MR. TRAINOR:
17 Q  If someone's freedom is restricted or their freedom to
18    move or move about is restricted, that's an arrest, isn't
19    it?
20 A  Yes.  Then, yes, she was under arrest.
21 Q  Okay.  Did you ever tell her she was under arrest, put
22    your hands behind your back, before you put the handcuffs
23    on her?
24 A  Word for word, no.
25 Q  Okay.  Well, what did you tell her?

Page 67

1  A  I explained that I was taking her into protective
2     custody --
3  Q  Okay.
4  A  -- involuntarily.
5  Q  So you said, I'm taking you into protective custody
6     involuntarily?  You used those words?
7  A  I did not use those words exactly.
8  Q  What words did you use?
9  A  I wouldn't be able to recall at this point in time the
10    exact quote of what I said to her.
11 Q  Did she move away from you when you told her that?
12 A  There was a refusal.  And the movement away from me was
13    when I grabbed her by the arm.
14 Q  Okay.  How many times did she move away from you when you
15    grabbed her arm?
16 A  It was the one.
17 Q  And you were able to gain control over her and take her to
18    the wall, right?
19 A  I was.
20 Q  Handcuffed?
21 A  She was handcuffed at the wall.
22 Q  And then she's in handcuffs?
23 A  Yes.
24 Q  And you asked her to put shoes on then?
25 A  Yes.

Page 68

1  Q  And she said no, I'm not putting shoes on?
2  A  Correct.
3  Q  Anything else that was discussed?
4  A  This was a point, as noted in my supplemental narrative,
5     where she was offering the defense that her brother was a
6     police officer and that she knows that I cannot do this to
7     her.  She also name dropped, if you will, the name of the
8     township supervisor who was going to be angry with our
9     actions this evening.
10 Q  I forgot what I asked.
11        (Record read.)
12 BY MR. TRAINOR:
13 Q  How about with respect to her shoes; any request by her to
14    get her shoes?
15 A  She did not offer a request to get shoes on while we were
16    in the house, because she was refusing our directive to
17    put shoes on so she didn't have to go out of the house?
18 Q  Who walked Miss Rudolph to the car?
19        MS. ZDARSKY: Were you done?  "So she didn't
20    have to go out of the house," period or -- were you done
21    with your house?
22        THE WITNESS: I think I was done.
23        MR. TRAINOR: Yes, he was.
24 BY MR. TRAINOR:
25 Q  Who walked Miss Rudolph to the car?

Page 69

1 A  I did.
2 Q  Did Atkinson help you?
3 A  He was in close proximity, yes.
4 Q  Did he have ahold of Miss Rudolph when you were escorting
5     Miss Rudolph to the car?
6 A  I don't recall.
7 Q  Is that you don't remember or that just didn't happen?
8 A  I don't remember.
9 Q  Do you know if Miss Rudolph was having trouble walking to
10    the car?
11 A  She had no problems walking to the car.
12 Q  Did she ever tell you, you're hurting me?
13 A  No.
14 Q  She never yelled out, you're hurting me?
15 A  No.
16 Q  Did she ever tell you the handcuffs were too tight?
17 A  Nope.
18 Q  If Miss Rudolph had told you that the handcuffs were too
19    tight, would you have checked the handcuffs?
20 A  Yes.
21 Q  Why is that?
22 A  Because as recent case law has come out, a complaint of
23    handcuffs being too tight can be a form of cruel and
24    unusual punishment.
25 Q  Okay.  Excessive force, right?

Page 70

1 A  Correct.
2 Q  So if someone complains of the handcuffs being too tight,
3    you have to check on them because to not do so would be a
4    violation of their constitutional rights.
5 A  Yes.
6 Q  Would you agree with me that if Miss Rudolph was being
7    dragged by you, that would be excessive use of force in
8    this case?
9 A  No.
10 Q  Would you agree with me that if you were dragging her such
11    that she couldn't catch her balance and she fell off a
12    porch or a step and twisted her ankle, that that would be
13    excessive use of force on your part?
14    MS. ZDARSKY:  Improper -- objection, improper
15 hypothetical.
16    Go ahead.
17 BY MR. TRAINOR:
18 Q  Go ahead.
19 A  No.
20 Q  Why don't you think that?
21 A  Based on the circumstances and her level of intoxication,
22    recent possession of a firearm while intoxicated, the
23    dishonesty of her statements as they changed throughout
24    the course of the interview, and the statements from other
25    witnesses through -- taken through other officers.

Page 71

1     So at this point she had committed a crime of
2 possession of a firearm while intoxicated, but of bigger
3 concern was her mental well-being.
4 Q  Okay.  I'm asking you, the act of you taking her from the
5    step or a porch in such a manner that she couldn't keep up
6    with you, hence dragging her, would that be excessive use
7    of force?  Not the act of arresting her.  Okay?
8     MS. ZDARSKY:  Objection to improper hypothetical
9 and assumes facts not in evidence.
10     You can go ahead.
11 BY MR. TRAINOR:
12 Q  Go ahead.
13 A  No.
14 Q  Why don't you believe that?
15 A  Because she's in protective custody.
16 Q  And you are allowed to drag someone such that they can't
17    walk on their own two feet?
18 A  Other circumstances at play here.  Is she refusing to
19    walk?
20 Q  No, she's trying to walk with you, and you're walking at
21    such a pace that you're dragging her.  Would that be
22    excessive use of force in your opinion?
23 A  I wouldn't have walked --
24     MS. ZDARSKY:  Hold on.
25     Again, objection to improper hypothetical.

Page 72

1     A lot of "ifs" and "what ifs" in play here.
2     But go ahead.
3 BY MR. TRAINOR:
4 Q  Go ahead.
5 A  I wouldn't have walked at a pace that was faster than for
6    her to keep up if she were complying.
7 Q  Can you explain how she injured her ankle during the
8    course of this arrest?
9 A  I can't.
10     MS. ZDARSKY:  Objection; speculation.
11 BY MR. TRAINOR:
12 Q  Can you explain how she ended up with bruising on her arm
13    during the course of this arrest?
14     MS. ZDARSKY:  Objection to the characterization.
15     You can go ahead.
16     THE WITNESS:  I can't.
17 BY MR. TRAINOR:
18 Q  Can you explain how she ended up with swollen wrists and
19    redness around her wrists --
20     MS. ZDARSKY:  Objection.
21 BY MR. TRAINOR:
22 Q  -- during the course of this arrest?
23     MS. ZDARSKY:  Same objection.
24     THE WITNESS:  I can't.
25 \

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

**Daniel Babinec**

Daniel Babinec -  Vol. I
October 2, 2017

Page 73

BY MR. TRAINOR:

1  BY MR. TRAINOR:
2  Q  Do you know when you completed your report -- your
3     supplemental report?
4  A  A specific time, I don't recall.
5  Q  I'll show you at the top it says date and time. Is that
6     the time you would have written the report?
7  A  I don't know the format of what that time signifies.
8  Q  Okay.
9  A  Whether that's the beginning of my typing, whether that's
10    the submission date and time.
11 Q  Okay. I'm not exact -- asking for minutes here, I'm just
12    going to ask youu would have written and
13    completed this report within the hours or half a day after
14    this incident occurred.
15 A  Yes.
16 Q  And Rypsytra reviewed it two days later, according to
17    this?
18 A  That says supervisor reviewed date and time, yes.
19 Q  Okay. And that's Rypsytra?
20 A  Rypsytra. Detective Sergeant Rypsytra.
21 Q  And do you know why it took him roughly two, three days to
22    review this report?
23 A  If I may review the first page of the complete incident
24    report.
25       The incident occurred in the early morning hours

Page 74

1     of Sunday. I'm not sure whether he worked Monday or not,
2     but that would have been consistent with this call coming
3     in on a weekend and being reviewed within the first couple
4     of days of the business week.
5  Q  Who inputs these times and dates for the supplemental?
6  A  These here?
7  Q  Yes.
8  A  They're time stamped in the system somehow.
9  Q  Can you leave the document open and make changes to it
10    between the time you start it and the time a supervisor
11    looks at it?
12 A  Yes.
13 Q  So, in other words, you could go back and make changes all
14    the way up until the time the supervisor reviews the
15    report?
16 A  Until it's submitted.
17 Q  Okay.
18 A  When it's submitted, it's not -- not correctable, not
19    edited.
20 Q  Okay. Do you know when this was submitted based upon me
21    showing you this supplemental report?
22 A  I don't know if that time stamp is the date and time of my
23    submission. I know that the one thing that I'm consistent
24    with is typing my reports as soon as I get a moment of
25    free time.

Page 75

1  Q  Okay. So you don't know whether you added to it or
2     subtracted from it between the time you would have started
3     it and the time Rypsytra looked at it.
4  A  Once it was submitted -- submitted, I can't edit it.
5  Q  Okay.
6  A  When it was completed, typed, that's when it gets
7     submitted.
8  Q  You submit it immediately?
9  A  I finish typing, review for grammatical errors, and then
10    I hit submit and it's sent to a server where it awaits
11    review.
12 Q  Well, how is the document able to be added to, if it's
13    been submitted, such that Rypsytra is allowed to add in
14    that he's reviewed it?
15 A  Repeat the question.
16 Q  So you say you submit it and the document can undergo no
17    other changes, is what you're telling me.
18 A  Yes.
19 Q  So how is it that Rypsytra can add to this at a later
20    date?
21       MS. ZDARSKY: Objection to the form, "Rypsytra
22    adding to the report."
23       I'm not sure I understand, but if you do go
24    ahead and answer.
25       THE WITNESS: I don't.

Page 76

1  BY MR. TRAINOR:
2  Q  Well, his name appears on it with the date and time he
3     reviewed it, right?
4  A  As far as the review process, when he reviews a report, he
5     goes through for grammatical errors, elements of any
6     crime, the review that our officers here are doing the
7     proper things on scene.
8        His review, as I've -- I've had supervisors
9     rights for some time. There is a time stamp button, and
10    you hit approve and you set a status for the report and it
11    approves the report.
12 Q  So there are additions that can be made to this report
13    after you submit it then, right?
14       MS. ZDARSKY: Objection to the form and
15    characterization, "additions" made to the report.
16       THE WITNESS: No, not that I'm aware of.
17 BY MR. TRAINOR:
18 Q  Well, then, how is it that Rypsytra's name appears on it
19    after you submit it?
20 A  It's part of the programing. It's not adding or editing
21    the report.
22 Q  What do you mean by forcefully bringing her hand behind
23    her back -- or arm behind her back? When you use the
24    word, "forcefully," what do you mean by that?
25 A  She was pulling away from me, to which I grabbed -- and

Leticia Rudolph v.  
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

**Daniel Babinec**

Daniel Babinec - Vol. !  
October 2, 2017

Page 77

1 with her resistance, I was still able to physically place  
2 her hand behind her back for handcuffing.  
3 Q Did you have conversations with Leticia as she was walking  
4 to the car?  
5 A I don't recall.  
6 Q Okay. How about while she was in the car?  
7 A I -- I do know she was yelling for shoes, that we wouldn't  
8 let her -- allow her to put shoes on. But I don't believe  
9 that I responded to her at that point.  
10 Q Did you get her shoes?  
11 A Officer Atkinson got her shoes, I did not.  
12 Q Did you tell him to get her shoes?  
13 A He did that on his own.  
14 Q And did he put them on her?  
15 A I don't recall.  
16 Q Okay. And you drove her to the hospital?  
17 A I did.  
18 Q Did you speak with her on the way to the hospital?  
19 A No.  
20 Q Was she saying anything to you?  
21 A I don't recall.  
22 Q Did you speak with her at the hospital?  
23 A I don't recall. I don't believe so.  
24 Q Okay. So the last words you had with her was when she was  
25 inside her home, and you don't have any other conversation

Page 78

1 with her when she's on her way to the car even? Strike  
2 that. Bad question.  
3 So the last conversation you had with her was  
4 inside her home.  
5 A I believe so. I didn't -- I don't -- I didn't respond to  
6 anything else at that point. I transported her to the  
7 hospital.  
8 Q Okay. Did she continue to yell as you walked her to the  
9 car?  
10 A She was, yes, about her shoes.  
11 Q That's it, nothing -- just about shoes, right?  
12 A I believe that was it.  
13 Q Okay. You're not sure, but you believe so?  
14 A Yes, that was what she was complaining of was her shoes.  
15 Q Anything else other than the shoes?  
16 A No.  
17 Q Okay. You remember there's nothing else other than shoes,  
18 right?  
19 A That I -- that she was yelling on the way to the car?  
20 Q Yes.  
21 A No, nothing else.  
22 Q Have you ever had to investigate any officer misconduct?  
23 A No.  
24 Q Do you know if there's a policy with respect to the  
25 investigation of officer misconduct here at the Fruitport

Page 79

1 Police Department?  
2 A That is covered within our union contract.  
3 Q And what does that say about investigation of officer  
4 misconduct?  
5 A The chief or his director of public safety or his designee  
6 will investigate all citizen complaints.  
7 Q And that's part of your contract as a police officer?  
8 A Yes.  
9 Q Do you know why someone didn't say that if there's a  
10 complaint by a citizen against an officer, an outside  
11 agency wouldn't investigate the matter?  
12 MS. ZDARSKY: Objection to form.  
13 THE WITNESS: Can you change that up a little  
14 bit and repeat your question.  
15 BY MR. TRAINOR:  
16 Q Yes. Do you know why it is that the policy doesn't say  
17 that if there's a citizen who complains about misconduct  
18 by a police officer, it's not investigated by an outside  
19 agency?  
20 A To my knowledge, I don't know why that is not there.  
21 Q Do you believe that that would be a better practice than  
22 having someone inside investigate officer misconduct?  
23 A Not necessarily, no.  
24 Q Did you ever report to anyone, other than in your report,  
25 that you had to forcefully grab or push Miss Rudolph?

Page 80

1 A No.  
2 Q Did Rypsytra ever ask you what you meant by forcefully  
3 grabbing or pushing --  
4 A No.  
5 Q -- Miss Rudolph?  
6 A No.  
7 Q Did anyone else review that with you at any time before  
8 Miss Rudolph made her complaint?  
9 A No.  
10 MR. TRAINOR: Do you have some questions?  
11 MS. ZDARSKY: Yeah.  
12 MR. TRAINOR: Go ahead. I think I'm done, but  
13 I'll see what you ask.  
14 EXAMINATION  
15 BY MS. ZDARSKY:  
16 Q I'm going to jump around, so if you get confused let me  
17 know.  
18 All right. You were asked some questions about  
19 your discussion with Detective Morningstar after the  
20 citizen complaint was filed.  
21 Do you remember that line of questioning?  
22 A Somewhat, yes.  
23 Q Did you worry about being free and open in  
24 your conversation -- were you free and open in your  
25 conversation with Detective Morningstar?

Leticia Rudolph v.                                    Daniel Babinec                                    Daniel Babinec - Vol. 1
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                                     October 2, 2017

Page 81

1　A　Yes.  There was nothing to hide.
2　Q　All right.  In the course of the traffic stop, while you
3　　　were there and Officer Hodges was there and Kyle was
4　　　there, did you have any information or did you see any
5　　　indication that would lead you to believe that Kyle was
6　　　anything other than truthful or honest?
7　A　I did not.
8　Q　Did he appear to be intoxicated to you?
9　A　No.
10　Q　Are you aware of Kyle's breath test, preliminary breath
11　　　test results?
12　A　Only because of being informed by Officer Hodges.
13　Q　And what was that?
14　A　That he blew a point zero zero zero.
15　Q　There's been some discussion about arriving at calls and
16　　　time stamps and things like that.
17　　　　　　Just for clarification, what does it mean when
18　　　you clear a call?
19　A　One of two things.  That I am done taking the call and
20　　　I have hit the respective buttons to complete that CAD
21　　　ticket, which is the equivalent of the event report, so
22　　　that can get -- the status is closed through dispatch.
23　　　　　　It can also mean that I may have stayed on this
24　　　call and typed a call -- some of my narrative for this
25　　　before hitting clear, and then my disposition of assist

Page 82

1　　　and then hitting send to get it off my computer.
2　　　　　　So there's -- there's variances in here as far
3　　　as at what point that happens.  But it would not happen
4　　　anytime before I would have ended my contact with whoever
5　　　on whatever call.
6　Q　So clearing a call is different from, for example, leaving
7　　　a location.
8　A　Correct.
9　Q　When you made your initial contact with Miss Rudolph at
10　　　her home -- and I know you were having this initial
11　　　conversation.  As you were talking with her, did she
12　　　continue backing up?
13　A　No.
14　Q　Now, at that point she says she's not suicidal, right?
15　A　Yes.
16　Q　And how come you didn't just take her word for it and
17　　　leave her at home?
18　A　The circumstances outside of just only her statement
19　　　indicated a concern for her well-being.  With the receipt
20　　　of a pistol on this traffic stop by Officer Hodges, the
21　　　information from the text messages, and then his
22　　　conversation with the husband relayed to me, plus her
23　　　level of intoxication, her lack of being forthcoming in
24　　　what had transpired.
25　Q　So in other words --

Page 83

1　A　The inconsistencies of the statements of all parties.
2　Q　In other words, you were concerned if you left her there
3　　　she would kill herself?
4　A　Yes.
5　Q　And the signs of intoxication, did that cause you
6　　　additional concerns?
7　A　It did.
8　Q　People who are intoxicated don't always make the best
9　　　decisions?
10　A　They don't.
11　Q　Did Miss Rudolph ever tell you, you know, eventually,
12　　　okay, now I agree to comply, now I agree to be taken to
13　　　the hospital?
14　A　I don't recall her ever saying that.
15　Q　If that's in your report, would your report be the best
16　　　indication of your recollection from that evening?
17　A　Yes.
18　Q　And would that report refresh your recollection?
19　A　Yeah.
20　Q　So looking at your report, does that refresh your
21　　　recollection of whether she eventually agreed to comply
22　　　with your request that you needed to take her to the
23　　　hospital?
24　A　Can you repeat that question, please.
25　Q　In looking at your report, does that refresh your

Page 84

1　　　recollection of whether she eventually agreed to comply
2　　　with your request?
3　A　It does.
4　Q　Just so we're clear -- because our record is only in
5　　　writing and it's not visual -- you're completely bald
6　　　right now, right?
7　A　Involved?
8　Q　Bald.
9　A　Yes, because I shaved my head today.
10　Q　At the time of this incident when you said you had a
11　　　really short -- some really short brown hair, could you
12　　　describe just in a little more detail what you mean by
13　　　really short brown hair.  Like in terms of, you know,
14　　　almost shaved or what you mean by that.
15　A　It would be very tight to my head.  It would have been
16　　　several days up to a week worth of growth.
17　Q　And still, I'll say, somewhat or to some degree balding?
18　A　Yeah.  Yeah.
19　　　　　　MS. ZDARSKY: Those are all the questions I have
20　　　for you.
21　　　　　　FURTHER EXAMINATION
22　BY MR. TRAINOR:
23　Q　Cleared call in this case would indicate the time you left
24　　　because you weren't writing any reports in your car when
25　　　you left the scene of the ex, right?

Leticia Rudoplh v.                          Daniel Babinec                    Daniel Babinec -  Vol. !
Daniel Babinec, Robert Atkinson, Twp. of Fruitport                                   October 2, 2017

Page 85

1          MS. ZDARSKY: Objection to form and
2    characterization.  What do you mean, "left the scene of
3    the ex"?
4  BY MR. TRAINOR:
5  Q  Left the scene.  When you cleared the scene where you were
6     with the ex, that means you left there, right, and went to
7     the Black Creek address?
8  A  When I -- I cleared the scene of the traffic stop.
9  Q  Right.
10 A  Yes, I hit clear assist send, and then my unit is pulled
11    off from that ticket.
12 Q  Okay.
13 A  And that's when I dispatched to the next thing.
14 Q  In your report you don't describe Miss Rudolph as ever
15    falling down because she was so intoxicated; isn't that
16    true?
17 A  That is true.
18 Q  In the house she never fell down or had to lean against a
19    wall or had to stabilize herself, did she?
20 A  I don't recall her using anything to stabilize herself.
21    So the answer would be no.
22 Q  Now, incidentally, if -- let's assume that Miss Rudolph
23    complies with you.  Did you have to handcuff her still?
24 A  No.
25 Q  Would you have handcuffed her?

Page 86

1  A  No.
2  Q  You would have allowed her to ride in the squad car in the
3     back seat --
4  A  Yes.
5  Q  -- unhandcuffed?
6  A  Yes.
7          MR. TRAINOR: That's all.  Thanks.
8          (Deposition concluded at 2:51 p.m.)
9  \
10 \
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

CERTIFICATE

1
2  STATE OF MICHIGAN     )
3  COUNTY OF OTTAWA      )  ss
4       I, CYNTHIA M. THOMAS, Certified Shorthand
5   Reporter and Notary Public, do hereby certify that the
6   foregoing deposition was taken before me at the time and
7   place hereinbefore set forth, and that said witness was
8   duly sworn by me to tell the truth, the whole truth, and
9   nothing but the truth, and thereupon was examined and
10  testified in the foregoing deposition as appears:
11       I FURTHER CERTIFY that the deposition was taken
12  in shorthand and thereafter transcribed by means of
13  computer-aided transcription by me and under my direction
14  and supervision, and that it is a true and accurate
15  transcript of my original shorthand notes.
16       I FURTHER CERTIFY that I am not a relative or
17  employee or attorney or counsel of any of the parties, or
18  financially interested directly or indirectly in this
19  action.
20       IN WITNESS WHEREOF, I have hereunto set my hand
21  this 10th day of October, 2017, at Grand Rapids, Michigan.
22
23
24            CYNTHIA M. THOMAS
             Certified Shorthand Reporter No. 3836
25           Notary Public, Ottawa County, Michigan
             My Commission Expires:  11-09-21

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec -  Vol. !
October 2, 2017

**1**

**1:00 (1)**
    3:2
**12 (1)**
    8:25
**15th (1)**
    37:7

**2**

**2 (1)**
    3:1
**2:08 (1)**
    57:8
**2:10 (1)**
    57:8
**2:51 (1)**
    86:8
**20 (1)**
    8:11
**2008 (1)**
    8:12
**2009 (1)**
    8:12
**2015 (2)**
    30:3;37:7
**2017 (1)**
    3:1
**21 (2)**
    38:1,4
**24 (1)**
    8:25
**2891 (1)**
    42:14
**29 (1)**
    41:22

**3**

**3:01 (1)**
    37:7
**3:07 (3)**
    42:24;43:2,9
**3:19 (1)**
    42:24
**3:19:39 (1)**
    41:7
**3:22 (5)**
    37:10,11,12;41:22,25
**3:24 (4)**
    38:11,19,20;42:3
**3:40 (1)**
    38:24

**6**

**63 (1)**
    8:9
**64-mile (1)**
    8:9

**9**

**91 (1)**
    9:8

**A**

**able (10)**
    13:6;19:14;21:15;
    36:7;44:2;46:9;67:9,17;
    75:12;77:1
**above (4)**
    19:8,9;42:24;43:4
**academy (3)**
    7:14;9:19,21
**access (1)**
    7:24
**according (1)**
    73:16
**accusation (1)**
    37:17
**act (3)**
    21:7;71:4,7
**action (3)**
    15:3;41:13;45:9
**actions (7)**
    18:5;20;26:12,24;
    35:6;40:15;68:9
**activities (2)**
    42:11,11
**activity (3)**
    36:2;42:10,21
**actually (4)**
    12:25;16:1;38:12;
    40:21
**add (2)**
    75:13,19
**added (2)**
    75:1,12
**adding (2)**
    75:22;76:20
**additional (1)**
    83:6
**additions (2)**
    76:12,15
**address (7)**
    41:18;42:14,20,25;
    43:8,19;85:7
**affirmative (2)**
    11:17;23:1
**again (7)**
    38:13;45:15,17;56:8;
    59:12,14;71:25
**against (10)**
    12:6;15:3,3;23:12;
    53:5,6;56:20;58:17;
    79:10;85:18
**agency (2)**
    79:11,19
**ago (2)**
    5:9,23
**agree (7)**
    29:16;33:6;54:11;
    70:6,10;83:12,12
**agreed (3)**
    49:12;83:21;84:1
**agreement (1)**
    32:21
**ahead (28)**
    9:13;18:17;22:7,9;
    23:23;24:21;25:3;28:19;
    33:1,9;45:25;46:17,19;
    47:21;57:5;58:12;62:20;
    63:19;66:11;70:16,18;
    71:10,12;72:2,4,15;
    75:24;80:12
**ahold (6)**
    20:7,20;21:19;23:16;
    58:4;69:4
**allow (3)**
    23:5;47:11;77:8
**allowed (5)**
    25:15;46:22;71:16;
    75:13;86:2
**allowing (2)**
    47:15,18
**allows (1)**
    15:5
**almost (1)**
    84:14
**along (1)**
    6:25
**always (2)**
    23:10;83:8
**amount (1)**
    35:25
**Andrew (1)**
    5:20
**angry (1)**
    68:8
**ankle (2)**
    70:12;72:7
**answered (2)**
    32:25;64:16
**anymore (1)**
    5:17
**appear (1)**
    81:8
**appears (2)**
    76:2,18
**applied (1)**
    20:10
**approve (1)**
    76:10
**approves (1)**
    76:11
**approximately (5)**
    5:9,23;57:24;58:5,18
**area (10)**
    19:7;20:5;21:12;
    24:18;25:21;50:25;
    56:18;57:2,12;58:5
**arm (20)**
    19:1,3,7,16;20:7,8,16,
    20,22;21:16,21,25;23:6,

16;24:18;58:8;67:13,15;
    72:12;76:23
**Arm's (2)**
    51:23,24
**around (7)**
    23:14;39:16;46:12;
    65:25;66:4;72:19;80:16
**arranged (1)**
    31:7
**arrest (9)**
    15:23;66:5,6,18,20,21;
    72:8,13,22
**arrested (2)**
    66:7,9
**arresting (1)**
    71:7
**arrival (3)**
    38:11;41:15;42:3
**arrive (1)**
    45:7
**arrived (16)**
    34:8,12;35:8;37:2,4,
    20,21;38:9,18;40:9,14,
    17;41:1,7;42:25;45:10
**arrive-on-scene (1)**
    36:5
**arriving (1)**
    81:15
**arts (1)**
    9:10
**aside (1)**
    22:17
**assault (1)**
    16:6
**assist (2)**
    81:25;85:10
**assistance (1)**
    20:1
**Associate's (1)**
    7:11
**assume (4)**
    39:2;45:19;46:7;85:22
**assumes (2)**
    47:18;71:9
**assuming (1)**
    13:4
**assumption (3)**
    13:7,9;45:24
**assumptions (1)**
    58:10
**Atkinson (31)**
    20:1,14;21:18;25:16;
    28:15,22;29:4,6,9,11,17;
    30:10;40:1;41:4,7;
    42:18,19,25;43:4;45:2,9;
    46:4;50:21;53:9;55:17,
    24;56:14;58:19;59:2;
    69:2;77:11
**Atkinson's (3)**
    39:19,25;41:20
**attached (1)**
    58:25
**attempts (1)**

61:20
**attend (1)**
    7:3
**attorney (5)**
    11:2;13:25;59:5,6,10
**attorney/client (1)**
    10:20
**attorneys (2)**
    13:23;59:20
**automatically (1)**
    44:7
**available (1)**
    16:10
**awaits (1)**
    75:10
**aware (6)**
    11:4;24:17;28:15;
    50:9;76:16;81:10
**away (25)**
    19:1,2,3,4,12,18,22;
    21:6,23,24;22:5;24:25;
    27:18;44:8,12,23;47:5;
    49:22;51:25;53:24;63:4;
    67:11,12,14;76:25

**B**

**BABINEC (4)**
    3:4,11,14,20
**B-a-b-i-n-e-c (1)**
    3:11
**back (39)**
    15:12;19:25;20:3,11,
    12,17;21:4,22;22:1;30:3,
    3,24;33:18;35:18,22;
    40:19;45:14;48:16;
    53:23;54:1,2,10;56:14;
    57:6,9;61:5;63:15,17,22;
    64:6,12;66:1,5,22;74:13;
    76:23,23;77:2;86:3
**backed (1)**
    54:17
**backing (3)**
    62:8,18;82:12
**backs (1)**
    62:4
**backwards (1)**
    58:8
**Bad (3)**
    12:20;48:23;78:2
**Baker (3)**
    6:2;8:6,7
**balance (1)**
    70:11
**bald (2)**
    84:5,8
**balding (2)**
    30:7;84:17
**based (7)**
    13:7,7;15:4;38:10;
    46:13;70:21;74:20
**basic (1)**
    42:10

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec - Vol. !
October 2, 2017

**basically (5)**
9:25;10:7;12:8;48:24;
63:10
**baton (1)**
16:6
**bed (1)**
50:10
**beginning (2)**
64:22;73:9
**behalf (1)**
3:5
**behavior (1)**
21:2
**behind (17)**
19:25;20:3,11,12;
21:4,21;22:14,16,22;
58:21;61:5;65:25;66:5,
22;76:22,23;77:2
**below (2)**
5:15;19:8
**besides (2)**
27:25;54:8
**best (5)**
16:21,22;57:1;83:8,15
**better (1)**
79:21
**betterment (1)**
8:18
**beyond (1)**
16:15
**bicep (2)**
19:6,10
**bigger (1)**
71:2
**bit (5)**
17:22;30:25;55:9;
58:6;79:14
**black (7)**
30:13,14;35:15;41:18;
42:14;43:19;85:7
**blanks (1)**
29:22
**blew (1)**
81:14
**blond (2)**
30:10,16
**blue (3)**
38:13,13;41:8
**body (2)**
21:11;23:5
**both (5)**
6:11,18,18;8:2;20:11
**bought (1)**
8:13
**boxing (1)**
9:9
**break (1)**
19:14
**breaking (1)**
46:5
**breath (5)**
26:8;54:3,5;81:10,10
**breathing (3)**

54:3,4,5
**Brian (1)**
5:11
**brief (1)**
12:5
**briefed (1)**
28:8
**briefly (2)**
27:12,13
**bringing (1)**
76:22
**broke (1)**
19:19
**brother (1)**
68:5
**brought (2)**
12:5;20:9
**brown (5)**
30:2,8,9;84:11,13
**bruising (2)**
24:17;72:12
**building (1)**
4:25
**bump (1)**
53:22
**business (1)**
74:4
**button (1)**
76:9
**buttons (3)**
36:5,5;81:20

**C**

**CAD (3)**
36:6;39:18;81:20
**call (19)**
30:19;31:7;35:18,21;
38:22;39:8,10;48:16;
49:13,14;63:13;74:2;
81:18,19,24,24;82:5,6;
84:23
**called (12)**
4:14,20;17:6,13;
31:16,23;36:3,6;43:14;
49:6;50:9;55:19
**calls (4)**
10:20;13:22;45:4;
81:15
**came (7)**
22:11;24:12;51:16,19;
55:24;58:19;63:15
**Campus (2)**
6:3;7:1
**can (44)**
10:22;17:10,13;21:23;
22:7;23:9,9;29:19;
30:24;33:9;36:12;37:2;
38:9,25;40:12;41:1;
45:25;47:22,23;49:2,3;
57:1,4;58:12;59:8;60:5,
15;62:6,6,6;66:11;69:23;
71:10;72:7,12,15,18;

74:9;75:16,19;76:12;
79:13;81:22,23;83:24
**car (17)**
40:20;45:12;51:1,1;
55:22;68:18,25;69:5,10,
11;77:4,6;78:1,9,19;
84:24;86:2
**career (2)**
9:10,12
**case (4)**
10:19;69:22;70:8;
84:23
**catch (3)**
21:13,14;70:11
**caught (1)**
34:2
**cause (2)**
44:10;83:5
**cell (2)**
30:21,22
**cement (1)**
25:21
**center (1)**
36:4
**central (2)**
42:4,7
**certainly (1)**
17:3
**change (2)**
4:22;79:13
**changed (4)**
32:10;55:10;63:5;
70:23
**changes (3)**
74:9,13;75:17
**characterization (15)**
9:11;18:14;22:6;
24:19;25:1;26:15;33:7;
47:17;58:11;62:5,19;
66:10;72:14;76:15;85:2
**charge (1)**
5:5
**check (6)**
43:25;44:4,5;46:5;
62:12;70:3
**checked (1)**
69:19
**chest (4)**
21:12;24:9,11,12
**Chief (4)**
5:13,14;13:11;79:5
**children (1)**
32:7
**choice (1)**
8:17
**Cindy (1)**
3:25
**circle (4)**
37:2,13;38:13,25
**circled (2)**
37:5;41:8
**circumstances (5)**
26:25;44:13;70:21;

71:18;82:18
**citizen (5)**
29:5;79:6,10,17;80:20
**City (1)**
6:1
**Civil (3)**
4:13;14:5;29:25
**Clarification (3)**
23:22;49:2;81:17
**clarify (2)**
23:10;43:2
**classify (1)**
48:6
**cleaning (2)**
32:1;65:19
**clear (11)**
38:21,22,22,23;39:2,5;
44:3;81:18,25;84:4;
85:10
**cleared (8)**
35:11;37:23;39:7,8,
10;84:23;85:5,8
**clearing (1)**
82:6
**client (1)**
30:2
**close (2)**
51:19;69:3
**closed (1)**
81:22
**coat (1)**
53:13
**coax (1)**
49:15
**College (4)**
6:3;7:3,6,7
**combat-type (1)**
9:9
**combined (1)**
42:19
**coming (3)**
50:15;62:8;74:2
**command (1)**
5:12
**comments (1)**
43:20
**committed (1)**
71:1
**common (1)**
21:1
**communications (1)**
10:23
**Community (2)**
7:6,6
**complained (1)**
25:15
**complaining (1)**
78:14
**complains (2)**
70:2;79:17
**complaint (13)**
10:13;11:23;12:6,8;
13:17;18:4;27:1;29:3,5;

69:22;79:10;80:8,20
**complaints (2)**
13:11;79:6
**complete (2)**
73:23;81:20
**completed (6)**
13:5;35:8;49:13;73:2,
13;75:6
**completely (1)**
84:5
**complies (6)**
37:14;38:14;39:1;
41:10;58:23;85:23
**comply (5)**
18:24;25:7;83:12,21;
84:1
**complying (1)**
72:6
**computer (1)**
82:1
**concern (3)**
32:16;71:3;82:19
**concerned (5)**
27:16,19;28:2;50:4;
83:2
**concerning (1)**
32:7
**concerns (1)**
83:6
**concluded (1)**
86:8
**conducted (2)**
34:17,18
**confronted (2)**
32:8;55:9
**confused (1)**
80:16
**consent (2)**
47:15,19
**consistent (5)**
3:15;15:18;42:4;74:2,
23
**constitutional (1)**
70:4
**contact (5)**
24:12;28:8;53:7;82:4,
9
**contacted (2)**
31:3;49:6
**contain (1)**
21:1
**contained (1)**
29:10
**continue (4)**
22:17;34:14;78:8;
82:12
**continued (3)**
34:8,9;61:20
**contract (2)**
79:2,7
**control (1)**
67:17
**controlled (1)**

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec - Vol. !
October 2, 2017

21:8
conversation (32)
  12:5,12;13:3;27:14;
  32:5,14,16;34:6,8;49:7,
  9;50:17;52:6,12;54:17,
  22;55:5;59:12;60:9;
  61:9,13;62:1,14;63:5,8;
  64:10;77:25;78:3;80:24,
  25;82:11,22
conversations (3)
  13:22;59:5;77:3
copies (1)
  14:7
copy (3)
  29:2;36:13,14
correctable (1)
  74:18
counselings (1)
  7:22
County (3)
  6:3,11;8:11
couple (4)
  20:24;58:18;64:18;
  74:3
course (9)
  15:22;37:25;55:5,5;
  70:24;72:8,13,22;81:2
Court (3)
  3:16,17;4:13
covered (2)
  38:20;79:2
cracked (1)
  46:8
crash (1)
  4:13
crashed (1)
  8:13
Creek (5)
  35:16;41:18;42:14;
  43:19;85:7
cries (1)
  32:10
crime (2)
  71:1;76:6
Criminal (1)
  7:12
criteria (1)
  17:17
cruel (1)
  69:23
cuff (1)
  21:5
cuffed (1)
  66:1
currently (6)
  4:17;5:7,11,13;6:2;
  8:19
custody (16)
  19:17;32:20,22,24;
  48:3;54:7;60:24,25;
  61:17,18;64:20;66:3,8;
  67:2,5;71:15
cut (1)

63:9

**D**

danger (2)
  34:3;44:11
DANIEL (3)
  3:4,10,14
D-a-n-i-e-l (1)
  3:10
date (7)
  58:22;73:5,10,18;
  74:22;75:20;76:2
dates (1)
  74:5
day (2)
  16:23;73:13
days (4)
  73:16,21;74:4;84:16
decided (1)
  48:16
decisions (1)
  83:9
defense (2)
  16:7;68:5
degree (3)
  7:10,11;84:17
denied (2)
  54:24;55:20
denying (1)
  31:23
Department (13)
  4:18,19,20;5:1,4,5,6,
  25;6:1,6,7;7:23;79:1
deposition (6)
  3:14,20;4:12;36:21;
  58:24;86:8
Deputy (2)
  5:13,14
describe (5)
  17:3;21:23;62:6;
  84:12;85:14
designee (1)
  79:5
detail (4)
  17:10;24:6;42:15;
  84:12
details (3)
  11:14,16;65:4
Detective (13)
  5:20;11:8;12:12;
  18:21;25:6;26:16;28:4,
  11;29:12;59:24;73:20;
  80:19,25
detergent (1)
  6:15
determination (1)
  18:22
determine (1)
  29:24
device (1)
  18:11
difference (2)

42:7,9
different (1)
  82:6
difficult (1)
  8:14
direct (2)
  32:19,23
directed (2)
  43:17,19
direction (2)
  33:5,8
directive (1)
  68:16
directly (3)
  35:15;43:4;60:9
director (9)
  5:10,11;11:4,5;12:1;
  13:13,19;14:4;79:5
discussed (2)
  63:10;68:3
discusses (2)
  16:2,2
discussion (2)
  80:19;81:15
dishonesty (1)
  70:23
dispatch (6)
  36:4,7;39:21;42:4,7;
  81:22
dispatched (4)
  41:16,17;43:9;85:13
disposal (1)
  46:21
disposition (1)
  81:25
distance (1)
  54:3
Doctor (10)
  5:5,7;10:9,15;11:3,24;
  12:3,15;13:1,4
document (3)
  74:9;75:12,16
documented (2)
  15:25;65:6
done (10)
  12:7;27:14;39:8,11;
  56:7;68:19,20,22;80:12;
  81:19
door (43)
  8:9;23:21,24;24:1;
  31:4,9;39:17;40:22,25;
  45:5,20,22;46:5,8,8,8;
  48:16;49:5,10,15;50:15;
  51:14,16,16,20,21;52:1,
  3;53:2,4,8;56:8,11,23;
  57:11,11,20;58:3,9,16,
  20;62:1,8
doors (2)
  45:15;48:15
doorway (8)
  51:22;53:1,12,19;
  57:1;58:21;64:1,5
down (14)

3:25;4:2;20:8;35:7;
  46:5;48:10,11;60:23;
  61:17;64:19,21;65:2;
  85:15,18
drag (2)
  16:12;71:16
dragged (1)
  70:7
dragging (3)
  70:10;71:6,21
draw (2)
  24:2;56:25
drive (1)
  8:9
driver (7)
  27:5,10,11,25;28:6,9;
  31:7
drivers (1)
  4:13
driveway (3)
  25:21;51:10,13
dropped (1)
  68:7
drove (1)
  77:16
duly (1)
  3:6
during (13)
  15:22;27:22;32:5,14;
  34:14,15;37:25;38:1,4;
  61:9;72:7,13,22

**E**

early (1)
  73:25
east (1)
  57:15
edit (1)
  75:4
edited (1)
  74:19
editing (1)
  76:20
either (4)
  8:15;13:23;46:9;59:5
elbow (3)
  19:7,8,9
elements (1)
  76:5
else (21)
  10:14;11:2;19:21;
  25:5;26:2,10,22,23;
  27:25;28:7,13;55:4;
  60:12;61:24;65:1;68:3;
  78:6,15,17,21;80:7
employed (4)
  4:17;5:24,25;8:12
employment (3)
  6:23;7:16,18
en (5)
  41:24;43:5,6,9;44:2
end (3)

34:2;57:16,22
ended (5)
  22:23;56:20;72:12,18;
  82:4
ending (1)
  33:22
enforcement (2)
  6:21;45:1
enforcement-related (1)
  6:23
engaged (1)
  17:23
enough (1)
  53:7
en-route (1)
  36:5
entire (2)
  26:25;51:3
entirety (1)
  34:20
entitled (1)
  59:10
entryway (1)
  63:24
equivalent (1)
  81:21
Era (7)
  6:6,11,13,14,17,18;8:1
errors (2)
  75:9;76:5
escalate (2)
  50:1,2
escalated (1)
  16:9
escorting (1)
  69:4
even (4)
  33:5;50:18;59:9;78:1
evening (2)
  68:9;83:16
event (10)
  39:21,24;40:8;41:13,
  23;42:2,8,17;43:8;81:21
events (1)
  28:2
eventually (3)
  83:11,21;84:1
Evidence (4)
  3:16,17;47:18;71:9
ex (4)
  38:15;84:25;85:3,6
exact (3)
  59:17;67:10;73:11
exactly (3)
  60:15;64:15;67:7
EXAMINATION (3)
  3:18;80:14;84:21
examined (1)
  3:7
example (1)
  82:6
Excessive (5)
  69:25;70:7,13;71:6,22

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec –  Vol. !
October 2, 2017

exchange (1)
27:9
Exhibit (1)
58:24
ex-husband (20)
31:8;33:14,20;34:7;
35:7,9,11;37:3,8,11,19;
43:14,23;44:18;46:25;
47:1,2;49:14,18;50:6
ex-husband's (1)
49:12
expect (1)
29:12
experience (2)
6:23;9:10
Explain (4)
14:24;72:7,12,18
explained (16)
18:21;19:22;26:4;
27:3,7;30:24;31:17,23;
49:10;60:17,21;61:16;
62:21;64:17;66:2;67:1
explaining (1)
61:13
extent (2)
13:21;57:4
exterior (1)
51:5
extreme (1)
26:5
ex-wife (3)
34:3,7;50:10

**F**

facts (5)
46:21;47:14,18;48:2;
71:9
Fair (2)
18:3;60:13
fall (1)
7:1
fallen (1)
58:8
falling (1)
85:15
family (2)
8:18;43:21
far (9)
20:23;43:17;45:20;
53:2;58:3,16;64:5;76:4;
82:2
faster (1)
72:5
Federal (2)
3:17,17
feel (2)
54:4,5
feet (7)
20:24;51:25;58:18,18;
64:7,9;71:17
fell (2)
70:11;85:18

felt (1)
14:20
female (1)
43:20
few (2)
51:25;64:7
field (6)
33:15,22;34:14,16,19,
25
file (2)
7:23,25
filed (6)
10:13;11:23;12:6,8;
18:4;80:20
fill (3)
15:17,23;29:22
filled (1)
16:1
find (1)
65:16
findings (1)
29:2
finish (1)
75:9
finished (2)
34:25;55:14
finishing (1)
8:3
fire (2)
5:2,5
firearm (3)
43:23;70:22;71:2
first (9)
3:6;32:5;52:3,9;53:14;
54:8;63:11;73:23;74:3
focused (1)
21:21
follow (3)
17:17;33:5;35:9
following (1)
56:15
follows (1)
3:7
follow-ups (1)
47:4
Force (16)
15:16,18,21,23,25;
16:4,5;17:1;18:5,25;
46:22;69:25;70:7,13;
71:7,22
forcefully (4)
76:22,24;79:25;80:2
forcing (1)
46:15
forearm (1)
19:6
forget (2)
15:14;24:3
forgot (1)
68:10
form (18)
12:16;15:21,24;16:1,
4;18:15;23:8;26:14;

29:18;33:16;39:4;40:11;
57:3;69:23;75:21;76:14;
79:12;85:1
formal (6)
10:13;11:23;13:11;
18:4;29:3;35:24
format (1)
73:7
forms (2)
15:16,18
forthcoming (3)
32:2,4;82:23
found (1)
37:23
Four (1)
64:9
free (4)
15:5;74:25;80:23,24
freedom (2)
66:17,17
freshman (1)
9:8
front (2)
22:2,4
Fruitport (8)
3:1;4:17,20;5:24;8:20,
22;29:5;78:25
Full (2)
8:5,22
further (2)
55:9;84:21

**G**

gain (1)
67:17
Garrity (4)
14:21,23,24;15:1
gave (2)
4:12;11:13
General (2)
7:13;50:25
gets (2)
45:2;75:6
given (2)
33:8;60:13
goes (2)
60:23;76:5
Good (2)
39:14;48:13
good-bye (1)
47:3
gotcha (1)
18:1
grab (7)
16:12;19:5,16;21:4;
24:23;61:11;79:25
grabbed (10)
18:25;19:5;20:8,21;
21:25;58:3;61:19;67:13,
15;76:25
grabbing (3)
21:19;65:23;80:3

grammatical (2)
75:9;76:5
grip (4)
19:14,19;24:24;58:7
growth (1)
84:16
guard (1)
6:24
guess (3)
7:25;20:19;30:4
gun (5)
27:4;47:2,5;49:22;
65:19
guy (1)
34:2
guys (1)
29:25

**H**

Hackley (7)
18:23;39:8,11;60:18;
61:2,17;64:14
hair (9)
30:2,3,8,10,13,14,16;
84:11,13
half (1)
5:9,23;73:13
hand (7)
20:9,13;21:3,4,17;
76:22;77:2
handcuff (1)
85:23
Handcuffed (5)
61:1,3;67:20,21;85:25
handcuffing (4)
16:16;17:1;57:22;77:2
handcuffs (13)
20:1,10;25:8,10;
61:11,16;66:22;67:22;
69:16,18,19,23;70:2
handle (5)
9:23;10:1,3;60:22;
64:18
handled (1)
61:14
hands (11)
19:25;20:3,6,11,12;
21:15,15;61:5;65:25;
66:4,22
hand's (1)
51:22
hand-to-hand (1)
9:9
happen (2)
69:7;82:3
happened (4)
11:13;14:8;15:2;60:11
happens (1)
82:3
hard (2)
24:23,24
harm (1)

46:24
harming (1)
44:11
head (7)
4:1;11:17;20:18;21:9;
23:1;84:9,15
health (2)
44:5,5
hear (3)
27:11,15;46:10
heard (2)
27:20;28:1
held (1)
4:6
hello (4)
52:4;53:19,21;62:12
help (7)
21:1;32:10;46:12;
52:16,19;55:20;69:2
hence (1)
71:6
hereto (1)
58:25
herself (7)
21:13,14;32:3;34:3;
83:3;85:19,20
hide (1)
81:1
high (1)
9:5
hips (1)
21:25
hit (9)
21:9,11;22:23;24:9,
11;75:10;76:10;81:20;
85:10
hitting (3)
22:20;81:25;82:1
Hodges (34)
27:4,7,10;28:5,8;
30:19;31:16;32:14,17;
33:24;34:6;35:3,18,22;
44:18;47:8,10;48:4,16,
24;49:6,9;50:9,12,18,24;
55:19;56:7;60:13;63:13;
64:10;81:3,12;82:20
Hodges' (1)
39:20
Hold (1)
71:24
home (28)
8:14;12:23;28:3;35:9,
23;38:10,16;39:16;40:1;
46:15,23;47:15,19;48:3;
51:2,3,4,9,19,21;52:23,
25;54:16;56:12;77:25;
78:4;82:10,17
honest (1)
81:6
hospital (10)
15:10;26:7;39:8,11;
77:16,18,22;78:7;83:13,
23

Leticia Rudoplh v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec –  Vol. !
October 2, 2017

hours (3)
  8:24;73:13,25
house (19)
  8:13,15;25:18,25;
  32:6;47:1,6,11;49:12;
  54:18;56:4,5,10,15;
  68:16,17,20,21;85:18
housing (1)
  8:12
huh-uh (1)
  4:2
Hunt (1)
  5:21
hurting (2)
  69:12,14
husband (8)
  32:6;36:10;44:24;
  55:2,6;63:3,12;82:22
hypothetical (4)
  45:24;70:15;71:8,25

**I**

idea (3)
  12:24;37:17;39:15
identification (1)
  58:25
ifs (2)
  72:1,1
immediately (4)
  16:17,22;53:17;75:8
important (1)
  44:20
improper (5)
  45:23;70:14,14;71:8,
  25
inches (1)
  54:6
incident (20)
  10:9,18;11:3;13:1,2,
  20;15:2,19;17:6,8,11,16;
  42:13;59:2,25;65:10;
  73:14,23,25;84:10
incidentally (1)
  85:22
inconsistencies (1)
  83:1
Incorrect (1)
  30:11
incriminating (1)
  15:7
in-depth (1)
  34:6
indicate (3)
  5:4;36:9;84:23
indicated (6)
  32:5,14,16;40:24;
  57:5;82:19
indicates (1)
  29:5
indicating (1)
  46:24
indication (4)

41:11,12;81:5;83:16
indications (2)
  48:20,24
information (12)
  13:16;17:22;27:7,9;
  28:5;32:8;40:8;47:7;
  48:4;60:12;81:4;82:21
informed (3)
  14:4;43:19;81:12
initial (2)
  82:9,10
initiated (1)
  27:4
injured (3)
  15:10,22;72:7
injuries (1)
  16:2
inputs (1)
  74:5
inquiries (1)
  7:22
inside (9)
  25:14;53:13;55:17;
  56:17;57:2,11;77:25;
  78:4;79:22
intent (1)
  46:24
interview (12)
  11:22,24;12:1;14:10,
  12;15:4;17:25;18:1,4;
  27:23;28:12;70:24
interviewed (8)
  11:20;12:25;14:17;
  28:15,22,25;29:15,17
interviewing (1)
  18:6
into (38)
  7:22;19:17;20:15;
  23:7;25:7,24;32:19,21,
  24;46:15,22;47:11,15,
  18;48:3,3;51:3,6,13;
  52:8,23,25;53:22;54:7,
  16;56:12;58:3;60:24;
  61:11,17;64:5,20;65:4,
  23;66:3,8;67:1,5
intoxicants (1)
  26:7
intoxicated (5)
  70:22;71:2;81:8;83:8;
  85:15
intoxication (4)
  26:4;70:21;82:23;83:5
investigate (4)
  78:22;79:6,11,22
investigated (1)
  79:18
investigating (1)
  18:12
investigation (8)
  13:5;17:7,17;29:5;
  34:24;52:8;78:25;79:3
invite (1)
  52:23

involuntarily (4)
  61:17;66:2;67:4,6
involve (1)
  4:12
involved (3)
  16:11;49:25;84:7
involves (1)
  16:5
issues (2)
  32:7;55:7
item (1)
  42:9

**J**

Jeff (1)
  5:13
job (1)
  8:16
jobs (1)
  8:2
jump (2)
  63:9;80:16
justice (1)
  7:12
justified (4)
  46:4,14;47:14;48:2

**K**

keep (4)
  14:10;22:20;71:5;72:6
Ken (9)
  5:5,7;10:9,14;11:3,24;
  12:3;13:1,4
kids (1)
  55:7
kill (1)
  83:3
Kind (1)
  23:14
kitchen (2)
  12:22;26:21
knew (2)
  12:1;13:4
knock (2)
  40:22;56:8
knocked (1)
  45:14
knocking (1)
  48:15
Knoll (2)
  6:22;8:3
K-n-o-l-l (1)
  6:22
knowledge (8)
  7:21,24;46:13;47:13;
  48:2,8,14;79:20
knows (1)
  68:6
Kyle (4)
  28:9;50:6;81:3,5
Kyle's (1)

81:10

**L**

lack (1)
  82:23
laid (1)
  36:22
language (1)
  52:10
last (3)
  3:11;77:24;78:3
later (5)
  17:13;38:11;39:2;
  73:16;75:19
laundry (2)
  6:15;56:17
law (4)
  6:21,23;45:1;69:22
layout (3)
  42:10;51:2,4
lead (1)
  81:5
lean (1)
  85:18
leaned (1)
  22:1
leaning (1)
  64:3
learned (2)
  38:2,5
least (1)
  22:15
leave (6)
  8:8;37:8;52:17;54:20;
  74:9;82:17
leaves (1)
  55:3
leaving (1)
  82:6
led (2)
  32:9;57:11
left (14)
  22:15;23:21;36:10;
  37:11;42:9;55:19;56:22,
  24;83:2;84:23,25;85:2,5,
  6
length (1)
  61:10
Leticia (14)
  10:10;17:20;18:23;
  31:8,11,14,15,18,23;
  35:15,19,22;60:15;77:3
level (2)
  70:21;82:23
lever (1)
  23:6
lieutenant (6)
  5:17,18;11:8;18:21;
  25:6;28:4
line (3)
  7:1;8:11;80:21
lines (1)

6:25
little (8)
  6:17;17:22;30:25;
  55:9;58:5,6;79:13;84:12
live (1)
  8:11
living (1)
  8:10
location (5)
  37:18;41:20;43:5,6;
  82:7
log (4)
  36:2;42:10,13;43:8
long (3)
  34:19;39:15;64:10
longer (1)
  6:21
look (3)
  36:12,19;39:25
looked (2)
  56:18;75:3
looking (4)
  4:24;18:2;83:20,25
looks (3)
  13:14;51:5;74:11
loss (1)
  6:24
lost (3)
  46:11,11;58:7
lot (1)
  72:1
loud (1)
  4:4
lowered (1)
  21:25

**M**

maintained (1)
  36:4
making (3)
  18:22;29:24;53:7
man (1)
  28:1
managing (1)
  34:23
manner (1)
  71:5
manufacturing (1)
  6:22
many (5)
  3:23;8:24;54:2;59:16;
  67:14
March (1)
  37:7
mark (1)
  37:13
marked (1)
  58:24
market (1)
  8:13
marking (2)
  36:16,18

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec -  Vol. !
October 2, 2017

martial (1)
9:9
matter (1)
79:11
matters (1)
18:12
may (9)
16:15,22;24:24;28:14;
49:25;50:25;57:17;
73:23;81:23
maybe (1)
12:21
mean (12)
23:4;32:4;42:18;44:7;
65:11;76:22,24;81:17,
23;84:12,14;85:2
means (1)
85:6
meant (1)
80:2
Mecosta (5)
6:3;8:4,6,7,8
medical (1)
15:10
members (1)
43:21
memorialize (3)
17:7;60:11;65:10
mental (4)
32:16;44:5;60:18;71:3
messages (7)
28:6;32:9,15;43:21;
46:24;48:20;82:21
Michelli (8)
5:11;11:4,5;12:1;
13:19;14:1,3,4
M-i-c-h-e-l-l-i (1)
11:6
Michigan (3)
3:1,16,16
middle (2)
3:10;20:9
miles (1)
8:11
military (1)
6:24
mind (1)
14:25
mine (2)
36:24;60:1
minute (2)
24:2;64:11
minutes (6)
38:1,4,11,15,17;73:11
misconduct (5)
78:22,25;79:4,17,22
Miss (5)
13:17;18:20;25:18;
26:13,24;28:3;29:24;
30:19;32:19;37:17;
38:10,16,18,21;39:9,16;
40:1,10,22;41:2,3,4;
42:25;44:15;45:19;46:7;

48:25;50:12,14,18;
51:16,19;57:23;58:4,8;
60:9,11;68:18,25;69:4,5,
9,18;70:6;79:25;80:5,8;
82:9;83:11;85:14,22
moment (2)
34:10;74:24
momentum (1)
22:17
Monday (2)
3:1;74:1
month (3)
5:23;8:25,25
more (11)
17:1,22;20:19;25:24;
30:3,25;42:15;51:14;
54:10;55:1;84:12
morning (1)
73:25
Morningstar (30)
11:9;12:13,14,24;
13:5;14:10,17;17:20;
18:19,21;19:21;24:4;
25:5,6;26:2,16,18,18;
27:22;28:4,11,16,23,25;
29:6,12;59:25;60:2;
80:19,25
Morris (2)
13:23;59:6
motion (1)
21:23
move (4)
66:18,18;67:11,14
moved (1)
53:24
movement (1)
67:12
much (6)
11:16;17:10;24:6;
35:17,21;40:4
Mudroom (4)
51:8;56:18;63:24;64:5
multiple (1)
25:9
Muskegon (4)
6:22;7:6,9,9
myself (7)
5:21;8:18;12:6;13:23;
41:15,24;59:5

**N**

name (7)
3:9;28:9;42:8;68:7,7;
76:2,18
narrative (6)
15:18,25;16:13;17:3;
68:4;81:24
nature (1)
50:17
near (3)
19:7;33:21;58:21
nearly (1)

27:14
necessarily (3)
65:11,14;79:23
necessary (1)
61:9
need (7)
14:20;31:1;46:12;
48:21;49:14;52:16;
65:16
needed (3)
52:19;65:14;83:22
needing (1)
55:20
negative (1)
7:22
New (7)
6:6,11,13,14,17,18;8:1
next (9)
6:12;35:14;41:13,15,
23;42:2;50:23;59:9;
85:13
night (1)
42:12
Nodded (2)
11:17;23:1
noncompliant (1)
18:24
Nope (3)
6:16;7:19;69:17
normal (1)
16:16
north (3)
57:15,17,18
northeast (1)
57:18
Notary (1)
3:6
notated (2)
36:2;41:13
notation (1)
42:24
noted (2)
44:2;68:4
notes (5)
14:10,12;18:6;29:3;
39:18
notice (1)
3:15
number (1)
59:17

**O**

object (1)
21:1
Objection (38)
9:11;10:16,19;12:16;
13:21;18:14;22:6;23:8;
24:19;25:1;26:14;28:17;
29:18;32:25;33:7,16;
39:4;40:11;45:23;47:17;
57:3;58:10;59:4;62:5,
19;64:16;66:10;70:14;
open (9)

71:8,25;72:10,14,20,23;
75:21;76:14;79:12;85:1
objections (1)
46:16
obstructing (1)
16:8
obtain (1)
7:10
Obviously (1)
11:8
occurred (7)
17:8;26:3;29:22;
34:11;59:3;73:14,25
Oceana (1)
6:11
October (1)
3:1
off (14)
15:4;21:13;22:15;
24:9,11;27:5;42:9;
43:23;57:7;58:6;63:9;
70:11;82:1;85:11
offer (1)
68:15
offering (1)
68:5
offers (1)
15:3
Office (2)
6:4;8:9
officer (39)
7:20;9:2;16:6;20:1,14;
21:18;25:16;27:4,7,10;
28:5,8;29:3;32:14;
35:18,22;39:25;40:1;
41:7,20;42:10,19,20,21;
43:4;48:4;49:6;68:6;
77:11;78:22,25;79:3,7,
10,18,22;81:3,12;82:20
officers (4)
30:15;32:8;70:25;76:6
officer's (1)
42:11
official (1)
29:2
Once (3)
3:24;13:14;75:4
one (23)
6:12;7:1;9:6;12:14;
14:20;20:12;25:24;
30:17;32:8;40:21;42:17,
19;43:4;51:14;54:1,10;
59:17,19;60:22;65:18;
67:16;74:23;81:19
one's (1)
46:24
only (12)
7:1;9:14;16:13;26:12;
27:12,19;35:25;55:6;
62:11;81:12;82:18;84:4
onto (2)
25:20;42:19

15:5;52:1;53:2,4,7;
56:11;74:9;80:23,24
opened (1)
52:3
opinion (3)
12:7;33:2;71:22
option (1)
64:20
oral (1)
7:22
order (2)
44:12;47:10
original (1)
18:24
others (2)
6:20;44:11
ourselves (1)
64:21
out (27)
4:4;9:23;10:2,3,5;
15:17,23;16:1;25:18,20;
32:1;36:22;37:24;40:9,
14,22;47:2;50:10;54:13;
57:11;58:8;63:12;65:19;
68:17,20;69:14,22
outside (11)
4:24,25;9:19;51:1,4,9;
53:15;55:22;79:10,18;
82:18
over (13)
5:10;18:4;28:1;32:6,
11;40:24;52:6;55:2;
57:16;62:14,24;63:3;
67:17
overheard (1)
59:24
overly (2)
32:2,4
own (5)
47:13,14;48:8;71:17;
77:13

**P**

pace (2)
71:21;72:5
page (2)
31:21;73:23
pair (1)
25:16
papers (1)
14:4
Pardon (1)
36:17
parried (2)
22:24,25
part (11)
8:1,1,4;14:13;21:11;
34:23;37:4;61:9;70:13;
76:20;79:7
parties (1)
83:1
partner (1)

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec -  Vol. !
October 2, 2017

21:4
passed (3)
    35:17,21;40:4
patches (1)
    5:4
patrol (3)
    9:3,4;25:13
patting (1)
    35:6
peak (1)
    8:13
People (1)
    83:8
pepper (1)
    16:6
perform (1)
    33:14
performing (1)
    34:20
period (1)
    68:20
person (4)
    15:22;16:12;44:8,11
personal (7)
    30:2;47:13,14;48:2,6,
    8,14
personally (1)
    29:17
personnel (2)
    7:23,25
persuade (1)
    61:21
phone (7)
    30:21,22;31:7;49:13,
    14;50:23;63:13
physical (2)
    16:6;44:5
physically (1)
    77:1
picture (1)
    57:1
pistol (6)
    27:18;32:1;55:3,10;
    63:4;82:20
place (1)
    77:1
placed (8)
    16:13;20:1;25:7,14;
    49:13;57:24;58:16;
    61:15
Plaintiff (1)
    3:5
planning (3)
    36:15,18,23
play (2)
    71:18;72:1
please (7)
    3:9;37:6;38:25;41:9;
    52:17;58:22;83:24
plus (1)
    82:22
pm (4)
    3:2;57:8,8;86:8

point (27)
    16:9,22;18:25;20:20;
    21:6;25:14;30:4,18;
    40:16;49:7;53:11;61:15,
    19,25;62:11,14,17;
    63:11,17;67:9;68:4;
    71:1;77:9;78:6;81:14;
    82:3,14
Police (24)
    4:19,20;5:1,4,6,24;6:1,
    6,7,24;7:20,23;9:2,19,
    21;13:16;15:18;16:13;
    65:5,9;68:6;79:1,7,18
policy (4)
    15:9,14;78:24;79:16
porch (7)
    25:20,22,23;51:11,12;
    70:12;71:5
possesses (1)
    18:11
possession (4)
    45:1;55:3;70:22;71:2
practice (1)
    79:21
preface (1)
    31:14
preliminary (2)
    26:8;81:10
premises (1)
    44:15
prepare (1)
    59:22
prepared (2)
    4:14;59:23
presence (2)
    59:10,20
present (5)
    10:24;13:3,23,25;59:5
presented (3)
    26:8;27:8;32:3
pretty (2)
    24:23,24
prevention (1)
    6:24
previously (2)
    55:6;56:16
Prior (1)
    6:2
privilege (2)
    10:20;59:4
probable (1)
    44:10
probably (3)
    16:1,24;30:4
problems (3)
    32:11;55:10;69:11
process (1)
    76:4
produced (1)
    3:5
programing (1)
    76:20
promoted (2)

5:14,22
proper (1)
    76:7
protection (1)
    15:3
protective (8)
    19:17;60:24;61:18;
    64:20;66:8;67:1,5;71:15
provide (2)
    15:1;17:10
provided (3)
    14:7;29:2;63:5
proximity (1)
    69:3
Public (5)
    3:6;4:17,24;13:13;
    79:5
pull (1)
    21:3
pulled (13)
    19:1,2,3,4,12,13,18,
    22;22:5,11;28:1;51:13;
    85:10
pulling (7)
    21:6,23,24;22:2,22;
    24:25;76:25
punishment (1)
    69:24
purpose (3)
    17:6,7;60:10
purposes (5)
    3:15;32:2;49:20,21;
    65:19
pursuant (1)
    3:14
push (8)
    16:18;20:15,17,17,18;
    23:12;54:13;79:25
pushed (11)
    17:24;19:22,25;20:3,
    5,5,7,21,23;22:19;23:15
pushing (2)
    20:16;80:3
put (15)
    21:15;25:8,15;61:5,
    11;65:4,16,25;66:4,21,
    22;67:24;68:17;77:8,14
putting (1)
    68:1

Q

quick (1)
    62:11
quotations (5)
    65:12,13,17,18,20
quote (1)
    67:10

R

radio (4)
    30:21;31:3;40:19,24

rank (1)
    32:18
reach (3)
    51:22,23,24
read (2)
    32:9;68:11
really (5)
    50:5;60:10;84:11,11,
    13
reason (4)
    5:1;21:3;49:18;60:5
recall (19)
    25:23;26:1;51:1,12,
    12,18;52:10;56:15;57:4;
    64:4;67:9;69:6;73:4;
    77:5,15,21,23;83:14;
    85:20
receipt (1)
    82:19
received (5)
    28:5;35:17;46:25;
    49:5,10
recent (2)
    69:22;70:22
recently (1)
    5:14
Recess (1)
    57:8
recollection (5)
    17:14;83:16,18,21;
    84:1
record (5)
    3:13;57:7,9;68:11;
    84:4
recording (2)
    18:9,11
records (2)
    36:7;38:10
red (2)
    37:13,13
redness (1)
    72:19
refer (1)
    43:1
reflect (1)
    3:13
refresh (4)
    17:13;83:18,20,25
refusal (3)
    25:7;65:23;67:12
refusals (2)
    25:13;64:22
refuse (1)
    61:20
refused (3)
    25:9;47:3;60:15
refusing (1)
    61:22;68:16;71:18
regarding (1)
    47:18
region (1)
    57:24
relayed (2)

28:11;82:22
relied (1)
    47:10
remember (10)
    43:16;51:2;52:11;
    54:22;56:17;69:7,8;
    78:17;80:21
repeat (6)
    35:20;47:24;48:22;
    75:15;79:14;83:24
repeated (2)
    18:22;65:2
reply (2)
    47:3;50:15
report (42)
    13:16;16:14,19;17:4,
    7,16,17;29:10;39:22,24;
    41:14;42:4,7,8;65:5,9,
    14,16;73:2,3,6,13,22,24;
    74:15,21;75:22;76:4,10,
    11,12,15,21;79:24,24;
    81:21;83:15,15,18,20,
    25;85:14
reports (5)
    15:16;42:17,21;74:24;
    84:24
representative (1)
    14:15
reprimands (1)
    7:20
request (6)
    18:24;35:24;68:13,15;
    83:22;84:2
requested (2)
    43:25;46:25
requesting (1)
    7:24
requests (1)
    65:2
required (1)
    8:10
requirement (1)
    8:10
residence (1)
    35:15
resistance (2)
    21:7;77:1
resisted (2)
    17:20,23
resisting (2)
    16:8,18
respect (5)
    15:9,14;35:6;68:13;
    78:24
respective (1)
    81:20
respond (4)
    35:24;43:25;47:1;78:5
responded (3)
    27:3;47:4;77:9
restricted (2)
    66:17,18
results (2)

Leticia Rudoplh v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec -  Vol. !
October 2, 2017

26:9;81:11
**retire (1)**
  5:8
**retired (1)**
  5:7
**retrieved (1)**
  25:16
**review (8)**
  73:22,23;75:9,11;
  76:4,6,8;80:7
**reviewed (5)**
  73:16,18;74:3;75:14;
  76:3
**reviewing (3)**
  28:6;39:18;40:6
**reviews (2)**
  74:14;76:4
**reword (1)**
  12:21
**ride (1)**
  86:2
**right (75)**
  9:23;10:7;11:16;12:7,
  9,11;13:6,15,15;16:23;
  17:4;19:4;20:7;21:5,16,
  25;22:4;23:16,17;24:14;
  27:23;31:18,22;34:4,9;
  36:12;38:19;39:3;42:5,
  15,18;43:2,10;45:19;
  47:11;48:17,21;50:19;
  53:17,20;54:25;55:8,20;
  56:12,22;57:6,18,25;
  58:5;61:1,12,19;62:2,9,
  12,15;64:24;65:5,7;66:9,
  9;67:18;69:25;76:3,13;
  78:11,18;80:18;81:2;
  82:14;84:6,6,25;85:6,9
**right-hand (1)**
  23:19
**rights (4)**
  15:1;29:25;70:4;76:9
**Road (7)**
  9:3,4,23;10:4,5;35:16;
  42:14
**room (3)**
  53:13;56:18;63:25
**roughly (2)**
  43:10;73:21
**route (5)**
  41:24;43:5,6,9;44:2
**Rudolph (38)**
  10:10;13:17;17:20;
  25:18;26:13;29:24;
  30:19;32:11,19;37:17;
  39:16;45:19;46:7;48:25;
  50:12,14,18;51:16,19;
  57:23;58:4;60:9,11,15;
  68:18,25;69:4,5,9,18;
  70:6;79:25;80:5,8;82:9;
  83:11;85:14,22
**Rudolph's (20)**
  18:20;26:24;28:3;
  35:15,19,23;38:10,16,

19,21;39:9;40:1,10,22;
41:2,3,4;42:25;44:15;
58:8
**Rules (1)**
  3:16,16,17,17
**Rypsytra (10)**
  5:20;73:16,19,20,20;
  75:3,13,19,21;80:2
**Rypsytra's (1)**
  76:18

## S

**safely (1)**
  21:8
**Safety (12)**
  4:18,25;6:3;7:1;13:13;
  27:16,19;28:2;49:20,21,
  22;79:5
**same (14)**
  8:2;17:17;31:21;
  32:18;41:24;43:10,10;
  46:16;58:5;59:4,22;
  66:9,15;72:23
**saw (4)**
  4:24;26:9;34:18;40:12
**saying (7)**
  15:6;26:16;46:10;
  47:2;53:21;77:20;83:14
**scene (31)**
  26:13;27:8;30:15,18;
  33:14,17,19;35:11;36:1,
  9,10;37:2,16,18,25;39:7;
  40:15,17;41:15;42:3;
  43:14;44:16;45:7,10;
  49:19;76:7;84:25;85:2,
  5,5,8
**school (1)**
  9:5
**Scottville (1)**
  7:9
**seat (1)**
  86:3
**second (5)**
  3:12;5:12;56:14;
  63:22;64:6
**secondhand (1)**
  47:8
**seconds (2)**
  41:22;42:3
**security (1)**
  6:24
**self (1)**
  46:24
**sell (1)**
  8:15
**selling (1)**
  8:14
**send (2)**
  82:1;85:10
**sent (2)**
  47:2;75:10
**Sergeant (4)**

5:20,20,22;73:20
**sergeants (2)**
  5:16,19
**served (1)**
  14:4
**server (1)**
  75:10
**service (1)**
  5:2
**set (1)**
  76:10
**several (3)**
  25:13;61:20;84:16
**shake (1)**
  4:1
**shaved (2)**
  84:9,14
**Shelby (7)**
  6:6,9,10,11,12,18;8:1
**sheriff (1)**
  8:10
**Sheriff's (1)**
  6:4
**shoes (10)**
  25:8,15;67:24;68:1,
  13,14,15,17;77:7,8,10,
  11,12;78:10,11,14,15,17
**Shore (3)**
  7:6,9,15
**short (6)**
  30:5,8;34:10;84:11,
  11,13
**shoulder (5)**
  5:4;20:5,17,19;22:15
**shoulders (1)**
  4:1
**shove (1)**
  16:19
**show (2)**
  48:25;73:5
**showed (2)**
  29:10;33:21
**showing (1)**
  74:21
**shows (1)**
  42:10
**shrug (1)**
  4:1
**side (2)**
  23:19;51:21
**sign (1)**
  58:22
**signifies (1)**
  73:7
**signs (2)**
  26:4;83:5
**sitting (3)**
  12:22;26:20;40:18
**situation (1)**
  50:1
**six (1)**
  54:6
**slip-ons (1)**

25:16
**slurred (1)**
  26:5
**small (2)**
  6:18,19
**smell (1)**
  54:5
**smelled (1)**
  26:7
**sobriety (6)**
  33:15,22;34:14,16,19,
  25
**social (4)**
  60:18,23;64:19;65:3
**SOGs (1)**
  15:12
**somehow (1)**
  74:8
**someone (7)**
  15:9;16:8,18;70:2;
  71:16;79:9,22
**someone's (3)**
  21:2;44:5;66:17
**sometime (1)**
  38:1
**Somewhat (2)**
  80:22;84:17
**son (2)**
  46:25
**soon (2)**
  44:2;74:24
**sorry (6)**
  6:8;10:1;18:1;26:18;
  38:19;55:13
**south (1)**
  51:21
**speak (12)**
  4:4;10:9,12,14;11:2;
  12:3,4;50:6;59:2;60:18;
  77:18,22
**speaking (5)**
  29:3;31:11,15,18;
  53:14
**Specific (6)**
  11:16;17:10,22;42:13;
  52:10;73:4
**specifically (2)**
  55:1;65:8
**specifics (2)**
  52:11;54:22
**speculating (1)**
  35:25
**speculation (2)**
  29:18;72:10
**speech (1)**
  26:5
**spelled (1)**
  11:6
**spent (1)**
  36:1
**spoke (16)**
  11:11;12:15,15,25;
  29:6,9,11;31:14;35:3;

41:11;50:12,14,19;59:8,
9,11
**spoken (1)**
  33:24
**spray (1)**
  16:6
**squad (1)**
  86:2
**squatted (1)**
  22:5
**stabilize (2)**
  85:19,20
**staff (1)**
  26:7
**stairs (1)**
  51:10
**stamp (3)**
  36:5;74:22;76:9
**stamped (1)**
  74:8
**stamps (1)**
  81:16
**Standing (6)**
  50:23;51:22;53:12;
  58:19,21;63:22
**start (2)**
  12:3;74:10
**started (4)**
  49:4;52:7;64:13;75:2
**state (1)**
  3:9
**stated (4)**
  32:1;33:2;55:6;56:16
**statement (1)**
  82:18
**statements (4)**
  32:9;70:23,24;83:1
**status (2)**
  76:10;81:22
**stayed (3)**
  56:4,5;81:23
**step (6)**
  22:17;25:24;54:1,10;
  70:12;71:5
**stepped (7)**
  51:6;53:1,23;54:1,2,
  16;56:24
**steps (2)**
  51:12;54:2
**still (10)**
  6:2;20:20;26:18;
  40:18;44:10;59:10;
  63:24;77:1;84:17;85:23
**stint (1)**
  6:21
**stop (13)**
  27:3;33:17,19;35:25;
  36:1;37:9,11,19;38:16;
  44:3;81:2;82:20;85:8
**stopped (2)**
  35:12;53:4,6
**storm (2)**
  46:8;51:16

Case 1:17-cv-00125-JTN-ESC   ECF No. 55-5 filed 04/19/18   PageID.947   Page 32 of 33

Leticia Rudoplh v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec -  Vol. !
October 2, 2017

story (2)
    32:10;55:10
straight (1)
    46:2
Strike (4)
    15:15;39:25;65:15;
    78:1
studies (1)
    7:13
stuff (2)
    29:24;63:12
subject (1)
    26:5
submission (2)
    73:10;74:23
submit (5)
    75:8,10,16;76:13,19
submitted (8)
    60:1;74:16,18,20;
    75:4,4,7,13
subsequent (1)
    47:3
subtracted (1)
    75:2
suicidal (10)
    32:9;37:17;48:19,21,
    23;52:13;53:15;54:24;
    62:22;82:14
suicide (1)
    43:20
suit (1)
    14:5
summarized (1)
    24:8
Sunday (1)
    74:1
superior (1)
    32:17
superiors (3)
    16:15,20,25
supervisor (5)
    32:17;68:8;73:18;
    74:10,14
supervisors (1)
    76:8
supplement (9)
    17:16;59:22,23,25;
    60:3,6,8,10;65:6
supplemental (5)
    17:16;68:4;73:3;74:5,
    21
supposed (3)
    15:23;16:4,14
sure (8)
    21:7;37:15;56:5,6;
    59:18;74:1;75:23;78:13
Suspended (1)
    7:18
swollen (1)
    72:18
sworn (1)
    3:6
swung (1)

23:14
system (1)
    74:8

—————
T

table (2)
    12:23;26:21
tail (1)
    34:2
talk (10)
    12:22;13:19;14:3;
    26:23;30:23;32:11;46:9;
    55:2;64:19;65:2
talked (6)
    13:1,25;28:4;32:6;
    47:4;55:4
talking (10)
    6:15;26:17,20;33:17;
    34:3;53:11;54:8;55:6;
    56:7;82:11
talks (1)
    60:23
taser (1)
    16:5
techniques (1)
    16:3
telephone (1)
    50:7
telling (3)
    13:8;39:12;75:17
tells (4)
    45:4;46:11;48:24;49:1
term (1)
    16:22
terminated (1)
    7:16
terms (1)
    84:13
test (3)
    26:8;81:10,11
testified (1)
    3:7
testify (2)
    4:14;17:13
testimony (1)
    37:16
testing (1)
    33:22
tests (5)
    33:15;34:14,16,19;
    35:1
Thanks (2)
    38:7;86:7
Thomas (1)
    3:11
T-h-o-m-a-s (1)
    3:11
thorough (2)
    29:13;30:25
though (2)
    29:19;66:7
thought (4)

6:14,14;50:5;65:9
three (6)
    5:16;38:12;42:18,22;
    58:18;73:21
throughout (2)
    42:11;70:23
ticket (3)
    36:6;81:21;85:11
tight (5)
    69:16,19,23;70:2;
    84:15
times (7)
    3:23;25:9;59:16,17,
    19;67:14;74:5
today (1)
    84:9
together (1)
    10:24
told (18)
    13:14;19:18;24:4;
    25:6;26:10;27:22,25;
    41:6;43:12,16;47:7,10;
    48:19;50:9;61:15;66:6;
    67:11;69:18
tonight (1)
    52:7
took (5)
    5:10;34:19;38:15;
    52:6;73:21
tools (3)
    16:3,9,11
top (1)
    73:5
topic (2)
    49:7,9
Totality (1)
    44:13
totally (1)
    39:7
towards (7)
    22:3,11,12,22;54:15,
    16;57:17
town (1)
    6:17
Township (3)
    4:19,20;68:8
traffic (13)
    4:13;27:3;33:17,19;
    35:25;36:1;37:8,11;
    38:16;44:3;81:2;82:20;
    85:8
training (4)
    9:14,16,20,21
TRAINOR (70)
    3:9,13,19;9:15;10:3,6,
    17,21;11:1,10;12:17,19;
    13:24;18:16;22:8;23:13;
    24:20;25:2;26:17,19;
    28:21;29:21;31:5;33:4,
    12,19,23;36:14,17,19,
    22;37:1;39:6,19,23;
    40:13;46:1,18;47:20;
    48:1;55:16;57:6,9,10;

58:15;59:1,7;62:7,23;
    63:21;64:23;66:16;
    68:12,23,24;70:17;
    71:11;72:3,11,17,21;
    73:1;76:1,17;79:15;
    80:10,12;84:22;85:4;
    86:7
transpired (1)
    82:24
transport (5)
    38:22,23;39:2,5;64:21
transported (3)
    18:23;61:2;78:6
treatment (1)
    15:11
trouble (1)
    69:9
true (4)
    17:1;47:16;85:16,17
truthful (1)
    81:6
trying (3)
    12:22;39:16;71:20
turn (2)
    65:25;66:4
turned (2)
    22:19,24;23:5
turns (1)
    65:23
twisted (1)
    70:12
two (18)
    4:13;16:23;27:9;
    32:12;38:11,15,17;42:3;
    45:14;58:18;59:17,18;
    60:22;64:11;71:17;
    73:16,21;81:19
two-year (1)
    7:11
type (1)
    6:23
typed (2)
    75:6;81:24
types (1)
    65:4
typing (3)
    73:9;74:24;75:9

—————
U

UD-10 (1)
    4:14
under (4)
    66:5,6,20,21
undergo (1)
    75:16
Understood (2)
    4:11;59:13
unhandcuffed (1)
    86:5
union (3)
    14:13,15;79:2
unit (1)

85:10
unknown (2)
    18:10;50:17
unsure (1)
    57:15
unusual (1)
    69:24
up (30)
    8:3;12:5;13:17;20:9,
    16;21:15;22:23;25:24;
    29:24;30:24;33:21;
    35:18,22;45:14;50:10;
    54:17;56:20;57:22;62:4,
    8,18;63:17;71:5;72:6,12,
    18;74:14;79:13;82:12;
    84:16
upon (8)
    13:7;17:13;18:21;
    31:11;38:10;46:13;
    47:10;74:20
upper (2)
    19:7;24:17
use (20)
    4:1;15:16,18,21,23,25;
    16:4,4,5;17:1;20:25;
    21:1;23:6;67:7,8;70:7,
    13;71:6,22;76:23
used (6)
    3:15;16:3;18:5,25;
    23:12;67:6
uses (1)
    18:12
using (3)
    16:9;36:23;85:20

—————
V

Vaguely (1)
    56:19
variances (1)
    82:2
Varies (1)
    8:25
vehicle (8)
    25:14;27:10;28:6;
    31:8;40:9,14,18,22
verify (2)
    15:12;49:17
vestibule (6)
    51:6;53:13;56:17;
    57:2,12;63:24
violated (1)
    29:25
violation (1)
    70:4
visual (1)
    84:5
voluntarily (5)
    25:7;60:23;64:13,19;
    65:3

—————
W

Leticia Rudolph v.
Daniel Babinec, Robert Atkinson, Twp. of Fruitport

Daniel Babinec

Daniel Babinec - Vol. !
October 2, 2017

**Wait (2)**
12:16;55:13
**waiting (2)**
45:12;50:22
**walk (6)**
25:18;53:7;56:12;
71:17,19,20
**walked (16)**
20:16;25:13;39:15;
53:17,19;54:8,15;55:22;
56:11,14,23;68:18,25;
71:23;72:5;78:8
**walking (4)**
69:9,11;71:20;77:3
**wall (32)**
19:23;20:7,15,23,25;
21:1,9,11,13,19;22:14,
18,19,22,23;23:7,12;
24:10,11,13;53:5,6;
56:20;57:15,16,18,22;
58:6,17;67:18,21;85:19
**warnings (1)**
14:21
**way (13)**
12:14;40:21;46:9,15,
22;53:3,4;54:13;58:5;
74:14;77:18;78:1,19
**ways (3)**
60:22;61:14;64:18
**weapon (1)**
44:23
**weapons (2)**
44:15;50:4
**week (2)**
74:4;84:16
**weekend (1)**
74:3
**welcome (1)**
38:8
**well-being (8)**
32:16;43:25;44:4;
49:17;52:8;60:19;71:3;
82:19
**weren't (2)**
53:15;84:24
**West (3)**
7:6,9,15
**what's (8)**
17:6;27:13;41:13;
42:7;44:4;50:21;52:3,9
**Whelan (1)**
5:13
**W-h-e-l-a-n (1)**
5:13
**Whitehall (4)**
6:1;8:7,19,24
**whole (1)**
50:21
**wife (1)**
33:24
**windows (2)**
45:15;48:15
**within (9)**

8:11;16:23;51:22;
54:3,6;58:16;73:13;
74:3;79:2
**without (7)**
15:6;18:25;39:18;
40:6;47:15,19;53:7
**witness (31)**
3:5,10;9:14;11:8;
23:11;26:9;28:18,20;
29:20;31:3;33:2,11,21;
37:14;38:14;39:1;41:10;
47:24;55:15;58:14,23;
62:21;63:20;64:17;
66:13;68:22;72:16,24;
75:25;76:16;79:13
**witnesses (1)**
70:25
**word (6)**
43:17,17;66:24,24;
76:24;82:16
**word-for-word (1)**
65:12
**words (8)**
15:5;67:6,7,8;74:13;
77:24;82:25;83:2
**work (1)**
8:19
**worked (6)**
6:1,2,3,6;8:2;74:1
**worker (4)**
60:18,23;64:19;65:3
**worry (1)**
80:23
**worrying (1)**
15:6
**worth (1)**
84:16
**wrestle (1)**
9:5
**wrestling (2)**
9:10,12
**wrist (5)**
19:5;20:8,21,22;21:21
**wrists (2)**
72:18,19
**write (1)**
38:12
**writing (2)**
84:5,24
**written (4)**
10:13;48:10;73:6,12
**wrote (1)**
13:17

## Y

**year (4)**
5:9;9:6,7,8
**yell (1)**
78:8
**yelled (1)**
69:14
**yelling (2)**

77:7;78:19
**Yep (3)**
6:11;34:5;41:7
**youu (1)**
73:12

## Z

**ZDARSKY (60)**
9:11;10:1,5,16,19,22;
11:7;12:16,18;13:21;
18:14;22:6;23:8;24:19;
25:1;26:14;28:17,19;
29:18;31:1;32:25;33:7,
16;36:13,15,18,21,23;
39:4,21;40:11;45:23;
46:16;47:17,22;55:13;
57:3,7;58:10;59:4;62:5,
19;63:19;64:16;66:10;
68:19;70:14;71:8,24;
72:10,14,20,23;75:21;
76:14;79:12;80:11,15;
84:19;85:1
**zero (3)**
81:14,14,14